1  John H. Reaves, Esq. (State Bar No. 111978)
   LAW OFFICES OF JOHN H. REAVES, APC
2  2488 Historic Decatur Road, Suite 200
   San Diego, California  92106
3  Telephone:  (619) 525-0035
   Facsimile:  (619) 525-0077
4  john@lawreaves.com

5  Timothy D. Lucas, ESQ. (SBN. 82374)
   A. Kerry Stack, Esq. (SBN 128807)
6  THOMAS|LUCAS
   9191 Towne Center Drive, Suite 190
7  San Diego, California 92122
   Telephone:  (858) 545-0700
8  Facsimile:  (858) 535-0701
   tlucas@thomaslucaslegal.com
9  kstack@thomaslucaslegal.com

10  Attorneys for Defendant Hollandia Dairy, Inc.

11

12              **UNITED STATES DISTRICT COURT**

13           **SOUTHERN DISTRICT OF CALIFORNIA**

14

15  CITIZENS DEVELOPMENT              | CASE NO. 12-CV-0334-GPC (KSC)
    CORPORATION, INC., a California   |
16  corporation,                      | **DECLARATION OF JOHN H.**
                                       | **REAVES IN SUPPORT OF**
17                        Plaintiff,  | **HOLLANDIA DAIRY, INC.'S**
                                       | **MOTION FOR JUDGMENT ON**
18  v.                                | **THE PLEADINGS**

19  COUNTY OF SAN DIEGO, a California |
    municipal corporation; CITY OF SAN | HEARING: APRIL 21, 2017
20  MARCOS, a California municipal     | COURTROOM THREE
    corporation; CITY OF ESCONDIDO, a  | HON. GONZALO CURIEL
21  California municipal corporation;  |
    VALLECITOS WATER DISTRICT, a       |
22  California municipal corporation;  |
    HOLLANDIA DAIRY, a California      |
23  corporation; and DOES 1 through 100,|
    inclusive                          |
24                                     |
                         Defendants.   |
25  _____|

26  AND RELATED ACTIONS

27

28

DECLARATION OF JOHN H. REAVES

I, John H. Reaves, declare as follows:

1.      I am an attorney duly licensed to practice before the courts in California and before this District Court. I am counsel for Defendant Hollandia Dairy, Inc. (Hollandia) in the above action. I have personal knowledge of the facts set forth in this declaration and if called as a witness could testify competently to thereto. A true and correct copy of each exhibit and/or relevant excerpts has been attached separately due to size. My comments regarding the various submissions and communications with the RWQCB, and other matters for which judicial notice is sought, reflect information found within such materials, which I have attached and underlined in relevant parts in the exhibits.

2.      Plaintiff, Citizens Development Corp. (CDC), originally sued the County of San Diego (County), City of San Marcos (San Marcos), City of Escondido (Escondido), Vallecitos Water District (VWD) (collectively, the Public Agency Defendants or PADs), and Hollandia on February 8, 2012. Docket (Dkt)# 1. Hollandia filed its First Amended Cross-claims and Counter-claims for contribution and related state claims against all parties on May 4, 2012. (Dkt# 21.) All defendants, except the County (Dkt # 39, filed 5-22-12), filed similar cross and counterclaims against Hollandia. CDC alleged in its First Amended Complaint (FAC) (Dkt#68, filed 10-11-12) that it incurred necessary response costs under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) (42 U.S.C. 9601, *et seq.*) due to responding to the Regional Water Quality Control Board's (RWQCB) Investigative Order R9-2011-0033 (IO) issued on September 14, 2011. The IO and all subsequent reference to documents submitted to the RWQCB can be found on the internet at http://geotracker.waterboards.ca.gov/ All such matters are identified in the database under CIWQS ID: 529040 and Geotracker Site ID: T10000003261 (hereafter, "Geotracker") and are found either under the tab "Regulatory Activities" or "Site Maps/Documents." The IO is under Regulatory Activities, 9/14/11. CDC incorporated

the IO as Exhibit I to its original Complaint. (Dkt# 1) CDC also made state law claims for continuing nuisance and trespass, negligence, and various indemnity-style claims in its Complaint and FAC.

3.    The following is a non-exhaustive illustration of major conclusory allegations by CDC directed to all defendants, including Hollandia (note that they are used frequently throughout the FAC, but just one or two references are made here):

- Each of the defendants "released and/or disposed of" "hazardous substances or wastes," which has caused "contamination and pollution." (FAC, para. 11.)

- The discharges have caused a condition of "pollution and nuisance" in the lake. (FAC, para. 12.)

- Defendants "caused contamination and pollution … at and in the vicinity of the Lake through the negligent, improper, or unreasonable transport, generation, handling, usage, storage, disposal, or release of hazardous substances and hazardous wastes." (FAC, para. 16.)

- Defendants were acting as "partners, joint venturers, agents, employees, fiduciaries, servants and successors" and were the "agent, employee, representative, and/or co-partner of each of the other Defendants." (FAC, para. 27, 28.)

- "[B]eginning in the 1960s through the present, Defendants owned and/or operated Defendants' Sites or other sites upon which Hazardous Substances were Released. The Hazardous Substances included, but are not limited to, nitrogen, phosphorus, and nutrients found in fertilizers, pesticides, and sewage." (FAC, para. 43.)

- "Defendants' tortious and unlawful actions and omissions constitute an unreasonable use of the Defendants' Sites and surrounding properties" (FAC, para. 67), which have caused a "continuing nuisance" (FAC, para. 68) and "continuing unauthorized trespass." (FAC, para. 77.)

- "Defendants … acted intentionally in undertaking the conduct that caused the trespass." (FAC, para. 78.)
- "Plaintiff's statutory liability as a property owner for the costs of environmental assessment, clean-up, and remediation is solely the result of Defendants' negligent, careless, wrongful, and unlawful conduct in the course of their normal business activities." (FAC, para. 85.)

CDC made no specific allegations about Hollandia and its operations.

4.    San Marcos alleges in its Counterclaims against Hollandia that it has incurred CERCLA response costs "related to Hazardous Substances …  which may be present at the Lake area…" and that "actions of Hollandia have resulted in releases or threatened releases of Hazardous Substances… ." (Para. 8, 9.)[1] In its counterclaim for negligence, it alleges "Hollandia has violated its duty of care to the City by failing to control, monitor, or maintain facilities it owns or operates or formerly owned or operated in the Creek watershed in a proper and legal manner thereby resulting in the release, disposal, discharge, collection, and exacerbation of contamination in and at the Lake area and Creek watershed." (Para. 18.) San Marcos made no specific allegations about Hollandia and its operations.

5.    VWD alleges in its Crossclaims against Hollandia that Hollandia's "acts or omissions have caused, increased, worsened, or prolonged the alleged condition of nuisance, contamination, pollution, or any other alleged negative condition of Lake San Marcos, Lake San Marcos Creek, or any other property owned by or damages claimed by CDC." (Para. 4.)[2] VWD made no specific allegations about Hollandia and its operations.

---

[1]  San Marcos's Counterclaims against Hollandia (Dkt# 44, filed 6-11-12): 1) CERCLA cost recovery and contribution; 2) CERCLA declaratory relief; 3) Negligence 4) Declaratory relief under state law; 5) Equitable indemnity.

[2]  VWD's Crossclaims against Hollandia (Dkt# 35, filed 5-5-12): 1) CERCLA contribution; 2) Indemnity, offset, and contribution.

6.    Escondido alleges in its Counterclaims against Hollandia that "Lake San Marcos … and the Creek have been listed as 'impaired' water bodies by the (RWQCB).[3] They appear on the (RWQCB) CWA Section 305(b) Surface Water Quality Assessment and the Section 3030(d) List of Water Quality Segments 2008 Integrated Report." (Para. 11.) Escondido further alleges, "The Creek is 'impaired' because the levels of phosphorus, DDE, toxicity, sediment toxicity, and selenium exceed water quality objective. (Ammonia as nitrogen, phosphorus, nutrients, DDE, toxicity, sediment toxicity, and selenium are hereinafter collectively referred to as the 'Contaminants.')" (Para. 12.) Escondido alleges it "entered into a Cooperation Agreement with local political subdivisions of the State of California and other organizations as members of the Lake San Marcos Working Group in response to threatened regulatory proceedings by the (RWQCB)." (Para. 14.) "Under the Cooperation Agreement, (Escondido) is obligated to, and has, contributed payments to the response costs authorized by the Lake San Marcos Working Group. Such costs include legal, technical, administrative and other costs reasonably necessary to respond to the Contaminants." (Para. 15.) Escondido then alleges that "All or some of the Contaminants constitute substances specifically listed or having characteristics designating them as 'hazardous substances' within the meaning of CERCLA …, including those listed by the Environmental Protection Agency … ." (Para. 24.) Finally, Escondido alleges, "As a proximate cause of (Hollandia's) release or threatened release of the hazardous substances into the Lake and/or the Creek, (Escondido) has had to incur necessary response costs, including costs to assess and investigate the nature and extent of the contamination." (Para. 28.) Escondido alleges that "hazardous substances" under the state equivalent to CERCLA, the California Superfund Act, were released by Hollandia. (Para. 40.) Finally, in its claim for

---

[3]  Escondido's Counterclaims against Hollandia (Dkt# 38, filed 5-22-12): 1) CERCLA contribution; 2) CERCLA declaratory relief; 3) Carpenter Presley (state Superfund); 4) Declaratory relief under state law; 5) Contribution under state law; 6) Negligence; 7) Equitable indemnity; 8) Unjust enrichment.

1  negligence, it alleges Hollandia "failed to exercise due care by releasing, threatening

2  the release of, or allowing the release of the Contaminants into the Lake and/or the

3  Creek… ." (Para. 53.) Escondido made no specific allegations about Hollandia and its

4  operations.

5         7.     The gist of CDC's FAC is that it owns a lake that has had a problem with

6  excessive nutrients from the watershed resulting in eutrophication of the lake.[4]

7  Further, the RWQCB issued the IO to CDC in 2011, which it attached as Exhibit 1

8  (FAC, para. 4). CDC alleges it has incurred response costs under CERCLA as a result.

9  (FAC, para. 1, 13, 51, 58, 61, 84.) At FAC, para. 12, CDC alleges pollution and

10  nuisance in the lake and identifies "nitrogen, phosphorus, and nutrients which fuel the

11  growth of algae and reduce oxygen levels within the Lake." "Pursuant to the Order,

12  the Regional Board has directed the Plaintiff to investigate the cause(s) and extent of

13  nutrient impairment in the Lake, and to report its findings to the Regional Board.

14  Consequently, the Plaintiff has incurred and will continue to incur costs of

15  investigating, monitoring, reporting, and potentially remediating the contamination at

16  issue." (FAC, para. 13.) CDC also alleges, "According to the Regional Board, the

17  Lake receives discharges from urban and suburban areas, private golf courses,

18  agricultural land uses, and open space. Such discharges come from a wide array of

19  sources including: (a) improper waste disposal; (b) poor and/or unmanaged

20  landscaping practices from commercial, recreational, and residential sites; (c) sanitary

21  sewer overflows; (d) septic system failures; (e) groundwater infiltration; (f) the

22  presence and operation of the dam; and (g) other non-point source discharges during

23  storm events and dry weather conditions." (FAC, para. 6.) CDC also vaguely alleges

24  the "pollutants" are not limited to those alleged nutrients, but the IO specifies the

25

26

27

28
   [4]  Claims filed against Hollandia by <u>CDC</u> (Dkt# 68): 1) CERCLA; 2) Declaratory Relief under CERCLA; 3) Continuing Nuisance; 4) Continuing Trespass; 5) Equitable Indemnity; 6) Declaratory Relief under state law.

nutrients that are the basis for the IO, and they mirror the few specific allegations of CDC in FAC, para. 12.

8.     The central issue alleged by CDC in its FAC is its response to the IO. Therefore, the IO, and all the submissions, sworn to by CDC and the other parties in response to the IO, are incorporated by law into the complaint. Those submissions include the Remedial Investigation/Feasibility Study (RI/FS) and all of the supporting information and investigatory reports included as appendices. The authenticity of these submissions by CDC and the parties are not an issue. These parties submitted the Final RI/FS to the RWQCB on 10/11/16. It can be found on Geotracker under "Regulatory Activities," "Feasibility Study Report," and then "09 30 Revised DBS&A LSM RI-FS Report." The cover page states the RI/FS was prepared for CDC and the PADs. (Exhibit 1-1; RJN No. 1.)

9.     The RI/FS and supporting materials provide the site background. A predecessor owner built a dam that became Lake San Marcos in 1946 "for an agricultural water supply" and obtained a license from the state to impound water from the creek to irrigate crops. CDC enlarged the current dam in 1962 and then developed the a resort community. (RI/FS, page 1; exhibit 1-4; RJN No. 1, A) CDC owns 252 acres of land in San Marcos including the 56-acre Lake, which holds 437 acre feet of water. (IO, page 8, section 28; exhibit 57-7; RI/FS, page 1; exhibit 1-4; RJN No. 1, A) CDC was reissued the state license in 1965 to impound a maximum of 480 acre-feet of water from the creek for irrigation. (IO, Attachment A; exhibit 57; RI/FS, page 1-2; exhibit 1-4 – 1-5; RJN No. 1, A) Hollandia removed the last of its cattle from its property in 2003. (RI/FS, page 75; exhibit 1-20; RJN No. 1, Q.)

10.    May 9, 2001, the Lake San Marcos Community Association asked the RWQCB to have "Lake San Marcos listed as an impaired water body under the 303(d) list. … [T]he evidence … demonstrates the high degree of contamination of  our Lake … ." "During the summer months, the Lake is eutrophic – it is rich in organic materials but deficient in oxygen." "We had fish kills in the Lake last summer … ."

1   (RI/FS, App. D ("303D Listing Info") pages 42-43 of 46; exhibit 2-2.) Designation of

2   impaired waters occurs under the Clean Water Act. (RJN No. 1, B; RJN No. 2) 33

3   U.S.C. § 1251 *et seq*. requires the EPA to designate impaired bodies of water and then

4   develop "Total Maximum Daily Loads" (TMDLs) to address them. 40 C.F.R. Part

5   130.7 require states to identify waters that require TMDLs. The RWQCB has been

6   delegated the task to do this and issued the IO, in part, based on authority under the

7   CWA. (IO, page 1, Item 1; page 3, Items 8-9; exhibit 57.)

8   http://www.swrcb.ca.gov/water_issues/programs/tmdl/docs/303dlists2006/epa/r9_06_

9   303d_reqtmdls,pdf (see page 21 on website). (Exhibit 12-1; RJN No. 12.)

10       11.    There were numerous VWD news releases disclosing massive sewage

11   spills from VWD either directly into the lake or into the creek leading to the lake in

12   2005, a year with very heavy rains. (1/11/05 spill of 21,000 gallons - CDC@28662,

13   28666; 2/21/05 spill of 52,500 gallons - CDC@28760; 2/23/05 spill of 103,550

14   gallons - CDC@28610) (RI/FS, App. AA "Sanitary System Overflow Information

15   (Part 1 of 7) – see chart following two-page PACE "Technical Memorandum" dated

16   September 30, 2016) (RJN No. 1, C; exhibit 11-1; RJN No. 11.)

17       12.    In 2006, the RWQCB listed the lake and creek as impaired under the

18   CWA 303(d) listings, thus requiring TMDLs. (RI/FS, page 3, exhibit 1-6; RJN No. 1,

19   D.) The RWQCB listed the lake as impaired because of ammonia as nitrogen

20   nutrients, and phosphorous. It listed the Creek as "impaired" due to DDE,

21   phosphorous, and sediment toxicity. (RJN No. 1, F; exhibit 1-5 – 1-6.) The EPA

22   approved the listings on June 28, 2007, according to the state website, and the required

23   TMDL completion date is 2019. (Exhibit 12-1; RJN No. 12.)

24       13.    "The U.S. Environmental Protection Agency (U.S. EPA) has scheduled a

25   total maximum daily load (TMDL) for nutrients to be developed and initiated for the

26   Lake and Creek in 2019. Under Section 303(d) of the CWA (Clean Water Act), states

27   (or U.S. EPA) are required to develop a TMDL for each listed pollutant to achieve

28   compliance with water quality objectives." (RI/FS, page 3; exhibit 1-6; RJN No. 1, D.)

14.    "[I]n 2009 the City of San Marcos initiated a public outreach … regarding the Lake and Watershed investigations and restoration efforts. A scope of investigative work was posted … ." (RI/FS, page 13; exhibit 1-9; RJN No. 1, E.) At that time, the PADS and CDC hired "Dr. Michael Anderson to assess the existing Lake data and to identify the gaps in that data." (Geotracker, Site Maps/Documents, Monitoring Reports, "Fall 2012 Nutrient Impairment Investigation Report – 2012 Q3," submitted 11/30/12 (with letter from John Lormon, counsel for San Marcos, to RWQCB, dated 9/2/11, page 1; exhibit 4-1; RJN No. 1, E). Dr. Anderson then prepared the February 3, 2010 report entitled, "Water Quality Management in Lake San Marcos: Analysis of Available Data." (RI/FS, App. E, "Anderson (2010) Report"); exhibit 3; RJN No. 3.) The RWQCB wrote on June 9, 2010, "Due to the wide range of potential contributors, it has been difficult to determine how to abate the Lake impairment." (Exhibit 13-2; RJN No. 13.)

http://www.swrcb.ca.gov/rwqcb9/board_info/agendas/2010/jun/item6/Executive_Summary_Report.pdf

15.    According to the IO, the RWQCB specifically listed the lake as impaired because of "ammonia as nitrogen, phosphorous, and nutrients (collectively Nutrients)." (IO, page 5, Item 14; exhibit 57-4; RJN No. 1, R.) Nutrients are the focus of the IO for the lake and creek no matter how CDC and the PADs may want to recharacterize them now. "Nutrients" as used in the IO is a broad term and treats different forms of nitrogen and phosphorus as "nutrients."

16.    To address the impairments, the PADs are performing the TMDL work in conjunction with the IO. Their TMDL compliance costs address reducing key pockets of nutrients that pass through their storm drains. "The RWQCB has agreed in concept to proceed with a non-TMDL approach to address the 303(d) listings … to avoid expending resources to develop a TMDL … . In June 2011, the RWQCB signed an agreement called the Lake San Marcos Work Group Participation Agreement (LSM Work Group, 2011). The work group members consisted of the following: (CDC and

1  the PADs, along with Caltrans and San Marcos Unified School District (SMUSD)).

2  The purpose of the work group agreement is 'to reasonably achieve nutrient Water

3  Quality Objectives (WQOs) in the Lake and Creek.'" (RI/FS, page 3; exhibit 1-6; RJN

4  No. 1, G.)

5      For unstated reasons, both CalTrans and SMUSD withdrew from their

6  agreement to comply with the IO in 2015 (RI/FS, page 4; exhibit 1-7; RJN No. 1, H),

7  despite being identified as PRPs by the RWQCB.

8      17.    The RWQCB issued the IO to CDC to investigate the "nutrient

9  impairment" of the Lake before remedying the problem, not CERCLA "hazardous

10  substances." (RI/FS, page 4; exhibit 1-7; RJN No. 1, I) The IO ordered CDC to

11  prepare a Site Conceptual Model that "must, at a minimum include identification of

12  known and suspected sources of nutrient impairment (spacially and temporally)." (IO,

13  Directive A, Item 1, page 11; exhibit 57-9.) The IO also ordered CDC to prepare a

14  "Lake San Marcos Nutrient Impairment Investigation Report." That report must

15  include a: "Description of nutrient loads to the Lake via surface water during both wet

16  weather and dry weather conditions. This discussion shall include information on how

17  land use, runoff rates, and drainage within the watershed affect the nutrient load to the

18  Lake. This discussion shall further accurately characterize and quantify all nutrient

19  preferential pathways that may affect nutrient flow and concentrations to the Lake."

20  (IO, Directive B, Item 3, page 12; exhibit 57-1.) In the February 8, 2017 Executive

21  Officer's report, the RWQCB said the lake was "impaired by elevated phosphorus and

22  nitrogen." (Exhibit 61-3; RJN No. 65.)

23      18.    Since 2011, CDC and the PADs have been required to prepare a report

24  that would show pathways and quantities of nutrients from suspected sources to the

25  lake, which necessarily would include Hollandia in light of the fingerpointing at it by

26  CDC and the PADs. (See, RI/FS, page 4; exhibit 1-7; RJN No. 1.) The RI/FS

27  compiled six years and countless investigations by the parties, yet the RWQCB

28  rejected the parties' claim that Hollandia has been a significant source of nutrients for

1   lack of evidence. The RWQCB found, "We agree that historical episodic releases
2   likely have added to the nutrient load, but do not see evidence of these contributions
3   from the historical dairy or poultry operations." (Letter from RWQCB, Sarah Mearon,
4   to CDC, Vitti and Thornberry, dated June 2, 2016, Item 96) (Underlining added); RJN
5   No. 1, JJ-1; exhibit 47-2; RJN No. 56.)

6       19.    The RWQCB also has found the "dam serves as a sediment trap." (IO,
7   page 6, section 18.b.; exhibit 57-5) As noted in the RI/FS, technically, the lake is not a
8   "lake," but a "reservoir" because it is a "standing water body impounded by a dam."
9   (RI/FS, page 16; exhibit 1-10; RJN No. 1, A.)

10      20.    The RWQCB stated, "CDC is named in this Order because evidence in
11  the record shows that it 'has discharged, discharges, or is suspected of having
12  discharged or discharging … waste' within the San Diego Region." (IO, page 7,
13  section 22) (Exhibit 57-6).) The RWQCB also found, "CDC as Debtor in Possession
14  owns land adjacent to the Lake, including approximately 252 acres of land within the
15  Creek watershed, which includes the Lake, Lakefront land, the dam, and the Lake San
16  Marcos Resort & Country Club. Lake San Marcos Resort and Country Club is located
17  immediately adjacent to the shores of the Lake. Irrigation runoff and storm water
18  discharges from the private County Club golf course owned and operated by CDC as
19  well as from surrounding areas contributes pollutants to the Lake and constitutes a
20  discharge of waste … . Wet weather sampling data, collected by the (PADs) …
21  pursuant to the … MS4 Stormwater Permits … is evidencing substantial nutrient
22  loading to the Creek and the Lake." (IO, page 8, section 28; exhibit 57-7.)

23      21.    The RWQCB called CDC and the PADs (along with CalTrans and San
24  Marcos Unified School District) "potentially responsible for some of the past and
25  ongoing nutrient discharges to the Lake and Creek," (IO, page 6 para. 20, fn. 6;
26  exhibit 57) To avoid being added to the IO, the PADs agreed to a "voluntary"
27  compliance schedule. (See, RI/FS, page 3; exhibit 1-6; Geotracker Site Documents
28  under "Regulatory Activities," "AGREEMENTS, Amendment to Agreement

6/21/11," "Addendum B to Participation Agreement: SDRWQCB Provisions" (Addendum); exhibit 14; RJN Nos. 13; 1, J.) Separately, Escondido "committed to work in cooperation with the Members through a cooperation agreement." (See, IO, fn.6; exhibit 57-5.)

22.    Part of the PADs' agreement is to develop a TMDL in lieu of the U.S. EPA, through the RWQCB, imposing one through its regulatory process and at its expense. A further stated purpose of the PADs is "abating the nutrient conditions in the Lake and Creek… ." (RI/FS, page 3; exhibit 1-6; RJN No. 1, K.)

23.    The Addendum addressed "the collective discharges of the Members (all PADs, less Escondido) and the individual discharges of the Member" prior to and after the Addendum effective date that "caused or contributed to the Nutrient impairment in the Impaired Water Bodies" (lake and creek). (page 3, section (f); exhibit 14-2) The specified purpose "shall be the Feasible abatement of the Nutrient impairment related conditions in the Lake and the Creek… ." (page 7, section 4; exhibit 14-3) In exchange for the PADs' participation, the RWQCB agreed to a "Covenant Not to Sue" or to take enforcement action. (Addendum, page 13, section 16; exhibit 14-4; RJN Nos. 1, L; 14.)

24.    The RWQCB has never identified Hollandia as a PRP or asked it to respond to the IO, despite an agreement by the RWQCB to assist the PADs where the evidence supported it, and despite CDC's and the PADs' incessant push to have RWQCB declare Hollandia to be a potentially responsible party. (RJN No. 15-1) For example, on April 27, 2015, Jeff Caufield, counsel for CDC, wrote an e-mail to the RWQCB Executive Director and asked the RWQCB to name Hollandia as a PRP. Caufield wrote, "If possible, it would be helpful to have the RWQCB clarify whether the RWQCB believes that Hollandia is 'innocent' as Hollandia claims and/or whether the RWQCB does contend that Hollandia is also a 'potentially responsible party' (PRP) and that Hollandia should voluntarily be participating in the characterization and RI/FS process." (Exhibit 15-1; RJN No. 15-2.)

25.    In the PADs' Addendum, "the RWQCB agrees to provide without charge to the Members (PADs) requested support to the affected Members in their defense, counterclaim, and/or cross claim against the contribution claim or action raised by a Non-Member and arising out of or related to the Matters Addressed." That "shall include cooperating with the affected Member to provide requested evidence the affected Member deems reasonably necessary for such defense, counterclaim, or cross complaint. Such evidence shall consist of evidence reasonably available to RWQCB, such as declarations of RWQCB staff and publicly available documents in the RWQCB files pertaining to proceedings affecting San Marcos Creek and/or Lake San Marcos." (Addendum, pages 16-17, Item 21; exhibit 14-5 – 14-6; RJN No. 14.)

26.    Additionally, "The RWQCB and the Members recognize that the Members represent a subset of those persons, entities, and agencies that may be responsible for causing or contributing to Nutrient impairment in the Impaired Water Bodies. The RWQCB agrees to compel response actions … against persons … not a party to the … Addendum (i.e., Non-Members) whose discharges and/or other acts or omissions have caused, permitted, or contributed to Nutrient impairment in the Lake and/or Creek, where the RWQCB determines that sufficient information exists to warrant such action … ." (Addendum, pages 19, Item 29 - "Future Cooperation By the RWQCB;" exhibit 14-7; RJN No. 14.)

27.    In Joint Status Reports over time, CDC and the other parties have chronicled their efforts to perform historical watershed and lake assessment, diagnostics and modeling, assess remedial measures, and to prepare the RI/FS to present to RWQCB to comply with the IO. In 2013, CDC reported that the RWQCB issued the IO "to CDC alleging the release of pollutants to the (San Marcos) Lake and commanding CDC to investigate the cause(s) and extent of nutrient impairment in the Lake. Consequently, CDC has incurred and will continue to incur substantial costs to investigate, monitor, and remediate this contamination." The RWQCB "has in fact identified numerous entities as potentially responsible for some of the past and

1    ongoing nutrient discharges to the Lake and its principle tributary, San Marcos Creek

2    … . By this action, CDC seeks to recover these response costs from (defendants)."

3    (CDC's Status Report 1:11-22 (Dkt# 91, filed 12/13/13) (Exhibit 16-6a; RJN No. 17).)

4    "To clarify, the present lawsuit is the only lawsuit currently pending in which

5    CDC and the other names parties are litigating questions of liability under CERCLA,

6    among other things, in relation to the alleged releases and discharges of hazardous

7    substances at and around the Lake." (Dkt# 91, 4:2-5.) (Exhibit 16-6b; RJN No. 17.)

8    28.    In 2014, the parties reported, "CDC filed this action for response costs

9    under (CERCLA), among other relief and claims, arising from the alleged release and

10    discharge of hazardous substances which have allegedly caused (the Lake) to become

11    contaminated. In particular, the Lake is contaminated with pollutants that fuel algae

12    growth and reduce oxygen levels, which cause fish kills, algae blooms, and nuisance

13    odors, in addition to the degradation of beneficial uses of the Lake waters." (Joint

14    Status Report (Dkt# 99, filed 7/25/14, 1:26-2:4) (Exhibit 16-8; RJN No. 17).)

15    CDC and the PADs "hope to streamline the process of finalizing the

16    remediation plans and to receive final Regional Board approval in 2015, a step that

17    will be required to ensure regulatory compliance and finality." (Joint Status Report

18    (Dkt# 116, filed 3/27/15, 15:18-20) (Exhibit 16-4; RJN No. 17).) "The goal of the

19    RI/FS process as it relates to the lake, creek, and watershed, is to allow the parties to

20    gather sufficient information to make informed decisions on potential remedial

21    actions, and to develop a comprehensive and reliable restoration strategy that satisfies

22    (RWQCB) requirements … ." (Joint Status Report (Dkt# 174, filed 5/10/16, 7:18-22)

23    (Exhibit 16-2; RJN No. 17).)

24    29.    The IO requires that CDC "[d]escribe and quantify past … Lake

25    operations, including, but not limited to, recreational uses, land management activities,

26    landscaping practices around the Lake, fertilizer and pesticide use around the lake, and

27    lake water bypass and retention practices." (IO, Item 6 of Directive A, page 12;

28    exhibit 57-10.) The IO also requires a "[d]escription of historical … uses of the Lake

1    and operation and maintenance actions used to manage Lake water levels, water

2    quality, and uses." (IO, Finding No. 9 under Directive B; exhibit 57-11; RJN No. 1, I.)

3        30.    The IO ordered that "The Report must include conclusions based on the

4    results of the work conducted in the Workplan and evaluations of any other existing

5    information on the Lake. The Report must further make recommendations for cleanup

6    and abatement actions and additional investigative work, if need." (IO, Item 10, page

7    13; exhibit 57-11) CDC's responses to these IO requirements form the undisputed

8    factual component for much of this Rule 12(c) motion. The RI/FS response did not

9    recommend any further investigations with regard to Hollandia. (RJN No. 1, I.)

10        31.    CDC and the PADs have jointly prepared the RI/FS and submitted

11    reports of their investigations to the RWQCB in response to the IO. (Exhibit 1-7) The

12    RI/FS, with its many attached appendices, are a response to a state order and are

13    central to the allegations of each of the parties' claims. These documents' authenticity

14    is not in question. They provide undisputed facts prepared by the parties and their

15    consultants and are proper material upon which Hollandia bases this Rule 12(c)

16    motion. As noted by the RWQCB on March 9, 2016, "The RI/FS Report serves as the

17    nutrient impairment investigation report submittal required by the order (IO)."

18    http://www.waterboards.ca.gov/rwqcb9/publications_forms/publications/docs/executi

19    ve_officer_reports/2016/EOR_03-09-2016.pdf (RWQCB Executive Officer's Report,

20    March 9, 2016, page 3) (Exhibit 58-2; RJN No. 16).)

21        32.    The five lead authors of the RI/FS signed the following sworn

22    Certification: "I certify under penalty of law that this document (RI/FS) and all

23    attachments were prepared under my direction or supervision in accordance with a

24    system designed to assure that qualified personnel properly gather and evaluate the

25    information submitted. Based on my inquiry of the person or persons who manage the

26    system, or those persons directly responsible for gathering the information, the

27    information is, to the best of my knowledge and belief, true, accurate, and complete. I

28    am aware that there are significant penalties for submitting false information,

including the possibility of fine and imprisonment for knowing violations." Statement and signatures are found after cover sheet of RI/FS. (Exhibit 1-2; RJN No. 1, M.)

Michael A. Anderson, Ph.D., who is a signatory to the RI/FS, had been "retained by some of the Voluntary Parties and CDC" to prepare the 2010 report reviewing the investigations up to that time. (IO, page 6, section 18.b; exhibit 57-5.)

The RWQCB required the principals for CDC and the PADs to sign the RI/FS by February 3, 2017, attesting to its accuracy, as well as to respond to additional questions from the RWQCB and public. I learned on February 7, 2017, that the parties sought an extension until February 9, 2017, making it impossible to refer in this opening brief to any of the materials that might be presented and be relevant to this motion. (RJN No. 1, N.)

33.    The RWQCB issued the IO ostensibly for "nutrient impairment" by nitrates and phosphates in Creek and Lake. The premise is simple, but the terminology can get complicated. The RI/FS said, "Nutrients are primarily nitrogen and phosphorus compounds measured in the laboratory under various names. Nitrogen compounds are typically measured as ammonia ($NH_3$), ammonium ion ($NH_4+$), nitrate ion ($NO_3$), nitrite ion ($NO_2$), total nitrogen, organic nitrogen, or total Kjeldahl nitrogen (TKN). TKN is the sum of $NH_3$ and $NH_4+$ plus any organic nitrogen. Total nitrogen is the sum of TKN plus $NO_3$ and $NO_2$. …  Nitrogen is an element that is biogeochemically active and … is capable of existing in a number of different oxidation states. … Total ammonia typically include ammonium ion and un-ionized ammonia. Un-ionized ammonia is usually a relatively minor component of ammonia in streams and groundwater (USGS, 1999)." (RI/FS, pages 17-18; exhibit 1-11 – 1-12; RJN No. 1, O.)

Showing the fluid state between different states of nitrogen, the RI/FS explains that "Ammonia is formed from the deprotonation of ammonium ($NH_4+$), which can be described using the equilibrium chemistry as follows: $NH_4+ \rightleftharpoons H+ + NH_3$ The distribution between $NH_3$ and $NH_4+$ is thus governed by the pH of the lake water …

." (RI/FS, page 130; exhibit 1-24; RJN No. 1, O) "Phosphorus compounds are typically measured as dissolved reactive phosphorus (DRP), orthophosphate, or total phosphorus. Phosphate is the most abundant form of phosphorus found in lakes and streams. … Dissolved phosphate and particulate organic phosphorus (i.e., from plant material) are the main components of total phosphorus (USGS, 1999)." (RI/FS, pages 18-19; exhibit 1-12 – 1-13; RJN No. 1, P)

34.    Hollandia is located four river miles upstream from the lake. (See, e.g., RI/FS, Figure 43; exhibit 1-38; RJN No. 1, Q) It operated a dairy on its premises at 922 East Mission Road, San Marcos, from the early 1950s until 2003. The RWQCB first regulated it in 1970. Hollandia removed the last of its cattle from the Property in 2003. (RI/FS, page 75; exhibit 1-20; RJN No. 1, Q.)

There were 11 accidental discharges of manure, which was used for irrigation, to the Creek documented by the RWQCB during its operations. The RI/FS chronicles various "offsite" discharges, but the ones that the RWQCB documented reached the creek add up to just 11, with the last one in 1995. The last discharge claimed in the RI/FS, which was not documented as reaching the creek, was May 1998, almost 19 years ago. (RI/FS, page 76; exhibit 1-21; RJN No. 1, Q.) The RI/FS does not present any evidence of manure entering the creek or anything entering the lake.

Greenwater is a relatively new term for rinse water from washing down cows prior to milking. It includes incidental cattle wastes, solids of which are separated out before being used for irrigation purposes. Greenwater is the same as processed (generated) wastewater. http://aces.nmsu.edu/pubs/_circulars/CR_639.pdf (August 2010 "Dairy Technical and Regulatory Guidance Manual for New Mexico, Circular 639, New Mexico State University," pages 100, 102.) (Exhibit 18-2 – 18-3; RJN No. 19.)

35.    As more regulations came into play, the RWQCB expressly authorized Hollandia's ongoing use of greenwater to irrigate its crop of Bermuda grass. For instance, RI/FS, page 75, noted "Daily operations in 1976 included spreading the

washwater across 60 acres of pastureland for fertilizer and irrigation purposes." (RJN No.1.) RWQCB Addendum No. 1 (dated 11/16/87) to the Order No. 76-68 said, "Application of manure and wastewater to disposal fields shall be at rates which are reasonable for the crop … ." (page 4, HOL001401) (Exhibit 19-4; RJN No. 20-1) Hollandia's 1988-1989 Annual Report to the RWQCB indicated it used the wastewater to grow crops on its 35 acres of Bermuda Pasture. (HOL001694) (Exhibit 20-1; RJN No. 21)

36.    IO and scientific reports show the ubiquitous nature of nutrients within the watershed, and the many ongoing sources that perpetuate the Lake's problems. Primary sources of nutrients in urban runoff are fertilizers and eroded soils. Nitrates are also nutrients that come from organic plant and animal decay and wastes, including duck droppings at the Lake, septic systems, and sewage.

With regard to the nutrient impairment of the lake, the RWQCB referred to "known and suspected sources of impairment of the Lake" as including the following: "StormWater and Non-Storm Water Discharges: The Lake receives discharges of waste from urban and suburban areas, private golf courses, agricultural land use, and open space. Direct and indirect discharges of pollutants to the Lake occur from natural sources and apogenic activities, such as, improper waste disposal, poor and/or unmanaged landscaping practices from commercial, recreational, and residential sites, sanitary sewer overflows, septic system failures, groundwater infiltration, from the presence and operation of the dam, and other non-point source discharges during storm events and dry weather conditions." (IO, para. 18.a.; exhibit 57-4.)

37.    The RI/FS noted that "nutrient and sediment yield from developed agricultural and urban areas are typically much higher loads than undeveloped areas… . Fertilizers, lawn wastes, leaking pipes, and other anthropogenic sources increase the concentrations of nutrients … from developed areas… ." (RI/FS, page 171; exhibit 1-26; RJN No. 1.)

38.    CERCLA states: "The President shall not provide for a removal or
remedial action under this section in response to a release or threat of release – (A) of
a naturally occurring substance in its unaltered form, or altered solely through
naturally occurring processes or phenomena, from a location where it is naturally
found."." 42 U.S.C. § 9604(a)(3)(A) The EPA says, "Generally, under CERCLA,
cleanup levels are not set at concentrations below natural background levels.
Similarly, for anthropogenic contaminant concentrations, the CERCLA program
normally does not set cleanup levels below anthropogenic background concentrations
… ." (2002, page 7: "Role of Background in the CERCLA Cleanup Program")
(Exhibit 21-2; RJN No. 22.)

https://nepis.epa.gov/Exe/ZyNET.exe/P100K17L.txt?ZyActionD=ZyDocument&Clie
nt=EPA&Index=2000%20Thru%202005&Docs=&Query=&Time=&EndTime=&Sea
rchMethod=1&TocRestrict=n&Toc=&TocEntry=&QField=&QFieldYear=&QFieldM
onth=&QFieldDay=&UseQField=&IntQFieldOp=0&ExtQFieldOp=0&XmlQuery=&
File=D%3A%5CZYFILES%5CINDEX%20DATA%5C00THRU05%5CTXT%5C00
000033%5CP100K17L.txt&User=ANONYMOUS&Password=anonymous&SortMet
hod=h%7C-
&MaximumDocuments=1&FuzzyDegree=0&ImageQuality=r75g8/r75g8/x150y150g
16/i425&Display=hpfr&DefSeekPage=x&SearchBack=ZyActionL&Back=ZyActionS
&BackDesc=Results%20page&MaximumPages=1&ZyEntry=7&slide

39.    The IO cited the case of *Lake Madrone Water District v. State Water
Resources Control Board* 209 Cal.App.3d 163, 168 (1989). (IO at page 5, fn.4; exhibit
57) As Dr. Anderson reported in 2010, and the RWQCB repeated, "Lake San Marcos
thus serves as a sediment trap … (and) particulate forms of nutrients are also retained
in the reservoir." (RI/FS, App. E, page 3; exhibit 3-4; RJN No. 20, DecJR 19)

40.    Nitrates, phosphates, ammonium, and naturally occurring ammonia are
not listed or designated under CERCLA, do not have RCRA characteristics for
hazardous wastes, and thus do not fit into any of the CERCLA categories. The

1  concentrated amount of ammonia used by industry, although listed, is not the dilute

2  type of ammonia found naturally in nature or the lake.

3       41.    Manure nutrient components (phosphates, nitrates, ammonium, and

4  naturally occurring ammonia (e.g. ammonia as N)) are not listed hazardous

5  substances. Links to two of the CERCLA statutes that define hazardous substances

6  follow: 33 U.S.C. § 1321(b)(2)(A) (Federal Water Pollution Control Act) (discharges

7  into navigable waters) (See, list at

8  http://www.epa.gov/dfe/pubs/pwb/tech_rep/fedregs/regsectb.htm). Any element,

9  compound, mixture, solution, or substance designated by the EPA pursuant to 42

10  U.S.C. § 9602 (See, list at http://www.gpo.gov/fdsys/pkg/CFR-2010-title40-

11  vol27/pdf/CFR-2010-title40-vol27-sec302-4.pdf );

12       42.    The EPA has published the "List of Lists" (List), which it more fully calls

13  the "Consolidated List of Chemicals Subject to the Emergency Planning Right-To-

14  Know Act (EPCRA), Comprehensive Environmental Response, Compensation and

15  Liability Act (CERCLA) and Section 112(r) of the Clean Air Act."

16       The EPA further defines the List as "EPCRA Section 302 Extremely Hazardous

17  Substance; CERCLA Hazardous Substances; EPCRA Section 313 Toxic Chemicals;

18  CAA 112(r) Regulated Chemicals for Accidental Release Prevention," thereby

19  reflecting the composite nature of the List. The List cautions that the statutes

20  sometimes refer to chemicals by different names, but there is one CAS number for

21  each chemical where applicable. (page i) The List identifies which of the above

22  statutes applies to each chemical. https://www.epa.gov/sites/production/files/2015-

23  03/documents/list_of_lists.pdf (Exhibit 22-1; RJN No. 23-1.)

24       43.    The EPA identifies various chemicals, reportable amounts, and agencies

25  to which notice is given in the List. Quantities used above the "Threshold Planning

26  Quantity (TPQ)" for Extremely Hazardous Substances must be reported under

27  EPCRA to state and local officials. (Exhibit 22-4) Ammonia fits into that category.

28  (Exhibit 22-6) CERCLA hazardous substances that are released above their

"reportable quantity (RQ)" are subject to reporting to the National Response Center under CERCLA. "Reporting under EPCRA section 313 is triggered by the quantity of a chemical that is manufactured, processed, or otherwise used during the calendar year." (Exhibit 22-5d)  Similarly, "EPCRA Section 313 Toxic Chemicals (a.k.a. Toxic Release Inventory (TRI) Chemicals)" have annual emissions reporting requirements. (Exhibit 22-5b – 22-5d; RJN No. 23-2)

"This consolidated list has been prepared to help firms handling chemicals determine whether they need to submit reports… ." (The List, page 1) (Exhibit 22-3; RJN No. 23-3)

With regard to "CAA Section 112(r) List of Substances for Accidental Prevention," the EPA says the list "includes several substances in solution that are covered only in concentrations above a specified level. These substances include ammonia (concentration 20% or greater) (CAS number 7664-41-7)." (Page iii.) (Exhibit 22-5a.) (RJN No. 24.)

44.    Elsewhere, the EPA also points out similar notice requirements in the event of a release greater than 100 pounds of anhydrous (gaseous) ammonia under CERCLA and EPCRA, as well as other accident reporting requirements. (Exhibit 23-5 – 23-10.) (RJN No. 24-1.) https://www.epa.gov/sites/production/files/2015-05/documents/accident_prevention_ammonia_refrigeration_5-20-15.pdf (pages C.1-C.6, which list all federal requirements that could apply to various accidents involving anhydrous ammonia; aqueous ammonia discharges to surface waters from a point source are regulated under the Clean Water Act) (RJN No. 22)

The EPA says the list "includes several substances in solution that are covered only in concentrations above a specified level. These substances include ammonia (concentration 20% or greater) (CAS number 7664-41-7)." (Underline added.) Naturally occurring ammonia is not listed. (Exhibit 23-3; RJN No. 24-2.)

45.    Ammonia in solution at 20% equals 200,000 milligrams (mg)/liter (L). 1mg/L equals one part in a million. An example of ammonia documented by the

1  RWQCB in a release from Hollandia is found in the RWQCB file for Hollandia. A

2  sample of "cow wash runoff" on April 20, 1995, contained 89.1 mg/L of "Ammonia,

3  as N." (RJN ) RWQCB calculations reflected that contained 2.0 mg/L of "un-ionized

4  ammonia." (Exhibit 59-2, 59-1; RJN No. 62.) That amount of un-ionized ammonia is

5  100,000 times less concentrated than a 20% concentration of aqueous ammonia

6  (200,000 mg/L). Even when compared to the higher number of 89.1, there is a 2,245

7  times difference in concentration.

8          46.    The List helps businesses identify their reporting obligations arising from

9  the chemicals they use. (Exhibit 22-3) Ammonia is listed four different ways (not as

10  "ammonia as N"): 1) "ammonia", CAS No. 7664-41-7 with reportable quantities of

11  500 to 100 pounds, depending on the statute checked; 2) "ammonia (anhydrous)",

12  which is the same chemical (a gas) and has a 10,000 pound TPQ under CAA 112(r);

13  3) "ammonia (conc 20% or greater)", CAS No. 7664-41-7, with a 20,000 pounds TPQ

14  for CAA 112(r);  4) "ammonia (includes anhydrous ammonia and aqueous ammonia

15  from water dissociable ammonium salts and other sources; 10% of total aqueous

16  ammonia is reportable under this listing)", CAS No. 7664-41-7, identified as an

17  EPCRA Section 313 (TRI) chemical. "Ammonium hydroxide" is ammonia plus water

18  (aka aqueous ammonia) with a different CAS No. 1336-21-6, and a CERCLA RQ of

19  1000 pounds. (Exhibit 22-5b – 22-5c, 22-6; RJN Nos. 26)

20          The National Institute for Occupational Safety and Health (NIOSH) describes

21  ammonia, CAS No. 7664-41-7, as a "Colorless gas with a pungent, suffocating odor.

22  [Note: Shipped as a liquefied compressed gas. Easily liquefied under pressure.]" It

23  recommends various personal protection measures, including respirators, when

24  dealing with ammonia. The chemical formula is NH3.

25  https://www.cdc.gov/niosh/npg/npgd0028.html (Exhibit 24-2; RJN No. 25.)

26          47.    The EPA calls anhydrous ammonia (the gas) "so dangerous." Moreover,

27  it is: "… used as a refrigerant at a large number of industrial facilities… . Accidental

28  ammonia releases cause injuries and death to employees, emergency response

1   personnel, and people in surrounding communities. … Anhydrous ammonia and

2   ammonium hydroxide are two types of ammonia commonly used in industry. This

3   manual will focus on the 'anhydrous' type, which means, 'without water.' …

4   Anhydrous ammonia is very corrosive, and exposure to it may result in chemical-type

5   burns to skin, eyes, and lungs. … Ammonia is also flammable and explosive at the

6   right concentrations, which is more likely to happen when released in a confined

7   space, such as inside a building." (Exhibit 23-3; RJN No. 24-2.)

8   https://www.epa.gov/sites/production/files/2015-

9   05/documents/accident_prevention_ammonia_refrigeration_5-20-15.pdf

10      48.    The List includes those hazardous substances under CERCLA compiled

11   from various statutes. The Emergency Planning and Community Right-to-Know Act

12   (EPCRA) is a separate program, which involves reporting of its own set of chemicals

13   above a specified threshold for community planning and emergency response

14   purposes and only by specified facilities in industry (those that are "manufacturing,

15   processing, or otherwise using listed toxic chemical." Those chemicals are also on the

16   List. There is a 1% "*De Minimus* Concentration" required for industrial nitrate

17   compounds (water dissociable). Table 3 in exhibit 60 lists some of the industrial

18   compounds included in this category. Naturally occurring nitrates are not included.

19   (Exhibit 60-1 – 60-5; RJN No. 63-1) 42 U.S.C. §11001 *et seq*.

20      The List also includes EPCRA chemicals. Determining if a CERCLA hazardous

21   substance is involved in the present case is simple: either 1) it is listed under CERCLA

22   or incorporated therein, or, 2) it could be a RCRA characteristic waste unless

23   expressly excluded as a waste. See, 40 C.F.R. § 302.4 ("Designation of hazardous

24   substances. (a) Listed hazardous substances. The elements and compounds and

25   hazardous wastes appearing in table 302.4 are designated as hazardous substances

26   under section 102(a) of the Act. (b) Unlisted hazardous substances. A solid waste, as

27   defined in 40 CFR § 261.2, which is not excluded from regulation as a hazardous

28   waste under 40 CFR § 261.4(b), is a hazardous substance under section 101(14) of the

Act if it exhibits any of the characteristics identified in 40 CFR § 261.20 through
261.24.")

49.    Relevant excerpts from the List shows certain phosphorus compounds
(with "phos" in it) listed with elemental phosphorus. Phosphates are not listed.

From Title 40 C.F.R. 302 (Exhibit 22-8; RJN No. 27)

Table 302.4  List of Hazardous Substances– Excerpted for "Phos…" (partial listing)

| Substance | Chem Abstracts No. |
|---|---|
| Phosgene | 75–44–5 |
| Phosphine | 7803–51–2 |
| Phosphoric acid | 7664–38–2 |
| Phosphoric acid, diethyl 4-nitrophenyl ester | 311–45–5 |
| Phosphoric acid, lead(2+) salt (2:3) | 7446–27–7 |
| Phosphorodithioic acid, O,O-diethyl S-[2-(ethylthio)ethyl] ester | 298–04–4 |
| Phosphorus | 7723–14–0 |
| Phosphorus oxychloride | 10025–87–3 |
| Phosphorus pentasulfide | 1314–80–3 |
| Phosphorus sulfide | 1314–80–3 |
| Phosphorus trichlorid | 1314–80–3 |
| Phosphorodithioic acid, O,O-diethyl S-[(ethylthio)methyl] ester | 298–02–2 |
| Phosphorodithioic acid, O,O-diethyl S-methyl ester | 4 P094 10 |
| Phosphorodithioic acid, O,O-dimethyl S-[2(methylamino)-2-oxoethyl] ester | 3288-58–2 |

| Phosphorofluoridic acid, bis(1-methylethyl) ester | 60–51–5 |
|---|---|
| Phosphorothioic acid, O,O-diethyl O-(4-nitrophenyl) ester | 56–38–2 |
| Phosphorothioic acid, O,O-diethyl O-pyrazinyl ester | 297–97–2 |
| Phosphorothioic acid, O-[4-[(dimethylamino) sulfonyl]phenyl] O,O-dimethyl ester | 52–85–7 |
| Phosphorothioic acid, O,O-dimethyl O-(4-nitrophenyl) ester | 298–00–0 |

50.    Regarding the substances on the List, phosphates are not listed anywhere as a hazardous substance. "Phosphates" and "phosphorus" are completely different chemicals, but the terms are often used in a confusing and interchangeable way. Technically, "phosphorus" refers to "elemental phosphorus," which is created in a lab and used by industry. "Never found free in nature, it is widely distributed in combination with minerals. … Phosphorus is very poisonous… . White phosphorus may be made by several methods. … Elementary phosphorus is liberated as vapor and may be collected under phosphoric acid, an important compound in making super-phosphate fertilizers. In recent years, concentrated phosphoric acids … have become of great importance to agriculture and farm production. … Phosphates are used in the production of special glasses, such as those used for sodium lamps. Bone-ash -- calcium phosphate-- is used to create fine chinaware and to produce mono-calcium phosphate, used in baking powder. Phosphorus is also important in the production of steels, phosphor bronze, and many other products. Trisodium phosphate is important as a cleaning agent, as a water softener, and for preventing boiler scale and corrosion of pipes and boiler tubes. Phosphorus is also an essential ingredient of all cell protoplasm, nervous tissue, and bones." http://periodic.lanl.gov/15.shtml (Los Alamos National Lab) (Exhibit 25-1 – 25-2; RJN No. 28.)

51.    Water scientists typically refer to "phosphorus" or "total phosphorus" broadly for nutrients: "Total phosphorus (TP) is a measure of all types of phosphorus

present. It includes the phosphate that is stuck to soil (sediment) as well as dissolved reactive phosphorus (DRP), which is more readily available for plants. TP is an important measure because most phosphate enters our rivers attached to sediment via run-off." Similarly, the definition of DRP is: "Over time the phosphate that is bound to the sediment dissolves, and becomes available for aquatic plant and algae growth. This is particularly an issue in slow flowing rivers where the phosphorus bound to sediment can gradually dissolve, feeding aquatic weeds and algae for many years. DRP concentrations are an indication of a waterbody's ability to support algae and plant growth." http://www.lawa.org.nz/learn/factsheets/phosphorus/ (Exhibit 26-1 – 26-2; RJN No. 29.)

In the "Nutrients" section of 2010 report on San Marcos Lake, Dr. Anderson focused on nutrients - "dissolved reactive phosphorus, or "DRP," a "bioavailable form of nutrients" and a small portion of total P. (Document at RI/FS, App. E, page 4, exhibit 3-5; RJN No. 1, R.)

52.     Elemental phosphorus is listed as a hazardous substance under both the Clean Water Act and CERCLA. Table 302.4 of 40 C.F.R. § 320. There are separate Chemical Abstract Service (CAS) Registry Numbers for phosphorus (7723140) and phosphate (1465442), showing that they have different characteristics.

Public Law 96-510 (94 Stat. 2767), Title II (Hazardous Substance Response Revenue Act of 1980), Subtitle D (miscellaneous excise taxes) Chapter 38 (Environmental Taxes), Subchapter B, imposed a tax on certain chemicals in accordance with a table listing specific chemicals and quantities to be used for Superfund sites. [26 USC. Sec. 4662 (b)]. The table lists phosphorus and over 40 other chemicals including 15 inorganic compounds, but not phosphates.

Elemental phosphorus is an industrial chemical used in many industries such as for the production of fertilizer, organophosphorus compounds, metallurgy (steel and bronze), matches, water softening, and in food applications. "Organic compounds of phosphorus form a wide class of materials; many are required for life, but some are

extremely toxic." Also, "Phosphoric acid made from elemental phosphorus is used in food applications such as soft drinks, and as a starting point for food grade phosphates. These include mono-calcium phosphate for baking powder and sodium tripolyphosphate. Phosphates are used to improve the characteristics of processed meat and cheese, and in toothpaste." https://en.wikipedia.org/wiki/Phosphorus: (Exhibit 27-3, 27-2; RJN No. 30.)

53.     (blank)

54.     A copy of the relevant excerpts of the IO is attached as Exhibit 57.

55.     (blank)

56.     (blank)

57.     (blank)

58.     EPA has engaged in cleanup at an elemental phosphorus manufacturing facility at the FMC Corporation site in Idaho. "Soils and groundwater in the FMC OU contain ignitable-reactive elemental phosphorus-containing wastes … . The former waste ponds (both CERCLA and RCRA) and other areas of contaminated soil are being covered with Evapotranspiration (ET) Caps to prevent precipitation infiltration and migration of these hazardous substances toward and into the Portneuf River." https://www.epa.gov/enforcement/case-summary-epa-orders-fmc-perform-57-million-cleanup-action-former-phosphorus (Exhibit 28-2; RJN No. 31.)

59.     Phosphates are not listed as a lesser RCRA "hazardous waste" in 40 C.F.R. Part 261 ("Identification and Listing of Hazardous Waste")

From Title 40 C.F.R. 261 – Excerpted for Phosphorus/Phosphate

| EPA Hazardous Waste Number | Substance | Chem Abstracts No. |
| --- | --- | --- |
| P041 | Diethyl-p-nitrophenyl phosphate | 311-45-5 |
| P043 | Diisopropylfluorophosphate (DFP) | 55-91-4 |
| P062 | Hexaethyl tetraphosphate | 757-58-4 |
| P109 | Tetraethyldithiopyrophosphate | 3689-24-5 |

| P111 | Tetraethyl pyrophosphate | 107-49-3 |
|------|--------------------------|----------|
| U087 | O,O-Diethyl S-methyl dithiophosphate | 3288-58-2 |
| U145 | Lead phosphate | 7446-27-7 |
| U189 | Phosphorus sulfide | 1314-80-3 |
| U235 | 1-Propanol, 2,3-dibromo-, phosphate (3:1) | 126-72-7 |
| U235 | Tris(2,3-dibromopropyl) phosphate | 126-72-7 |

http://www.ecfr.gov/cgi-bin/retrieveECFR?gp=&SID=c4b06f8d18d0da20b968d50cfb766e6d&mc=true&n=pt40.28.261&r=PART&ty=HTML (RJN No. 32.)

60.    The EPA deals with phosphates outside of CERCLA cost recovery claims. See, e.g., EPA 2011 Consent Decree with Agrifros Fertilizer Company involving ammonium phosphate fertilizers. https://www.epa.gov/sites/production/files/documents/agrifos-cafo.pdf (Exhibit 29-2; RJN No.33.)

61.    To distinguish between an element and a compound: A Purdue University primer on "Elements, Compounds & Mixtures" says compounds are "bound together," but, by contrast, a "mixture consists of two or more different elements and/or compounds physically intermingled, can be separated into its components by physical means, and often retains many of the properties of its components." http://www.chem.purdue.edu/gchelp/atoms/elements.html (Exhibit 51-1 - 51-2; RJN No. 34-1.)

62.    "In chemistry, a compound is a substance that results from a combination of two or more different chemical elements, in such a way that the atoms of the different elements are held together by chemical bonds that are difficult to break. These bonds form as a result of the sharing or exchange of electrons among the atoms. The smallest unbreakable unit of a compound is called a molecule.

A compound differs from a mixture, in which bonding among the atoms of the
constituent substances does not occur. In some situations, different elements react with
each other when they are mixed, forming bonds among the atoms and thereby
producing molecules of a compound. In other scenarios, different elements can be
mixed and no reaction occurs, so the elements retain their individual identities.
Sometimes, when elements are mixed, the reaction occurs slowly (as when iron is
exposed to oxygen); in other cases it takes place rapidly (as when lithium is exposed
to oxygen). Sometimes, when an element is exposed to a compound, a reaction occurs
in which new compounds are formed (as when pure elemental sodium is immersed in
liquid water)."

Often, a compound looks and behaves nothing like any of the elements that
comprise it. Consider, for example, hydrogen (H) and oxygen (O). Both of these
elements are gases at room temperature and normal atmospheric pressure. But when
they combine into the familiar compound known as water, each molecule of which
contains two hydrogen atoms and one oxygen atom ($H_2O$), the resulting substance is a
liquid at room temperature and normal atmospheric pressure."
http://whatis.techtarget.com/definition/compound (Exhibit 30-1; RJN No. 34-2.)

63.    The EPA states, "The mixture rule regulates a combination of any
amount of a nonhazardous solid waste and any amount of a listed hazardous waste… .
Even if a small vial of listed waste is mixed with a large quantity of nonhazardous
waste, the resulting mixture bears the exemptions same waste code and regulatory
status as the original listed component of the mixture … . This is intended to prevent a
facility from mixing a listed waste with a nonhazardous waste in order to escape
having to manage the waste as hazardous."
https://www.epa.gov/sites/production/files/2015-07/documents/rom.pdf (Exhibit 31-2;
RJN No. 35.)

64.    Table salt (sodium chloride, NaCl) is a compound containing elemental
sodium and elemental chlorine. Such a compound is safe while both individual

components are extremely hazardous (toxic and reactive) and are listed hazardous substances. Sodium chloride is not a listed hazardous substance. Such salt serves many useful purposes and is not a mixture or subject to the mixture rule. (RJN No. 61-1.)

"Sodium is a chemical element with symbol Na (from Latin natrium) and atomic number 11. It is a soft, silvery-white, highly reactive metal. … The free metal does not occur in nature, but must be prepared from compounds…. Among many other useful sodium compounds, sodium hydroxide (lye) is used in soap manufacture, and sodium chloride (edible salt) is a de-icing agent and a nutrient for animals including humans. Sodium is an essential element for all animals and some plants. Sodium ions are the major cation in the extracellular fluid (ECF) and as such are the major contributor to the ECF osmotic pressure and ECF compartment volume." https://en.wikipedia.org/wiki/Sodium  (Exhibit 52-1; RJN No. 61-2.)

"Chlorine is a chemical element … . Chlorine is a yellow-green gas at room temperature. It is an extremely reactive element and a strong oxidising agent… . The most common compound of chlorine, sodium chloride (common salt), has been known since ancient times. Because of its great reactivity, all chlorine in the Earth's crust is in the form of ionic chloride compounds, which includes table salt… . Elemental chlorine is commercially produced from brine by electrolysis. … In the form of chloride ions, chlorine is necessary to all known species of life." https://en.wikipedia.org/wiki/Chlorine (Exhibit 53-1; RJN No. 61.)

65. Relevant excerpts from the List shows certain unrelated nitrate compounds listed under CERCLA. Nitrates are not listed. (Exhibit 21; RJN No. 36.)

Table 302.4—List of Hazardous Substances and Reportable Quantities
[Excerpted for "Nitrate"]

| Hazardous substance | CASRN | Statutory code | Final RQ pounds (Kg) |
|---|---|---|---|
| Beryllium nitrate | 13597–99–4 | 1 | 1 (0.454) |

| Cupric nitrate | 3251–23–8 | 1 | 100 (45.4) |
|---|---|---|---|
| Ferric nitrate | 10421–48–4 | 1 | 1000 (454) |
| Lead nitrate | 10099–74–8 | 1 | 10 (4.54) |
| Mercuric nitrate | 10045–94–0 | | 10 (4.54) |
| Mercurous nitrate | 10415–75–5 | | 10 (4.54) |
| Nickel nitrate | 14216–75–2 | 1 | 100 (45.4) |
| 1,2,3-Propanetriol, trinitrate | 55–63–0 | 4 | 10 (4.54) |
| Silver nitrate | 7761–88–8 | 1 | 1 (0.454) |
| Thallium (I) nitrate | 10102–45–1 | 4 | 100 (45.4) |
| Uranyl nitrate | 10102–06–4 | 1 | 100 (45.4) |
| | 36478–76–9 | | |
| Zinc nitrate | 7779–86–4 | 1 | 1000 (454) |
| Zirconium nitrate | 13746–89–9 | 1 | 5000 (2270) |

A copy of the one page starting with "nickel nitrate" is attached as Exhibit 22-7.

"Nitrate compounds (water dissociable)" are listed for EPCRA only. (Exhibit 60-4 *et seq*.) EPCRA Section 313 reporting is required if threshold quantities are exceeded. Separate thresholds apply to the amount of the EPCRA Section 313 chemical that is manufactured, processed or otherwise used. You must submit a report for any EPCRA Section 313 chemical … which is: 1) Manufactured in excess of 25,000 pounds over the calendar year; 2) Processed in excess of 25,000 pounds over the calendar year; or 3) Otherwise used in excess of 10,000 pounds over the calendar year." (Exhibit 60-4.)  Naturally occurring nitrates are not included. (Exhibit 60; RJN No. 63-1) Table 3 in exhibit 60 lists some of the industrial compounds included in this category. (Exhibit 60-13 – 60 15.) Naturally occurring nitrates are not included. (RJN No. 63-2.)

https://ofmpub.epa.gov/apex/guideme_ext/f?p=104:42:::no:42:p42_id:ri_2_4

66.    The EPA challenges court rulings when it wants to object to a ruling. I have searched and not discovered any evidence that the EPA did that with regard to

the Apache Court's characterization of EPA's position or the ruling. The following is an example of criticism by the Office of Enforcement and Compliance Assurance in the EPA of the Seventh Circuit interpretation of the mixture rule in *United States v. Bethlehem Steel Corp.*, No. 93-2260, 9-26-94. "While it is the position of OECA and OGC that the court incorrectly interpreted the F006 listing, EPA is not seeking rehearing of the decision. The Agency is, however, working on an interpretation … to clarify the status of wastes … ." (Exhibit 33-2; RJN No. 38.)

https://www.epa.gov/sites/production/files/documents/7cirdecusvbsteel-mem.pdf

At its website, the EPA only identifies nitrates as a "contaminant of concern" at the ongoing Apache Powder site remediation. (Exhibit 32-2; RJN No. 37.)

http://yosemite.epa.gov/r9/sfund/r9sfdocw.nsf/7508188dd3c99a2a8825742600743735/510f2916dad8646e88257007005e9402!OpenDocument

67.    There has been no change of law, and I have discovered no change in EPA position since the Apache decision. I have done an extensive search and found no cases where the EPA has used CERCLA to pursue a cost recovery action against a party because of nitrates, ammonium nitrate, or naturally occurring levels of ammonia.

To the contrary, I have only found cases where the EPA has sued parties for nitrate or ammonia as N in drinking water and waterways pursuant to the Safe Drinking Water Act or Clean Water Act. See, DOJ and EPA action against dairy in Iowa for cattle wastes in stream, including ammonia, under CWA.

https://www.justice.gov/usao-ndia/pr/united-states-sues-iowa-cafo-and-its-owner-alleged-clean-water-act-violations-including; Grace & Co. v. U.S. EPA, Nos. 99-5662 & 00-3302 (3rd Cir.; filed August 10, 2001). (Exhibit 34-1; RJN No. 39.)

68.    In a recent example, EPA and Ammonia Magellan Pipeline Enterprises reached CWA Settlement after Magellan spilled 1,202,236 pounds of anhydrous ammonia in two incidents. According to the EPA, "The spills which occurred in 2004 resulted in significant fish kills in surrounding waterways."

https://www.epa.gov/enforcement/magellan-ammonia-pipeline-enterprise-products-

operating-lp-and-mid-america-pipeline-lp (Exhibit 35-1 – 35-2; RJN No. 40.) EPA also noted CERCLA notice violations under section 103 (42 U.S.C. 9603) but did not use CERCLA for remedial purposes.

EPA has also brought cases or entered into settlements with parties for failure to report ammonia emissions. See, EPA settlement with two ammonia refrigeration facilities: https://www3.epa.gov/region9/superfund/ammonia/ (Exhibit 36-1; RJN No. 41.)

69.    Relevant excerpts from the List show high-concentration ammonia and certain ammonia compounds listed. Ammonium ion and ammonium nitrate are not listed. The following table shows the various listings for ammonia and certain ammonia compounds. Twenty-one specific ammonium salts are listed as hazardous substances.

Table 302.4—List of Hazardous Substances and Reportable Quantities

[Excerpted for "ammonia and ammonium"]

| Hazardous substance | CASRN | Statutory code | Final RQ pounds (Kg) |
|---|---|---|---|
| Ammonia | 7664–41–7 | 1 | 100 (45.4) |
| Ammonium acetate | 631–61–8 | 1 | 5000 (2270) |
| Ammonium benzoate | 1863–63–4 | 1 | 5000 (2270) |
| Ammonium bicarbonate | 1066–33–7 | 1 | 5000 (2270) |
| Ammonium bichromate | 7789–09–5 | 1 | 10 (4.54) |
| Ammonium bifluoride | 1341–49–7 | 1 | 100 (45.4) |
| Ammonium bisulfilte | 10192–30–0 | 1 | 5000 (2270) |
| Ammonium carbamate | 1111–78–0 | 1 | 5000 (2270) |
| Ammonium carbonate | 506–87–6 | 1 | 5000 (2270) |
| Ammonium chloride | 12125–02–9 | 1 | 5000 (2270) |
| Ammonium chromate | 7788–98–9 | 1 | 10 (4.54) |
| Ammonium citrate, dibasic | 3012–65–5 | 1 | 5000 (2270) |

| | | | |
|---|---|---|---|
| Ammonium fluoborate | 13826–83–0 | 1 | 5000 (2270) |
| Ammonium fluoride | 12125–01–8 | 1 | 100 (45.4) |
| Ammonium hydroxide | 1336–21–6 | 1 | 1000 (454) |
| Ammonium oxalate | 6009–70–7 | 1 | 5000 (2270) |
| | 5972–73–6 | 1 | |
| | 14258–49–2 | 1 | |
| Ammonium picrate | 131–74–8 | 4 | 10 (4.54) |
| Ammonium silicofluoride | 16919–19–0 | 1 | 1000 (454) |
| Ammonium sulfamate | 7773–06–0 | 1 | 5000 (2270) |
| Ammonium sulfide | 12135–76–1 | 1 | 100 (45.4) |
| Ammonium sulfite | 10196–04–0 | 1 | 5000 (2270) |
| Ammonium tartrate | 14307–43–8 | 1 | 5000 (2270) |
| | 3164–29–2 | 1 | |
| Ammonium thiocyanate | 1762–95–4 | 1 | 5000 (2270) |
| Ammonium vanadate | 7803–55–6 | 4 | 1000 (454) |
| Ferric ammonium citrate | 1185–57–5 | 1 | 1000 (454) |
| Ferric ammonium oxalate | 2944–67–4 | 1 | 1000 (454) |
| Ferrous ammonium sulfate | 10045–89–3 | 1 | 1000 (454) |
| Nickel ammonium sulfate | 15699–18–0 | 1 | 100 (45.4) |
| Phenol, 2,4,6-trinitro-, ammonium salt | 131–74–8 | 4 | 10 (4.54) |
| Vanadic acid, ammonium salt | 7803–55–6 | 4 | 1000 (454) |
| Zinc ammonium chloride | 52628–25–8 | 1 | 1000 (454) |

There is no listing of "ammonium" or "ammonia and compounds," or ammonium nitrate, a fertilizer and explosive. A copy of those entries starting with ammonia is attached at Exhibit 22-6 (RJN No. 42.)

70.     73 Fed. Reg. 76948 reflects emissions notice rulemaking by the EPA. At page 76950, the EPA only focused on air emissions from animal waste concerns in the

context of Community Planning and Right-to-Know (known as "EPCRA") notice issues: "The exemption to the CERCLA section 103 notification requirements will apply to all releases of hazardous substances to the air from animal waste at farms. … [T]he exemption to EPCRA section 304 emergency notification requirements will apply to air releases of hazardous substances from animal waste at farms that are below the thresholds in 40 CFR 355.31(g) and for those farms that have animals that are not stabled or confined."

71.    True ammonia is a caustic, hazardous gas used for industrial purposes: "About 80% of the ammonia produced by industry is used in agriculture as fertilizer. Ammonia is also used as a refrigerant gas, for purification of water supplies, and in the manufacture of plastics, explosives, textiles, pesticides, dyes and other chemicals. It is found in many household and industrial-strength cleaning solutions. Household ammonia cleaning solutions are manufactured by adding ammonia gas to water and can be between 5 and 10% ammonia. Ammonia solutions for industrial use may be concentrations of 25% or higher and are corrosive." https://www.health.ny.gov/environmental/emergency/chemical_terrorism/ammonia_tech.htm (Exhibit 38-1; RJN No. 44.)

72.    The List specifies one chemical CAS code for four listings of ammonia: 7664-41-7 (e.g., aqueous ammonia with concentration of 20% or greater). (Exhibit 22-6.) That is not naturally occurring ammonia, or formed through degradation, the kind of which we are exposed to at some nano-level every day.

73.    The U.S. Occupational Safety and Health Administration has strict exposure limits for workers to the harsh chemical, ammonia, but not to naturally occurring ammonia. The intent of the regulation and listing seems straightforward: to regulate industrial use of the harsh anhydrous ammonia or the 20% or more concentrated version of hydrous ammonia. (Exhibit 37-1 – 37-3; RJN No. 43.)

74.    Ammonia is also almost everywhere in small degrees through natural processes. Some ammonia is produced by the putrification of animal matter.

"Ammonia is both a metabolic waste and a metabolic input throughout the biosphere. … In certain organisms, ammonia is produced from atmospheric nitrogen by enzymes called nitrogenases. … Ammonia excretion is common in aquatic animals. In humans, it is quickly converted to urea, which is much less toxic … . Ammonium ions are a toxic waste product of metabolism in animals. In fish and aquatic invertebrates, it is excreted directly into the water. In mammals, sharks, and amphibians, it is converted in the urea cycle to urea, because it is less toxic and can be stored more efficiently. In birds, reptiles, and terrestrial snails, metabolic ammonium is converted into uric acid, which is solid, and can therefore be excreted with minimal water loss."

https://en.wikipedia.org/wiki/Ammonia#Ammonia.27s_role_in_biological_systems_and_human_disease (Exhibit 39-2 – 39-3; RJN No. 45.)

75.   The State Water Resources Control Board has written, "Ammonia is excreted by animals and produced during decomposition of plants and animals, thus returning nitrogen to the aquatic system."

http://www.waterboards.ca.gov/water_issues/programs/swamp/docs/cwt/guidance/3310en.pdf (Exhibit 17-1; RJN No. 18.)

76.   As shown in the nitrogen cycle, the ammonium ion is produced in the soil from interaction of animal wastes with bacteria and is a precursor to nitrates and nitrites. From a University of  Minnesota article:

"Nitrogen exists in the soil system in many forms and changes (transforms) very easily form one form to another. The route that N follows in and out of the soil system is collectively called the "nitrogen cycle." ... The nitrogen cycle is biologically influenced. Biological processes, in turn, are influenced by prevailing climatic conditions along with the physical and chemical properties of a particular soil. … Inputs of N for plant growth [include:]

- The atmosphere
  - Biological fixation

- Atmospheric fixation
- Precipitation (deposition)
- Industrial fixation – commercial fertilizers
- Soil organic matter
- Crop residues
- Animal manures

Nitrogen is available to plants as either ammonium ($NH_4^+$-N) or nitrate ($NO_3^-$-N). Animal manures and other organic wastes can be important sources of N for plant growth." ("Understanding nitrogen in soils," exhibit 54-1 – 54-2; RJN No. 46-2) http://www.extension.umn.edu/agriculture/nutrient-management/nitrogen/understanding-nitrogen-in-soils/

77.    The following diagram uses the figure of a rabbit to represent nitrogen deposition in animal wastes. http://en.wikipedia.org/wiki/Nitrogen_cycle  As shown, nitrates are formed by nitrifying bacteria acting on plant residues and animal wastes that have been decomposed by bacteria and fungi. Bacteria is a key part of the cycle, providing different forms of nitrogen compounds assimilable by higher organisms. The "+" and "-" references show positively charged ammonium salts and negatively charged nitrates and nitrites. Salts in solution generally dissociate and re-associate readily, which explains in large part why there is no stability to any compound.

///
///
///
///
///
///
///
///
///

(Exhibit 40-1.) Bacteria is a key part of the cycle, providing different forms of nitrogen compounds assimilable by higher organisms. As shown in the nitrogen cycle, the ammonium ion is produced in the soil from interaction of plant and animal wastes with bacteria and is a precursor to nitrates and nitrites. (Exhibit 40-1 – 40-3; RJN No. 46-1.)

78.     RI/FS reports the un-ionized ammonia concentration Water Quality Objective is currently set in the Basin Plan at 0.025 mg/L. (RI/FS, page 131; exhibit 1-25; RJN No. 1, T.)

79.     In 1992, VWD detailed how a discharge of reclaimed water with some ammonia would not harm the creek. A report was prepared for VWD in 1992, "Preliminary Impact Assessment of Live Stream Discharge to San Marcos Creek," by Risk Sciences, dated February 20, 1992 (with regard to a proposed VWD reclamation facility in which a possible discharge of reclaimed water to the creek was assessed as

a "failsafe discharge option." (RI/FS, App. F (CSM0002592); RJN No. 1, F; RI/FS Appendix F ("Historical Lake Data"), starting at CSM0002561); exhibit 5-2).)

The report states, "Ammonia is a constituent of concern in many aquatic systems because the un-ionized form of ammonia is toxic to fish. Ammonia dissolved in water normally exists in the form of the positively charged ammonium ion. … The fraction of ammonia in the un-ionized form increases as pH and temperature increase. … Since less than 1 percent of the total ammonia present in water normally exists in the un-ionized (toxic) form, and the EPA's warm-water chronic criterion for un-ionized ammonia is 0.06 mg/L, the ammonia levels recorded in the lower reach (of the creek) pose no threat to aquatic life." (CSM002601) (Exhibit 5-3; RJN No. 1, S.)

80.    (blank)

81.    While elemental phosphorus and industrial-strength ammonia are listed, there is no broad listing that contains phosphorus and ammonia and all their possible compounds. The following is a chart of the hazardous substance listings for an element "and compounds."

| Hazardous substance | CASRN | Statutory code | RCRA Number | RQ, pounds |
|---|---|---|---|---|
| Antimony†† | 7440–36–0 | 2 | | |
| ANTIMONY AND COMPOUNDS | NA | 2,3 | | ** |
| Antimony Compounds | NA | 2,3 | | ** |
| Arsenic†† | 7440–38–2 | 2,3 | | |
| ARSENIC AND COMPOUNDS | NA | 2,3 | | ** |
| Arsenic Compounds (inorganic including arsine) | NA | 2,3 | | ** |
| Beryllium †† | 7440–41–7 | 2,3,4 | P015 | |
| BERYLLIUM AND COMPOUNDS | NA | 2,3 | | ** |
| Cadmium †† | 7440–43–9 | 2 | | 10 |

| Hazardous substance | CASRN | Statutory code | RCRA Number | RQ, pounds |
|---|---|---|---|---|
| CADMIUM AND COMPOUNDS | N.A. | 2,3 | | ** |
| Chromium †† | 7440–47–3 | 2 | | 5000 |
| CHROMIUM AND COMPOUNDS | N.A. | 2,3 | | ** |
| Chromium Compounds | N.A. | 2,3 | | ** |
| Cobalt Compounds | N.A. | 3 | | ** |
| Copper †† | 7440–50–8 | 2 | | 5000 |
| COPPER AND COMPOUNDS | N.A. | 2 | | ** |
| Cyanide Compounds | N.A. | 2,3 | | ** |
| CYANIDES | N.A. | 2,3 | | ** |
| Lead†† | 7439–92–1 | 2 | | 10 |
| LEAD AND COMPOUNDS | N.A. | 2,3 | | ** |
| Manganese Compounds | N.A. | 3 | | ** |
| Mercury | 7439–97–6 | 2,3,4 | U151 | 1 |
| MERCURY AND COMPOUNDS | N.A. | 2,3 | | ** |
| Nickel†† | 7440–02–0 | 2 | | 100 |
| NICKEL AND COMPOUNDS | N.A. | 2,3 | | ** |
| Selenium†† | 7782–49–2 | 2 | | 100 |
| SELENIUM AND COMPOUNDS | N.A. | 2,3 | | ** |
| Silver †† | 7440–22–4 | 2 | | 1000 |
| SILVER AND COMPOUNDS | N.A. | 2 | | ** |
| Thallium †† | 7440–28–0 | 2 | | 1000 |
| THALLIUM AND COMPOUNDS | N.A. | 2 | | ** |
| Zinc †† | 7440–66–6 | 2 | | 1000 |
| ZINC AND COMPOUNDS | N.A. | 2 | | ** |

1    A copy of select excerpts from "EPCRA" "Chemical Categories" Appendix D

2  is attached as Exhibit 22-9 and from "CERCLA Hazardous Substances" in Appendix

3  E with the relevant pages at Exhibit 22-10 – 22-13. (RJN No. 47.)

4    82.    In EPA's List, Appendix E, entitled "CERCLA Hazardous Substances –

5  Chemical Categories," the EPA specifies, "For all listings above which contain the

6  word 'compounds' … the following applies: Unless otherwise specified, these listings

7  are defined as including any unique chemical substance that contains the names

8  chemical (i.e., antimony, arsenic, etc.) as part of that chemical's infrastructure." (fn. a)

9  (Exhibit 22-13; RJN No. 48.) The EPA says the List includes "chemical categories as

10 well as specific chemicals." (page vi) (Exhibit 22-5d.)

11    The List provides specific identification for the listed substances with

12 "Chemical Abstracts Service" (CAS) registry numbers to be clear what is regulated.

13 CAS REGISTRYSM contains more than 124 million unique organic and inorganic

14 chemical substances, such as alloys, coordination compounds, minerals, mixtures,

15 polymers and salts, and more than 66 million sequences—more than any other

16 database of its kind. (Exhibit 41-1; RJN No. 49.)

17 https://www.cas.org/content/chemical-substances

18    83.    The state allows the following levels of nitrates in drinking water (45

19 mg/L (as NO3) or 10 mg/L as N). (Exhibit 62-1; RJN No. 64.)

20    84.    Section 261.24 (Toxicity characteristic) of 40 C.F.R. § 261 (Identification

21 and Listing of Hazardous Waste) gives instructions how to test for toxicity under

22 RCRA. There, the EPA specifies that the Toxicity Characteristic Leaching Procedure

23 ("TCLP"), Test Method 1311, must be used to determine if one of the listed chemicals

24 in Table 1 of that section is found above the Regulatory Level. If yes, then the

25 sampled substance is a hazardous waste (and a hazardous substance under CERCLA).

26 "A solid waste … exhibits the characteristic of toxicity if … the extract from a

27 representative sample of the waste contains any of the contaminants listed in table 1 at

28 the concentration equal to or greater than the respective value given in that table." 40

1  C.F.R. § 261.24. http://www.ecfr.gov/cgi-
2  bin/retrieveECFR?gp=1&SID=9fe3914d403828e32953026dcaeda&ty=HTML&h=L&
3  mc=true&n=pt40.28.261&r=PART#se40.28.261_124  A copy of Table 1 is attached
4  at Exhibit 55-1 – 55-2.

5       85.    Because phosphates, nitrates, and ammonium are not listed in Table 1 of
6  exhibit 55, they cannot be a toxic hazardous waste by characteristic. Nor is there a
7  listing for ammonia, phosphorus, nitrogen, or any of their compounds. Therefore,
8  cattle wastes cannot be toxic by characteristic and cannot be a hazardous substance
9  under CERCLA

10      86.    In 1998, Hollandia signed a contract with the San Marcos Unified School
11  District (District) for sale of a portion of its land. The contract required Hollandia to
12  remove certain manure and waste from the property. Specifically, "the obligation
13  herein extends only to removal of the surface wastes, the manure pond, manure pile
14  and corrals." (Exhibit 42-2; RJN No. 50.)

15      87.    According to the District, it was required by the state Department of
16  Education to perform a Preliminary Endangerment Assessment (PEA), overseen by
17  the California E.P.A., Department Of Toxic Substances Control (DTSC), prior to
18  purchasing the property. District letter to Hollandia, dated February 28, 2000. (Exhibit
19  43-1; RJN No. 51.)

20      The District hired Taylor-Hunter Associates, which submitted a PEA to the
21  DTSC dated February 5, 2001 (Assessment). The Assessment stated DTSC would
22  "make an informed decision regarding the potential risks posed at the site." The
23  Assessment said its "minor" concerns could be "effectively managed" during site
24  development. For one of those concerns, "The manure-rich sediment in and around the
25  former settling ponds … should be segregated during grading and disposed of offsite.
26  The manure-rich materials are not a regulated waste and do not exhibit characteristics
27  of a hazardous waste and therefore do not require disposal at a regulated facility."

28

(Emphasis added.) It recommended that the site be considered as a "No Further Action" site. (Page E-3.) (Exhibit 44-3; RJN No. 52.)

The District acknowledged on March 31, 2001, after a public hearing, that "DTSC will now issue a No Further Action letter… ." (Exhibit 45-1; RJN No. 53.)

88.    Congress also created a broad exclusion for "the normal application of fertilizer" from the definition of a "release" of a hazardous substance under CERCLA. 42 U.S.C. § 9601 (22). "The term "normal field application" means the act of putting fertilizer on crops or cropland, and does not mean any dumping, spilling, or emitting, whether accidental or intentional, in any other place or of significantly greater concentrations or amounts than are beneficial to crops." S. Rep. No. 96- 848, at 46 (page 353) (1980). None of the parties' pleadings account for this and other fertilizer exemptions discussed in the brief.

89.    Hollandia used greenwater as an organic fertilizer for its pasture crop, Bermuda grass. As for the solid cattle wastes, they were nearly always stockpiled and regularly sold and taken off site. See, e.g., RWQCB Inspection Form regarding Hollandia inspection on July 12, 1977. (HOL001602; exhibit 56-1; RJN 20-2) Therein, the inspector noted under the "Solids" category: "sold as fertilizer" and "Wastewater" was used for "irrigation." (Exhibit 56-1; RJN No. 20-2.)

90.    The final  RI/FS, combined with the response to public comments about the draft RI/FS, indicated the lake is flushed every year roughly three to nine times. "Watershed runoff is capable under typical conditions of exchanging the entire Lake volume 2.6 to 5.2 times each winter… . The amount and degree of Lake flushing that occurs is a direct result of the total amount and intensity of the annual precipitation… . During an El Nino cycle … [t]he result can be a significant increase in rainfall over the Watershed. … Even under drought conditions, the Lake could be effectively flushed each winter with the runoff inputs." (RI/FS, page 174; exhibit 1-27b; RJN No. 1, U.)

At page 173, the RI/FS said the watershed covers about 18,540 acres and the lake surface covers about 56 acres.  (Exhibit 1-24a.) The ratio of watershed to lake is over 300:1. (RI/FS, page 174; exhibit 1-27b; RJN No. 1, U.)

91.    The Final RI/FS dated September 30, 2016, reduced the exchange rate from upwards of 8 and 9 times per winter to 5.2, compared to the draft RI/FS and original Work Plan, without explanation. The reduction is undoubtedly due to using less than an average rain year (i.e., just three recent drought years, 2012-2015 – which "did not include an El Nino period"), not the average rainfall over a more representative period of time. (RI/FS, page 68; exhibit 1-17; RJN No. 1, V.)

Nonetheless, the RI/FS authors, in response 41 to Hollandia's public comment, in which Hollandia asked for an explanation of the above discrepancies, stated, "The calculation is an approximation, and both or either range of values is correct." (Exhibit 50-2; RJN Nos. I, V; 60.) Therefore, the authors acknowledged annual flushing could be as high as 9 times the volume of the lake per year.

92.    The RI/FS provided sufficient information to calculate that in just the wet year of 2005, there would have been 32 flushings. Total inflow to the lake was more than 14,000 acre-feet in 2005 according to the RI/FS, App. V, Table 1 (Exhibit 10-1; RJN No. 10.) Divide that by the estimated lake volume of 437 acre-feet (RI/FS, page 1; exhibit 1-4) to yield 32 flushings in 2005 alone. (RJN No.1, W-1.)

93.    "Nutrients are often recycled numerous times before being sequestered in the bottom sediments… ." (RI/FS, pages 17, 175; exhibit 1-28; RJN No. 1, X.) No sediment removal or dredging has been conducted in the lake. Estimated sedimentation rate is 1.8 cm/year. (RI/FS, page 176; exhibit 1-29; RJN No. 1, X)

If the last discharge by Hollandia alleged in the RI/FS were in 1998, then it was either flushed out of the lake or deposited in the sediment, buried below 34.2 centimeters (19 yrs x 1.8cm/yr = 34.2") of newer sediment.

94.    While the RI/FS did not state the depth at which nutrients in the lake bottom sediment becomes "sequestered," there is a common understanding among

1 lake scientists, for which judicial notice is appropriate. In peer reviewed "Modeling of
2 phosphorus dynamics in aquatic sediments: I-model development," Wang, *et al*.,
3 explains that: "The sediment-water flux study concerns the phosphorus dynamics in an
4 'active layer' of sediments, which is between the 'deep' sediments and the overlying
5 water. This layer is defined as that depth up to which there is influence of
6 bioturbation, and the potential for flux to the water column. The depth is generally
7 considered to the 10 cm. (citations). This layer of active sediments participates in the
8 exchange of phosphorus between the overlying water and sediments." Wang, Appan
9 and Gulliver (2003), "Modeling of phosphorus dynamics in aquatic sediments: I—
10 model development," *Water Research* 37 : 3928–3938. (RJN No. 57.) The article was
11 peer reviewed prior to publication. https://www.elsevier.com/journals/water-
12 research/0043-1354/guide-for-authors (Exhibit 48-4; RJN No. 56.)

13      95.    In a second peer-reviewed scientific article, "Role of sediment and
14 internal loading of phosphorus in shallow lakes," Sondergaard, *et al.*, reiterated the
15 observation in Wang that the top 10 centimeters are the interactive area, but that in
16 some instances, that can be up to 20-25 centimeters: "The sediment depth interacting
17 with the lake water is probably lake specific and highly dependent on lake
18 morphology, sediment characteristics and wind exposure. Most often, phosphorus in
19 the upper approximately 10 cm is considered to take part in the whole lake
20 metabolism (Bostrom *et al*., 1982), but mobility of phosphorus from depths down to
21 20-25 cm has been seen (Fig. 2, Sondergaard *et al*., 1999)."
22 https://www.researchgate.net/publication/226944017 Sondergaard, Jensen, and
23 Jeppeson (2003) "Role of sediment and internal loading of phosphorus in shallow
24 lakes," *Hydrobiologia* 506–509: 135–145, 2003. (Page 138; exhibit 49-5; RJN No.
25 58.) The article was peer reviewed prior to publication.
26 http://www.editorialmanager.com/hydr/default.aspx

27      96.    Here, by the parties' own admissions, Hollandia's theoretical discharges
28 are buried at least under 34.2 centimeters. Therefore, even from the most conservative

1    perspective, any speculative nutrients from Hollandia are buried too deeply in the

2    sediment to be consequential to the parties' response to the IO. Moreover, the parties

3    propose to spread alum over the lake bottom to prevent the type of interaction that

4    might otherwise allow nutrients in the top 10 centimeters to mix with the water

5    column. The RI/FS explained how that works: "Phosphorus inactivation requires

6    application of a larger dose compared with flocculation/settling so that the alum floc

7    forms a reactive barrier on the sediment surface that intercepts and irreversibly binds

8    phosphorus recycled within the sediments." (RI/FS, page 211; exhibit 1-32; RJN No.

9    1, W-2, W-3.)

10    97.    In the more detailed discussion, the RI/FS explained,

11    "Addition of alum to the water column of lakes achieves a number of benefits,

12    including the flocculation of dissolved and particulate forms of nutrients, removal of

13    these nutrients out of the water column through settling, and inactivation of mobile

14    phosphorus within bottom sediments. … A large-dose sediment inactivation treatment

15    can achieve theoretical improvements for 10 to 20 years only when external nutrient

16    loading is sufficiently controlled. Because it is difficult if not impossible to control

17    external loading during the extreme runoff events, this alternative refers to a low-dose

18    application strategy that targets dissolved and particulate forms within the water

19    column but can achieve some control of internal loading. … Conclusion. … [T]he

20    flocculation/settling/phosphorus inactivation alternative will be selected as a

21    component of the overall preferred remedy." (RI/FS, pages 230-231, 232; exhibit 1-33

22    – 1-35; RJN No. 1, W-3; RJN No. 59.)

23    98.    The original developing landowner (Clemson *et al*.,) of the lake and

24    surrounding property received permission in 1954 from the State of California

25    Department of Public Works Division of Water Resources (State) to divert San

26    Marcos Creek water to a proposed new dam for purposes of "irrigation and domestic"

27    use. (RI/FS Appendix L ("Dam Chronology and Documentation Part 2 of 2")

28    (CSM000582, CSM000584); exhibit 9-3; RJN No. 1, Z; RJN No. 9.)

99.    CDC (Gordon Frazar) acquired the dam, along with the lake and
surrounding property, in 1962. (App. L, CSM000609; CSM000595; CSM000629.)
(Exhibit 9-4, 9-5, 9-7.) CDC, in turn, then developed the Lake San Marcos community
around the lake. (App. L, CSM000620.) (Exhibit 9-6.)  In 1965, the State issued a
"License for Diversion and Use of Water," Permit 6305, License 7224, allowing CDC
to use 480 acre feet per year for "irrigation use." (RI/FS, page 1-2; exhibit 1-4 – 1-5.)
(App. L, CSM000658; exhibit 9-8; RJN No. 1, Z; RJN No. 9.)

100.    CDC submitted a "Report of Licensee for 1974, 1975, 1976" to the State,
signed under penalty of perjury, in which it reported it had used water for "grass &
citrus" crops (App. L, CSM000684) (exhibit 9-10) and that the water quality
contained agricultural wastes and would be "deleterious to fish and wildlife or which
would impair the water for beneficial purposes." (App. L, CSM000684-685; exhibit 9-
10 – 9-11; RJN No. 9.)

CDC signed a similar report for 1977, 1978, and 1979. (App. L, CSM000686-
687; exhibit 9-12 – 9-13; RJN No. 9.) CDC continued to identify the irrigation
purpose was for "grass/citrus" through 1991 in response to the State form request:
"Crops grown." (App. L, CSM000694; exhibit 9-14; RJN No. 9.)

Starting in 1992, the State form no longer required the Licensee to identify the
crops grown, and CDC simply continued to identify the purpose of the diversion was
"Irrigation." (App. L, CSM000696; exhibit 9-15; RJN No. 9) The last such report in
the Appendix was 1998, and it, too, stated "Irrigation" was the purpose. (App. L,
CSM000700; exhibit 9-16; RJN No. 9.)

CDC's rights under the License "are subject to the continuing authority of the
State Water Rights Board … to prevent waste, unreasonable use, unreasonable method
of use or unreasonable diversion of said water." (Exhibit 9-1; RJN No. 9; RJN No.
54.)

101.    CDC hired Orville P. Ball & Associates (Ball) in 1974 to address the
problem of eutrophication at the lake. The RI/FS attached this report as Appendix F

1  ("Historical Lake Data") to the RI/FS, which it submitted to the RWQCB. In, "LAKE

2  SAN MARCOS - A Lake Management and Rehabilitative Investigation," dated

3  December 27, 1974, Ball noted "The present dam which impounds Lake San Marcos

4  was built in 1962 … . The watershed stream course is known as San Marcos

5  Creek … ." (RI/FS, App. F, CDC0040718 (Page 2); exhibit 6-3; RJN No. 1, BB; RJN

6  No. 6).)

7       102.   Ball framed the issue that lead to CDC retaining him to study the lake:.

8  In "THE PROBLEM" section, Ball stated as follows: "Water quality deterioration

9  appears to have resulted in increasing frequency of noxious algae blooms, the dieoff

10  of fish, and erosion of the aesthetic environment in and adjacent to the lake." (RI/FS,

11  App. F, CDC0040717 (page 1); exhibit 6-2; RJN No. 1, CC; RJN No. 6.)

12      103.   In the "DISCUSSION OF RESULTS" section, Ball wrote at page 13

13  (exhibit 6-4), "The watershed survey was chemically interesting, and our on-site

14  inspection revealing." Ball identified watershed "features" as the adjacent residences

15  and golf courses, agriculture, cattle grazing, dairy farms, and high intensity chicken

16  (egg) production ranches. Ball tested the "standing water" in the creek "below

17  Hollandia Dairy," without mentioning the location was also in the vicinity of, and

18  likely just below, Wilgenburg Dairy, and found such water nutrient-rich, even though

19  he did not investigate to see if there were any discharges from Hollandia at the time.

20  (RI/FS, App. F, Table 9 ("Lake San Marcos Investigation Watershed Water Quality

21  Survey … 1974" (CDC0040753) (Exhibit 6-12; RJN No. 1, CC; RJN No. 6)

22      "Winter and spring rainfall and runoff into San Marcos Creek above the lake

23  results in direct physical transport of particulate organic material and the leaching of

24  surface and subsurface accumulation biochemical residuals, such as nitrates and

25  phosphates." (RI/FS, App. F, page 13, CDC0040729) (Exhibit 6-4; RJN No. 6) CDC

26  was on notice of Hollandia and other dairies in 1974.

27      104.   In the "DISCUSSION SUMMARY," Ball said: "Basically, the problem

28  is accelerated eutrophication." (Page 17.) (Exhibit 6-5.) "The cultural nature of the

Lake San Marcos watershed and the semi-closed nature of the water storage situation

(i.e. minimal annual dilution) are the major contributors to the eutrophication

processes. … There is no question that Lake San Marcos is rapidly approaching a

critical period where undesirable limnologicial conditions will render the aesthetic

environment increasingly objectionable … . The solution requires a reversal of the

eutrophication processes (rehabilitation) and the instigation of augmented lake

management practices. … Nutrient limitation schemes are presently considered the

most desirable from the standpoint of long range management."

(RI/FS, App. F, CDC0040733-004074, pages 17-18; exhibit 6-6; RJN No. 1, CC; RJN

No. 6.)

105.   Finally, Ball wrote: "Our recommendations are therefore based upon

achievable standards and goals plus rational compromises – all of which are

economically justified, technically feasible, and based upon standard practices and

prior achievement. … [T]he signs are presently clear that the aquatic environment will

continue to deteriorate unless corrective therapy is formulated and correctly applied."

(RI/FS, App. F, CDC0040736, page 20; exhibit 6-8; RJN No. 1, CC; RJN No. 6.)

106.   Under, "RECOMMENDATION", Ball queried:  "How much does it cost

per year to properly manage (labor, material, equipment, contractual services) an

attractive recreation-residential lake such as Lake San Marcos? Accumulated

experience shows a range of from $15-$50 per surface acre per month. For estimating

purposes, you should, in our judgement, be spending approximately $35 per surface

acre per month, or between $24,000-$25,000 per year. We urge that you appreciate

and accept this fiscal commitment for Lake San Marcos in the years ahead."

(RI/FS, App. F, CDC0040736, page 20; exhibit 6-8; RJN No. 1, CC; RJN No. 6.)

"[W]ater quality criteria as presented cannot practically be achieved in a single

year of rehabilitative work, and in fact, may never be actually achieved. It must be

considered as a goal, and every single attempt must be made to reverse the present

trend and grade in a consistent manner toward these criteria." (RI/FS, App. F, CDC0040737, page 21; exhibit 6-9; RJN No. 1, CC; RJN No. 6.)

107.   CDC also hired Ball to prepare another report regarding the sport fish population in the lake in 1979. (RI/FS, Appendix L, starting at CSM000707; exhibit 8-1; RJN No. 1, DD; RJN No. 8) Ball noted that, "During the 1974-1975 study of Lake San Marcos, it was determined that excessive nutrients (nitrogen and phosphorus) derived mostly from watershed inflow sources were responsible for the algae blooms, low oxygen levels at depth, and the subsequent history of fish kills."

Ball further noted that alum was applied to the lake to reduce phosphorus in 1975, which controlled algae blooms. "The procedure was a success." (RI/FS, page 239; App. L, CSM000711, page 5; exhibit 8-2; RJN No. 1, DD; RJN No. 8)

108.   The RI/FS also notes Ball had recognized dairy and poultry properties as watershed nutrient sources in a 1984 report. (RI/FS, page 73; exhibit 1-18; RJN No. 1.)

109.   In 1974, Ball recommended CDC implement the following suite of remedial measures to maintain the lake: A) restricting nutrient influx, B) "in-lake schemes to accelerate nutrient outflow or prevent recycling": 1) dredging for nutrient control, 2) nutrient inactivation/precipitation, 3) dilution/flushing, 4) lake aeration, 5) selective discharge, 6) biotic harvesting, 7) sediment exposure and desiccation, and 8) lake bottom sealing." (RI/FS, App. F, CDC0040735, page 19; exhibit 8-3; RJN No. 1, EE; RJN No. 8.)

110.   Regarding a qualified lake manager, Ball recommended: 1) hire an employee specifically for lake management; 2) train that person in proper lake management procedures … ; 3) provide the employee an operations manual attendant to lake management; 4) regular lake monitoring of key conditions. He further recommended installing a properly functioning aeration system for water quality (the present one was having "negligible" effect because it was "underdesigned" for the magnitude of water). (RI/FS, App. F, CDC0040739, pages 24; exhibit 8-4; RJN No. 1,

EE; RJN No. 8.) CDC did not follow through with many of these recommendations for long.

111.   According to the RI/FS (page 239), CDC last used alum in 1979.

As noted in the RI/FS in support of its recommendation to use alum as part of the lake remedial actions, "Application of alum to the Lake each year will effectively help control phosphorus levels, limit algal growth, and increase clarity." (RI/FS, page 232; exhibit 1-36; RJN No. 1, FF.)

112.   On May 9, 2001, the Lake San Marcos Community Association asked the RWQCB to have "Lake San Marcos listed as an impaired water body under the 303(d) list. We strongly believe the evidence that we have compiled to date demonstrates the high degree of contamination of our Lake … ." "During the summer months, the Lake is eutrophic – it is rich in organic materials but deficient in oxygen." "We had fish kills in the Lake last summer … ." (RI/FS, App. D ("303D Listing Info") (pages 42-43 of 46); exhibit 2-2; RJN No. 1, GG; RJN No. 2.)

113.   (blank)

114.   The RWQCB recently analyzed the following statement by CDC in a Technical Memorandum requested by the RWQCB: "no records of lake operation and maintenance appear to have been kept. However, it is our understanding that CDC has managed the lake according to standard lake management practices for the times throughout successive years." On June 2, 2016, in response, the RWQCB issued the following finding: "We disagree with this statement. Limited information provided in the Memo indicates that aeration was performed in the mid-1960s to mid-1970s and alum treatments were applied to the lake in the 1970s. With the exception of periodic aquatic plant removal, no additional lake treatments have been performed for over 40 years. The statement regarding CDC managing the lake according to standard lake management practices for the times is not based on fact. Further, if no records have been kept then how does CDC know that the lake has been properly managed? The lake appears to have been managed poorly or not at all, given that it is of poor quality

1  and eutrophic." (Letter from Mearon to Vitti, June 2, 2016, page 28, Item 192)

2  (underline added) (Exhibit 47-4).)

3      Page one of the letter indicates the Technical Memorandum was prepared in

4  response to supplemental information sought by the RWQCB regarding lake

5  management pursuant to the IO. (Exhibit 47-1.)

6  http://geotracker.waterboards.ca.gov/regulators/deliverable_documents/2144134342/D

7  raft%20RIFS%20Report_Comment%20Letter_060216.pdf (RJN No. 1, JJ-3; RJN No.

8  56.)

9      115.   Appendix E to the RI/FS contains the "Water Quality Management in

10  Lake San Marcos: Analysis of Available Data Final Report," prepared by Dr. Michael

11  Anderson for San Marcos, dated February 3, 2010. In his "Introduction," he noted,

12  "The lake suffers algal blooms and has been placed on the 303(d) list for nutrients,

13  ammonia as N and phosphorus. The primary tributary to the lake, San Marcos Creek,

14  is also listed for phosphorus, as well as DDE and sediment toxicity." (RI/FS, App. E,

15  exhibit 3-3; RJN No. 3.)

16      He wrote, "Available data describing water quality conditions of San Marcos

17  Creek and Lake San Marcos have been provided by … San Marcos, San Diego

18  County, … Escondido, … Lake San Marcos Community Association, and other

19  private parties." The 3,259 pages of material were bound into a "Compendium" and

20  "used to develop a summary of historical water quality as well as current conditions."

21  The 1974 Ball report was one of the sources of information. (RI/FS, App. E, page 1;

22  exhibit 3-3; RJN No. 1, HH; RJN No. 3) The Compendium was relied upon in the

23  RI/FS. (RI/FS, pages 21-22; exhibit 1-14 – 1-15; RJN No. 1, HH.)

24      116.   Dr. Anderson noted fish kills in 1968, 1974, 1976, and 2006. (RI/FS,

25  App. E, page 8; exhibit 3-6; RJN No. 3.) He went on to note the "near-record runoff in

26  early 2005 and resulting problems in the watershed" with increased phosphorus

27  concentrations in all the lakes in the region (RI/FS, App. E, page 4; exhibit 3-5; RJN

28  No. 1, HH; RJN No. 3.)

Dr. Anderson also reported that the water quality in the lake has improved significantly since its nadir in the 1970s. He identified "very high" concentrations of nutrients in 1974, with "significantly lower nutrient levels" by 1991 (RI/FS, App. E, page 4; exhibit 3-5; RJN No. 1, HH; RJN No. 3.) "Nutrient concentrations in … 2009 … were comparable to concentrations reported in 1991. … It seems likely that changes in land-use and improvements in agricultural practices and waste treatment and disposal were responsible for the dramatic reductions in nutrient concentrations between 1974 and 1991. … [L]imited subsequent improvements have been achieved over the past 18 years, with periodic episodes of large external nutrient loading from the watershed." (RI/FS, App. E, page 4; exhibit 3-5; RJN No. 1, HH; RJN No. 3.)

117.   Dr. Anderson advised that "a number of different in-lake strategies can be employed to improve water quality in Lake San Marcos. … Excessive nutrients are the cause of the impairment….  While it will be critical to control external loading of nutrients to the lake, actions within the lake will also be necessary to meet water quality goals. In some cases, in-lake treatment can offer a more cost-effective strategy for reducing nutrient concentrations than actions in the watershed." (RI/FS, App. E, page 17; exhibit 3-7; RJN No. 1, HH; RJN No. 3.) He then analyzed various possible strategies for the lake. (RI/FS, App. E, pages 18-22; exhibit 3-8 – 3-12; RJN No. 1, HH; RJN No. 3.)

118.   PACE Advanced Water Engineering estimated 177,050 gallons of sewage from VWD's pipes went into the lake in 2005 in a year of heavy rains. (RI/FS, App. AA; exhibit 11-1; RJN No. 1, II; RJN No. 11.)

119.   The design and operation of the dam that created Lake San Marcos contributes to the poor water quality in the lake. Because the design of the dam allows surface outflow only when the lake elevation exceeds the spillway elevation (and by withdrawing water at the shallow end for irrigation of one golf course), the dam acts as an extremely efficient sediment trap. "Periodic dam overflow and Lake water extraction provide some relief from Watershed loading. Nevertheless, nutrients are

1   retained in the Lake, promoting long-term biogeochemical recycling from sediments
2   to the water column. … Sediment nitrogen and phosphorus concentration increase
3   with water depth and proximity to the dam on the deeper southern end of the Lake.
4   Excess nutrients in turn promote algal production in the Lake." (RI/FS, page ES-2;
5   exhibit 1-3; RJN No. 1.)

6       120.   The RWQCB has already evaluated the consultants' data that the parties
7   provided the agency with the hopes they could pin some blame on Hollandia for past
8   and present releases. The Final RI/FS authors appear to have put a different emphasis
9   on Dr. Anderson's language from the paragraph 116, above, when they wrote:
10  "[H]istorical nutrient releases from the Watershed have also likely contributed to Lake
11  nutrient loading over time, such as at historical former dairy properties" (largely
12  quoting Dr. Anderson - except he was silent as to causes). (RI/FS, page 178; exhibit 1-
13  130; RJN No. 1.)

14      The RWQCB had already criticized the draft RI/FS for using the same
15  language. The RWQCB complained with the following *finding*: "The RI portion of the
16  Report does not provide evidence for the statement that, 'Historical episodic releases
17  from the watershed have also contributed to lake nutrient loading over time, such as at
18  historical former dairy or poultry properties.' <u>We agree that historical episodic
19  releases likely have added to the nutrient load, but do not see evidence of these
20  contributions from the historical dairy or poultry operations.</u>" (Letter from RWQCB,
21  Sarah Mearon, to Vitti and Thornberry, dated June 2, 2016, Item 96) (underlining
22  added); exhibit 47-2; RJN No. 1, JJ-1; RJN No. 56).) There was no new study or
23  information reported in the final RI/FS compared to the draft RI/FS.

24      121.   The RWQCB also refuted the draft RI/FS conclusion that Hollandia and
25  another dairy and an egg farm contributed "significant quantities of nutrients" to the
26  creek based upon 2015 data with this *finding:* "<u>This conclusion, however, is not
27  supported by the data.</u> … <u>Further, the Report states that groundwater contributes
28  limited nutrients to the creek and lake; therefore, there does not appear to be evidence</u>

of a pathway for the soil nutrients to the receiving water (the creek)." ) (Letter from RWQCB to CDC's Vitti and San Marcos' Thornberry, dated June 2, 2016, Item 99) (underlining added).) (Exhibit 47-3; RJN No. 1, JJ-2; RJN No. 56.)

The final RI/FS authors, having no new investigation or evidence to report, wrote the following conclusion that could apply to every property in the watershed: "[Hollandia] (and other former dairy and agricultural properties) … historically contributed nutrients to San Marcos Creek over the course of their former agricultural operations. … [R]esidual soil nutrients are present in the vicinity of the agricultural properties." (RI/FS, page 181; exhibit 1-31; RJN No. 1.) There was no new study or information reported in the final RI/FS.

122.  CDC and the other parties estimate a minimum of $11.3 to remediate the lake. The RI/FS states, "Combined, the estimated costs for Lake and Watershed preferred options total approximately $11.3 million over 30 years (Table 73)." (Exhibit 1-37 – 1-39.)  Those options include agricultural BMPs, stream restoration, phosphorus deactivation, diffused aeration, and selective withdrawal of deeper parts of the lake water for irrigation. (RI/FS, page 242; exhibit 1-37; Table 73; exhibit 1-39; RJN No. 1, KK.)

123.  The RI/FS does not show that the CDC ever gave notice to Hollandia that its operations might be impacting the lake. Nor does it show that the RWQCB ever informed Hollandia that one of its few discharges actually reached or impacted the lake.

124.  CDC used lake water for its St. Mark Golf Course and thereby lessened its fertilizer needs. "[T]he practice at St. Mark Golf Club (*sic*) of using Lake water for irrigation" provides "relatively higher nutrient content compared to potable water. This would conceptually result in the need for lesser or no fertilizer application on that golf course." (RI/FS, page 53; exhibit 1-16; RJN No. 1, LL.)

125.  The RWQCB has found no pathway for nutrients from soil at Hollandia today to the creek (see para. 120-121, above). The following aerial picture of

Hollandia, retrieved from Google Earth on April 14, 2015, is a fair depiction of the property today, which is largely bound by roads. I have been to the property on many occasions and know its appearance. The picture accurately reflects that the property is covered almost exclusively by buildings and parking structures. (Exhibit 46-1; RJN No. 55.) To the extent the parties want to claim there are cattle wastes still on the property, they are effectively capped.



126.    There are no allegations by CDC and/or the parties that continuing nuisance or trespass is reasonably abatable at a reasonable price; that the claimed

damages exceed the fair share of any party or that the party, as opposed to its insurer, paid such costs. The RI/FS does not show CDC ever gave notice to Hollandia or that the RWQCB found any discharges actually reached or impacted the lake.

DATED: February 10, 2017                By: /s/ John H. Reaves
                                        John H. Reaves, Esq.,
                                        Attorney for Hollandia Dairy, Inc.