1

2

3

4

5

6

7

8

9

10

11 **UNITED STATES DISTRICT COURT**

12 **SOUTHERN DISTRICT OF CALIFORNIA**

13 | CITIZENS DEVELOPMENT CORPORATION, | Case No. 3:12-CV-00334-GPC-KSC

14 INC., a California corporation,

**DECLARATION OF JOHN REAVES IN**
15                                         Plaintiff, **SUPPORT OF HOLLANDIA DAIRY,**
v. **INC.'S MOTION FOR DETERMINATION**
**OF DISCOVERY DISPUTES RE ALL**
16 **ISSUES AGAINST ALL FIVE PARTIES IN**
COUNTY OF SAN DIEGO, a California **RESPONSE TO HOLLANDIA DAIRY,**
17 municipal corporation; CITY OF SAN MARCOS, **INC.'S DISCOVERY, SET ONE; REQUEST**
a California municipal corporation; CITY OF **FOR SANCTIONS AGAINST EACH**
18 ESCONDIDO, a California municipal corporation; **PARTY AND/OR COUNSEL OF RECORD**
VALLECITOS WATER DISTRICT, a California
19 municipal corporation; HOLLANDIA DAIRY,
INC., a California corporation; and DOES 1 Complaint Filed:    February 8, 2012
20 through 100, inclusive, Trial:               None Set

21                                         Defendants.

22 ─────────────────────────────

AND RELATED COUNTER-ACTIONS AND
23 CROSS-ACTIONS.

24

25

26

27

28

# DECLARATION OF JOHN H. REAVES

I, John H. Reaves, declare as follows:

1.       I am an attorney duly licensed to practice before the courts in California and before this District Court. I am counsel for Defendant Hollandia Dairy, Inc. (Hollandia) in the above action. I have personal knowledge of the facts set forth in this declaration and if called as a witness could testify competently to thereto. As to those facts to which I do not have personal knowledge, the facts presented herein are based on information and belief and, on these bases, these facts are set forth below. In particular, the documents produced in this case are in the tens of thousands, often in disorganized, nonchronological, and illogical order, and I have relied upon other attorneys to assist me in reviewing documents and upon their observations about what has or has not been produced. Due to a miscommunication amongst my team members regarding some of the documents reviewed, I signed, and served upon the other parties, February 26, 2018 and April 24, 2018 declarations with inadvertently erroneous information about the documents produced by some of the other parties. This declaration corrects those errors and supersedes my February 26, 2018 and April 24, 2018 declarations. The purpose of a "Joint Motion" should be to present all parties' positions as accurately as possible in one motion, and through ongoing meet and confer, particularly if an inaccuracy is pointed out. I have tried with this corrected declaration to achieve that purpose. I am submitting this declaration in support of all the Motions regarding all the discovery disputes between the RI/FS Parties (CDC and the Public Agency Defendants) and Hollandia. Abbreviations used in this declaration are defined in the Motions. Comments about what have not been produced are based on information and belief provided to me by my team based on their combing of the documents.

2.       On November 2, 2017, I served Hollandia's First Set of Interrogatories, Requests for Production of Documents, and Requests for Admission on all parties. All parties requested extensions to respond. Kerry Stack (my co-counsel) and I met and conferred with each party (except Mr. Stack as to the City of Escondido when he was on vacation). We discussed claims of mediation confidentiality/privilege, attorney work product, common interest/joint defense privilege, and consultant assisting counsel in preparation for trial in detail as well as other issues not involving claims

1  of privilege in an effort to resolve these discovery disputes due to the improper, inadequate,

2  incomplete, and/or evasive responses and lack of merit of their objections. Mr. Stack met and

3  conferred in person. I participated by phone in each instance, as I am no longer located in San Diego

4  County, having moved from the county one year ago. Each party agreed to amend its responses in

5  varying degrees, but no common ground was found on the various privilege disputes and several other

6  issues.

7       3.       Details of the meet and confer with CDC are as follows. Hollandia presented CDC with

8  a meet and confer demand on January 11, 2018. Therein, Hollandia raised concerns about the extent of

9  documents that were withheld based on various assertions of privilege and confidentiality applicable to

10  nearly all of CDC's responses and privilege log, and specifically addressed ROG Nos. 1, 4, 6, 7, 8, 9,

11  14, 16, 17, 18, 19, 22, and RFA Nos. 4, 20, 21, 22, 23, 24, for that and other reasons. The parties met

12  and conferred on February 5, 2018, at the office of Jeff Caufield. Present were Mr. Caufield, Matt

13  McMillan, Doug Simpson, and Kerry Stack. I participated by phone. Based upon representations and

14  clarification by CDC as to adequacy of responses for some of the requests, and its agreement to amend

15  certain other responses, Hollandia was able to whittle the dispute down to a small fraction of the

16  original, aside from the privilege and a few other issues. CDC amended its privilege log, responses to

17  RFA No. 10, and ROG Nos. 14 and 24 in non-substantial respects, and was unwilling to amend other

18  discovery requests. The parties agreed to defer on the privilege issue for all the discovery because it

19  was clear the court would have to issue rulings.

20       4.       I also provided a draft Joint Motion that addressed the issues of privilege raised in the

21  current Motions as to all parties and provided many legal citations in support of Hollandia's position,

22  to CDC on February 26, 2018. That was the deadline prior to the court extending the time to file a joint

23  motion to compel as against all parties the next day. CDC was nonresponsive before that date when I

24  asked it to agree to an extension of time for Hollandia to serve its draft joint motion in the event the

25  court did not grant an order extending time as to all parties. I felt compelled to serve the motion to

26  avoid potentially missing a deadline without express permission from CDC. After Hollandia sent the

27  Joint Motion, I asked CDC if it agreed with any of Hollandia's legal points raised therein in an

28

DECLARATION OF JOHN REAVES IN SUPPORT OF JOINT MOTIONS
FOR DETERMINATION OF DISCOVERY DISPUTE RE ISSUES OF PRIVILEGE RAISED BY ALL PARTIES
AND OTHER ISSUES AS TO EACH PARTY IN RESPONSE TO HOLLANDIA DAIRY'S DISCOVERY, SET ONE

ongoing attempt to meet and confer. A few hours after receipt, CDC responded by e-mail dated February 27, 2018: "I (Jeff Caufield) read you [sic] motion and it is barely intelligible and fraught with simply invented arguments and allegations. Nothing I saw had merit such that we would consider modifying our responses." Nonetheless, Mr. Caufield restated his assertion from the meet and confer that CDC would look for communications with the Regional Board that were not publicly available: "Moreover, as we've indicated, to the extent additional communications with the Regional Board (which are already publicly available anyway) we've followed up with Great Ecology to see if they can locate any additional communications with the RWQCB that have not already been produced." A true and correct copy of the e-mail is attached as **Exhibit 1**. I am not aware of any new documents being produced since that time. CDC previously provided additional documents after the meet and confer, but has not provided any notes, analyses, discussions, or communications by its consultants.

5.      Details of the meet and confer with CSD are as follows. CSD requested an extension of time to respond, which Hollandia provided. CSD was the only party to object to all discovery requests for production and interrogatories and most requests for admission. CSD did not produce a privilege log. CSD relied on its former document production (via access made available during mediation) that did not cover all the requests for production made here. Hollandia presented CSD with a meet and confer demand on January 11, 2018. Therein, Hollandia raised concerns about the extent of documents that were withheld based on various assertions of privilege and confidentiality applicable to nearly all of CSD's responses and *lack of a privilege log*, and specifically addressed RFP Nos. 1-18, ROG Nos. 1-21, and RFA Nos. 1, 3, 5-6, 8, 11-13, 15, 17-19, 21 for that and other reasons. CSD's document production to date consists of providing access to documents early in mediation and offered again at the outset of this discovery period pursuant to Rule 26. Rudy Perrino (for CSD and located in Los Angeles), Kerry Stack, and I all participated by phone in a meet and confer on February 15, 2018. Based upon representations and clarification by Mr. Perrino as to adequacy of responses for some of the requests, and its agreement to amend certain other responses, Hollandia was able to whittle the dispute down to a small fraction of the original, aside from the privilege issues. The parties agreed to defer on the privilege issue for all the discovery because it was clear the court would have to issue

rulings. CSD promised to amend and supplement its responses and documents during the meet and confer, including providing information regarding its consultants' communications with the Regional Board. Specifically, during the meet and confer, Mr. Perrino agreed to produce: the latest MS4 (stormwater) documents and track down nutrient TMDL related documents; recent documents showing yearly quantities of nutrients; update CSD's fertilizing practices if they exist; documents that were claimed to be privileged and reflected investigation regarding third party complaints; some documents concerning evidence about the responsibility of Hollandia for damages; investigation of Hollandia; insurance payments (not checks), including invoices; Wilgenberg Dairy file; Prohoroff egg farm file. CSD and Hollandia agreed RFP No. 9 would be limited to the substances identified in the IO. CSD also agreed that communications by its consultants with other consultants working on the IO are not privileged, and that there may be more responsive documents than contained in the RI/FS and appendices.

CSD also agreed it would amend all of the requested RFAs contained in the present Motion. Hollandia has not yet received any amendments or documents promised, discussed, or that would be looked for, during the meet and confer. After pressing many times without success for a supplemental response in time for me to able to review before having to serve the Joint Motion, I expressed some frustration on April 9, 2018: "I've not heard back from you. Do you plan to serve us any new documents or amended responses? How do you plan to reconcile getting these to us in time for us to assess before the current deadline? You've had over five months since discovery was served and nearly two months since we met and conferred." Rudy Perrino responded that day, "I don't appreciate the paternalistic tone of your e-mail. … As for the issues we do agree on, I believe I will have all documents and answers to my questions by the 16th. I expect to get amended responses to you some time during the week of the 23rd and to make the documents available for your inspection at the same time." By the time Hollandia served its portion of these Motions, I had not received any supplementation.

Note that CSD's consultant, Steve Figgins, was included in e-mails with other consultants and the Regional Board in **Exhibits 3, 10, 16, and 17**, as well as referenced in Agendas for the Technical

Meetings with the Regional Board in **Exhibit 8-9**. True and correct copies of the e-mails and agendas are attached as **Exhibit 3, 8, 9, 10, 16, and 17.** The attached e-mail, **Exhibit 16**, dated October 16, 2017 – produced by CSM and VWD - reflects Mr. Figgins' notes of a Technical Meeting with the Regional Board in which the group discussed an e-mail from a resident of LSM "about continued problems in the lake." Mr. Figgins talked about recent efforts that had reduced "phosphorous" in the lake. All of the parties' consultants and members of the Regional Board are included in the e-mail, yet, to my knowledge, only CSM and VWD produced it. Mr. Figgins also authored an e-mail, attached as **Exhibit 17**, to all the consultants, members of the Regional Board, and the mediator, Tim Gallagher, dated February 28, 2018, regarding stormwater sampling and application for an algaecide permit – yet, to my knowledge, only CSM produced this document. The mediator responded on March 1, 2018 and said, "And I am working on funding." (See **Exhibit 17**.) To date, to my knowledge CSD has not produced or described any communications between its consultants and any third parties, including the Regional Board, or provided any notes, analyses, discussions, or communications by its consultants.

6.    Details of the meet and confer with VWD are as follows. VWD requested an extension of time to respond, which Hollandia provided, and VWD served its responses December 22, 2017. Hollandia presented VWD with a meet and confer demand on January 11, 2018. Therein, Hollandia raised concerns about the extent of documents that were withheld based on various assertions of privilege and confidentiality applicable to nearly all of VWD's responses and privilege log, and specifically addressed ROG Nos. 3, 5, 6-7, 11, 13-14 and RFA Nos. 11-12, 19 for that and other reasons. The parties met and conferred on February 14, 2018. Kerry Stack met with Athena Troy at her office, and I participated by phone. Based upon representations and clarification by VWD as to adequacy of responses for some of the requests, and its agreement to amend certain other responses, Hollandia was able to whittle the dispute down to a small fraction of the original, aside from the privilege issues. The parties agreed to defer on the privilege issue for all the discovery because it was clear the court would have to issue rulings. Ms. Troy also agreed to inquire to her consultant as to whether the consultant had communications with the Regional Board. Several communications by VWD counsel, James Dodson, with the Regional Board and various third parties were produced by

way of amendment. (See, e.g., **Exhibit 2** (dated November 7, 2009).) With regard to the production of e-mails between all the parties' consultants and the Regional Board, my team has not found all of the agendas, although VWD produced most of them from 2014 forward. It is not clear when these meetings began. I do not believe we have the agendas for all of the monthly meetings that the "Tech Team" had with the RWQCB. To my knowledge, only a few meeting minutes were found, and none of the consultants' handwritten notes on these meetings has been provided. VWD also produced a redacted e-mail dated November 5, 2014 from Nick Buhbe, CDC's consultant, to the other RI/FS Parties' consultants and members of the Regional Board, which showed his proposal to get approval from all of the RI/FS Parties and the regional Board before removing the notation, "mediation confidential" and "draft" from Draft Agendas.  (See, paragraph 17 for details, **Exhibit 3** (dated November 5, 2014).) Two other consultants in that e-mail were SCS Engineers, Chuck Pryatel and Daniel Johnson, hired by the PADs and CDC, yet to my knowledge CDC and the other parties have not produced this document (a consultant for each of the parties was included in the e-mails: Nick Buhbe for CDC; Steve Figgins for CSD; Tim Simpson for COE; Andy Komor for VWD; and Gary Brugger for CSM (note that the mediator, Tim Gallagher, was also copied on this e-mail although the subject had nothing to do with mediation; Regional Board staff, Laurie Walsh, was included).) A true and correct copy of the above referenced e-mail is attached as **Exhibit 3**. I asked Ms. Troy to provide an unredacted version, which she refused. CSM produced a variation on this document after the meet and confer, but with the date of November 6, 2014. To my knowledge, no other party produced either. Further, the Regional Board had not produced these documents in response to Public Record Requests by Hollandia. (See, paragraphs 44-45 for details) Additionally, CSM produced other e-mails involving all the consultants and the Regional Board that that are attached as **Exhibits 16 and 17** (dated October 16, 2017, and February 26, 2018 to March 1, 2018, respectively). Although VWD's consultants are included, my team has not found that VWD produced **Exhibit 17**. VWD provided additional documents after the meet and confer, but has not provided any notes, analyses, discussions, or communications by its consultants.

7.      Details of the meet and confer with CSM are as follows. CSM requested an extension of time to respond, which Hollandia provided.  Hollandia presented CSM with a meet and confer demand on January 11, 2018. Therein, Hollandia raised concerns about the extent of documents that were withheld based on various assertions of privilege and confidentiality applicable to nearly all of CSM's responses and privilege log, and specifically addressed RFA Nos. 9, 11-12, 19, ROG Nos. 3-4, 6-8, 13 and RFA Nos. 10, 17 for that and other reasons. The parties met and conferred on February 15, 2018. Ernest Slome and Kerry Stack met in person at Mr. Slome's office in San Diego, while Berj Parseghian (also CSM counsel) and I participated by phone. Based upon representations and clarification by CSM as to adequacy of responses for some of the requests, and its agreement to amend certain other responses, Hollandia was able to whittle the dispute down to a small fraction of the original, aside from the privilege issues. CSM amended its response to RFP Nos. 9, 12, ROG Nos. 14, 24, RFA No. 10, and privilege log in a tiny respect, but was unwilling to amend other discovery requests. The parties agreed to defer on the privilege issue for all the discovery because it was clear the court would have to issue rulings. Mr. Slome also agreed to inquire to his consultant as to whether the consultant had communications with the Regional Board. CSM produced a few e-mail exchanges with the Regional Board, scattered over time, and largely duplicating the limited e-mail exchanges between the parties' consultants and the Regional Board that VWD had previously produced after that meet and confer. To my knowledge, only CSM produced **Exhibit 3**, which included all the parties' consultants, and only VWD produced an e-mail dated October 5, 2015 from Chad Loflen with the Regional Board to three of the consultants of the RI/FS Parties (CSD, CSM, and John Dodge with LimnoTech), where the Subject line was "RE: Mediation Settlement Confidential." In said e-mail, the Regional Board member suggested additional toxicity studies in response to a call from Gary Brugger, consultant for CSM. A true and correct copy of said latter e-mail is attached as **Exhibit 4** (see paragraph 18). CDC provided additional documents after the meet and confer, but has not provided any notes, analyses, discussions, or communications by its consultants.

8.      Details of the meet and confer with COE are as follows. COE requested an extension of time to respond to January 12, 2018, which Hollandia provided. I sent a meet and confer statement to

1   COE on January 26, 2018. The parties met and conferred on March 9, 2018. Kerry Stack was on

2   vacation, and Josh Levine (located in Los Angeles) and I participated by phone. Based upon

3   representations and clarification by COE as to adequacy of responses for some of the requests, and its

4   agreement to amend certain other responses, Hollandia was able to whittle the dispute down to a small

5   fraction of the original, aside from the privilege issues. COE amended its response to ROG No. 10,

6   RFA Nos. 11-13, and privilege log in a tiny respect, but was unwilling to amend other discovery

7   requests. The parties agreed to defer on the privilege issue for all the discovery because it was clear the

8   court would have to issue rulings. Mr. Levine also agreed to inquire to his consultant as to whether the

9   consultant had communications with the Regional Board. Mr. Levine wrote on April 3, 2018, however,

10  that his consultant, Tim Simpson, "did not believe there were" any documents sent by his firm to the

11  Regional Board. Mr. Levine had agreed to look more broadly for communications with the Regional

12  Board, so it is unclear if there is a play on semantics over "documents sent" to the Regional Board

13  versus "communications with" the Regional Board. Documents produced by VWD, however, show e-

14  mail communications between all the parties' consultants and Regional Board staff and involving Mr.

15  Simpson in various e-mail chains and in an e-mail obtained by Public Records Request (see, **Exhibit**

16  **10**; see also, **Exhibits 3, 16, and 17** with Mr. Simpson in the e-mail chain). The Regional Board had

17  not produced **Exhibit 2, 16, or 17** in response to Public Record Requests by Hollandia, emphasizing

18  why COE and the parties need to produce all responsive documents and not claim they are equally

19  available to Hollandia publicly. COE produced no such documents. During the meet and confer,

20  Hollandia also agreed with COE to treat the starting date for Interrogatory No. 6 (and related RFP),

21  regarding potential nutrient TMDL, as the date the U.S. EPA first starting talking about a potential

22  TMDL for nutrients for the watershed leading to the lake. It does not appear that COE ever provided

23  any notes, analyses, discussions, or communications by its consultants or communications with the

24  Regional Board or third parties.

25      9.      I also shared the same early rough draft of the present Motion that I sent to CDC on

26  February 27, 2018, with all the PADs on March 2, 2018, asking all parties to meet and confer and to

27  share their legal positions and authorities in response to said draft so that we could further refine the

28

1    issues for all parties and this Court. None did. Mr. Perrino, for CSD, wrote to me, copied to all, on

2    March 5, 2018: "I don't foresee that happening." I also proposed an early circulation of briefs and

3    asked for an opportunity to include its reply, if needed, in the Joint Motion. CDC refused on all counts,

4    and no other party urged otherwise. E-mails and agendas produced by VWD, CSM, and CDC reflect

5    each party's consultants had meetings and discussions with the Regional Board staff on a monthly

6    basis, as well as ad hoc calls with Regional Board staff, to go over technical aspects of the

7    investigation and remedial analysis. Yet no consultant records, besides invoices, have been produced

8    or described by any of the Responding Parties. No parties produced any notes of their consultants

9    relating to meetings with the Regional Board, except for a few "minutes" from RWQCB monthly calls

10   and a few notes within e-mails, although that was requested in Hollandia's discovery herein and

11   reinforced in all the meet and confers. **Exhibit 16** reflects notes by CSD's consultant, Mr. Figgins, in

12   an e-mail to the consultants and Regional Board, highlighting the obvious - that consultants took notes

13   at the meetings. I have also seen references to technical memos that the Tech Team prepared for the

14   RWQCB that I have not seen produced. For instance, in an e-mail dated March 22, 2016, (produced by

15   CDC) Nick Buhbe told the RWQCB staff that he was preparing a technical memo and that he would

16   share the "high points" that week.

17         10.     The RI/FS Parties have not identified narrowly enough which categories or documents

18   fall within their privilege logs for me to identify with particularity what documents have been withheld

19   and why. It appears to me that many of the broad categories could embrace documents not protected

20   under any analysis. As an illustration, the RI/FS Parties have not distinguished between consultants

21   involved in part in mediation and in part in investigations in the watershed to comply with the IO/PA

22   who then had communications with other consultants who prepared the RI/FS.

23         11.     Hollandia seeks data, studies, modeling, and percipient witness information, including

24   opinions reached by consultants during the course of their work on the IO/PA (like treating

25   physicians). Hollandia does not seek new, yet-to-be formed opinions. In my opinion, the evidence that

26   I have seen indicates that the RI/FS Parties have conspired with each other and their consultants to

27   engineer a bias in the direction and nature of testing and modeling to Hollandia's detriment, to conceal

28

1  information that exculpates Hollandia, to make misrepresentations to the Regional Board to try to get

2  the Board to add Hollandia to the IO, and/or to hide or disguise the nature of damages allegedly caused

3  by, and sought from, Hollandia., all of which I contend is relevant to the issues presented in this

4  lawsuit. Much, if not all, of the collusion appears to have transpired in what the RI/FS Parties claim to

5  have been mediation or subject to a common interest or joint defense agreement, seemingly

6  encompassing all communications between the RI/FS Parties since at least 2011, when the IO was on

7  the horizon. Yet, I have seen communications amongst the RI/FS Parties and others as early as 2005,

8  after massive sewage spills by VWD into the lake galvanized broad support for Regional Board and

9  PAD action with CDC. The RI/FS Parties do not appear to have produced all of these communications.

10 At least one of the privilege logs served by VWD included parties unrelated to this litigation in the list

11 of recipients/authors, such as California Coastkeeper Alliance and numerous other third parties. A true

12 and correct copy of an e-mail dated November 7, 2009, from Jim Dodson, counsel for VWD to many

13 parties (not in this litigation) with a draft Participation Agreement and Common Interest Agreement

14 that was being proposed, is attached as **Exhibit 2**. The e-mail attachments are not part of the Exhibit.

15       12.     There is no confidentiality agreement binding on Hollandia, except during one phase of

16 mediation. Hollandia agreed to confidentiality during the limited time in which it participated in the

17 mediation and is not asking to obtain information expressly shared with Hollandia during that time.

18 The parties mediated both before and after Hollandia's limited participation. During the time Hollandia

19 was in the mediation, the RI/FS Parties worked privately on the IO/PA without allowing Hollandia's

20 participation in technical committees or decisions unless Hollandia paid 1/6 of all their costs, which

21 Hollandia declined to do. Hollandia is seeking information and consultant observations and opinions

22 with respect to what the parties learned and how the parties complied with the IO/PA, wherever

23 compiled or discussed.

24       13.     The RI/FS Parties have made technical decisions about how to comply with the IO/PA,

25 and the discussion of any disagreements among consultants behind those technical decisions, which

26 may be exculpatory to Hollandia, are not disclosed in the publicly-available documents on the

27 Regional Board website (Geotracker) (i.e., the RI/FS and appendices). Instead, in my opinion, the

28

1   RI/FS Parties are using the mediation as a shield to hide information learned and how they decided to

2   perform work to investigate the sources of nutrients to the Creek and Lake, including any avenues that

3   were not pursued because they would absolve Hollandia or harm the RI/FS Parties. The RI/FS Parties

4   would have had to do such work to comply with the IO/PA whether or not they were in litigation, and

5   the work involves consultants selecting areas of investigation, collecting data, agreeing on

6   assumptions, reconciling differences of opinion, and recommending solutions. The results and output

7   of the RI/FS are only as good as the data and assumptions used as input and the confidence level in the

8   results. The RI/FS Parties controlled the data, giving them the ability to skew the investigation and

9   modeling to their advantage. Hollandia seeks a full understanding of how the RI/FS Parties'

10  consultants and RI/FS consultants arrived at their decisions to perform investigations, reach opinions,

11  resolve differences, draft the RI/FS as they did, and whether those decisions were driven by a bias

12  against Hollandia.

13      14.    CDC only sued one private party/company – Hollandia – and the RI/FS only targeted

14  one private party/company - Hollandia. Nonetheless, the RI/FS mentioned many other known

15  historical and current substantial sources, but failed to do an equivalent investigation into them that

16  would quantify relative contributions. The RI/FS failed to quantify and rank the RI/FS Parties' own

17  contributions, including: over 870,490 gallons of raw sewage admitted by VWD to have entered the

18  creek or lake; golf courses and avocado groves around the lake owned at some time by CDC; a

19  property now owned by CSM, formerly Wilgenburg Dairy, that pled guilty in 1988 to violating the

20  Clean Water Act by dumping cow wastes by pipeline directly into the creek across from Hollandia;

21  and a former egg farm (Prohoroff) that was the world's largest, and is now where California State

22  University, San Marcos is located.

23      15.    The PADs entered into the PA, which COE (Escondido) joined through the CA in 2011

24  in order to address nutrient impairment in the creek and lake. Therein, the PADS also agreed to a

25  "Covenant-Not-To-Sue and Reservation of Rights." The "Members to this Agreement … covenant not

26  to initiate, bring, or support any claim … against each other arising out of or related in any way to

27  water quality conditions relating to the Nutrient impairment of the Creek or Lake or for any liability or

28

responsibility therefore, and agree to resolve any such disputes among themselves in accordance with the Dispute Resolution procedures set out in Section 12 of this Agreement." PA, section 9.2. They also agreed to keep confidential all "information received from any other Member or its counsel, from common counsel, or from any technical consultant retained by the Work Group pursuant to this Agreement…." PA, section 10.2. Thus, the PADs agreed to keep technical information confidential, not to sue each other, and to resolve internal disputes by arbitration. A true and correct copy of the referenced portion of the PA is attached as **Exhibit 14**.

16.    The PA includes an agreement to keep everything secret among the PADs and to work together against other parties they believe should share in responsibility. Now in discovery, the RI/FS Parties seek to continue their secrecy and to suppress evidence of any attempt to harm Hollandia. For example, the RI/FS Parties are not disclosing diverging opinions and disagreements their consultants have had in the course of responding to the IO/PA. Parties like VWD - that had over 176,050 gallons of raw sewage into the lake in 2005 alone - would be making similar arguments as Hollandia regarding flushing and sediment burial, discussed below, and that would be contrary to positions taken by CDC and the other PADs. The PA gives the PA signatories power to make any decision by a majority rule (with 40% quorum). PA, section 6.5. The RI/FS Parties have kept differences secret by suppressing dissenting minority opinions.

17.    An e-mail dated November 5, 2014 from Nick Buhbe, CDC's consultant, to the other RI/FS Parties' consultants and members of the Regional Board, showed his proposal to gain get approval from all of the RI/FS Parties and the regional Board before removing the notation, "mediation confidential" and "draft" from Draft Agendas. A true and correct copy of the e-mail redacted by VWD is attached as **Exhibit 3.** CSM also produced a version of this document after the meet and confer, but with the date of November 6, 2014. To my knowledge, no other party produced either.

18.    In another e-mail dated October 5, 2015 from Chad Loflen with the Regional Board to three of the consultants of the RI/FS Parties, the Subject line was "RE: Mediation Settlement Confidential." In said e-mail, the Regional Board member suggested additional toxicity studies in response to a call from Gary Brugger, consultant for CSM. A true and correct copy of said e-mail is

1   attached as **Exhibit 4.** VWD produced **Exhibit 4** in discovery after the meet and confer, but made

2   redactions to that and other e-mails.

3        19.   On September 30, 2016, the RI/FS Parties presented the Regional Board the final RI/FS.

4   There were areas of investigation that yielded results favorable to Hollandia, but the RI/FS Parties'

5   consultants and/or RI/FS consultants did not disclose how such results would help or exculpate

6   Hollandia, but that had to be part of the underlying discussion. There was also inflammatory language

7   in the Draft RI/FS, dated January 8, 2016, against Hollandia that the Regional Board found lacked

8   evidence, yet the final RI/FS failed to acknowledge or adopt such findings.

9        20.   The RI/FS Parties hired SCS Engineers (SCS) specifically to develop evidence that

10  Hollandia contributed nutrients to the creek (RI/FS, p.26) by runoff and groundwater.  SCS reported

11  that Hollandia and Prohoroff "most likely contributed potentially significant quantities of nutrients to

12  the Watershed…," SCS 2015 Soil and Shallow Groundwater Monitoring and Sampling Report (Ag

13  Report). The Regional Board found this conclusion unsupported by the facts.

14       21.   In a letter to CDC dated June 2, 2016, the Regional Board disagreed with SCS's

15  conclusion that Hollandia most likely contributed potentially significant quantities of nutrients to the

16  watershed. Referring to the Draft RI/FS, the Regional Board found, "We agree that historical episodic

17  releases likely have added to the nutrient load, but do not see evidence of these contributions from the

18  historical dairy or poultry operations." The Regional Board also disagreed with the Draft RI/FS

19  statement that Hollandia, Wilgenburg Dairy, and Prohoroff contributed "significant quantities of

20  nutrients" to the creek: "This conclusion … is not supported by the data. … Further, the Report states

21  that groundwater contributes limited nutrients to the creek and lake; therefore, there does not appear to

22  be evidence of a pathway for the soil nutrients to the receiving water (the creek)." A true and correct

23  copy of the relevant portion of the letter is attached as **Exhibit 5.** The revised, final RI/FS, submitted

24  on September 30, 2016, provided no new evidence. Despite that, the Final RI/FS persisted in reporting

25  that SCS indicated Hollandia and Prohoroff "most likely contributed potentially significant quantities

26  of nutrients to the Watershed over the course of their historical large agricultural production facility

27  operations." RI/FS, p.27. The RI/FS Parties' consultants and/or RI/FS consultants failed to mention or

28

1  discuss these two critical Regional Board's findings in the final RI/FS. The RI/FS Parties have

2  produced no evidence of their consultants' communications, analyses, or discussions as to how to

3  address these findings. There have to be memoranda, notes, research, tests, modeling, data,

4  communications, and/or other documents that mention, support, challenge, and/or refute these and

5  other critical issues described herein, yet, to my  knowledge, the RI/FS Parties have not disclosed

6  anything but the RI/FS and appendices in discovery and have said they do not intend to provide further

7  information.

8         22.    Hollandia only occupies ~1.3% of the drainage area investigated by SCS, and the Ag

9  Report failed to disclose that SCS did not isolate nutrients coming from Hollandia or that any nutrients

10  detected would have come from a large area upgradient of Hollandia. The Coco fire in 2014 was

11  within such upgradient drainage area, but the Ag Report failed to account for the nutrients that could

12  have come from the ashes and charred organic debris. Yet an Agenda with the Regional Board dated

13  July 25, 2014 shows the consultants discussed the potential impacts of fires on water quality. No notes

14  regarding that have been produced.

15         23.    The RI/FS Parties have done extensive analysis of lake flushing, and how nutrients in

16  the lake bottom sediment interact with the water column, yet have failed to present and discuss the full

17  extent of their findings. A complete understanding of the data and interactions would have been

18  required before recommending remedial measures. In the PA and CA with COE, the PADs agreed to

19  undertake 17 different studies designed to "Understand Internal Loading and Recycling of Lake

20  Nutrients," including the study of "Contributions from Shallow Sediments" as well as "estimated

21  frequency of Lake turnover." A true and correct copy of the relevant excerpts from the Cooperation

22  Agreement is attached as **Exhibit 6**. The RI/FS simply acknowledged that sediments are "sequestered"

23  at an undisclosed depth. Further, the RI/FS states it considered dredging the lake bottom, something

24  that CDC's consultant recommended it do periodically since 1974 (Ball, 1974), but which CDC claims

25  it did not do. The RI/FS discarded that possible solution and, instead, recommended spreading alum

26  over the sediment to cap it and prevent any sediment phosphorus compounds from entering into the

27

28

1  lake water. The research and analysis leading to that recommendation have not been made public or
2  produced in discovery.

3  24. Moreover, the RI/FS also said, "Watershed runoff is capable under typical conditions of
4  exchanging the entire Lake volume 2.6 to 5.2 times each winter… Even under drought conditions, the
5  Lake could be effectively flushed each winter with the runoff inputs." The RI/FS authors wrote in
6  response to public comment submitted by Hollandia that the flushing could also average 3-9 times per
7  year. The RI/FS parties and consultants must have also reached a consensus on how these issues
8  impact lake mechanics so as to develop a remedial plan but have not made such discussions or
9  communications public or produced evidence of such discussions or communications. To my
10  knowledge, the RI/FS Parties have not disclosed anything but the RI/FS and appendices in discovery.

11  25. The RI/FS Parties specifically required their consultants to exclude discussion and
12  interpretation of data in the RI/FS that would be exculpatory to Hollandia. The Regional Board told
13  SCS on March 30, 2016, that the Ag Report "required context to be of value in meeting the objectives
14  of the investigation. The Report does not include any discussion or interpretations." SCS responded
15  that, "The LSM Technical Team specifically requested SCS to exclude discussion and interpretations
16  of the data collected [sic] therefore it is not in our contracted scope to respond to" to the Regional
17  Board's ten questions. (Underline added.) A true and correct copy of the relevant portion of the
18  response is attached as **Exhibit 7.** In the Ag Report, SCS identified the Technical Advisory Committee
19  for the RI/FS Parties as directing its work. Ag Report, section 1.2. The RI/FS Parties' consultants
20  and/or RI/FS consultants again failed to discuss in the RI/FS that the SCS Ag Report did not show
21  Hollandia was a significant source of nutrients, past or present, or to discuss the Regional Board
22  findings or concerns, and the RI/FS Parties have not disclosed anything but the RI/FS and appendices
23  in discovery.

24  26. A Draft Agenda dated April 29, 2016 for the consultants' "monthly update" meeting
25  with the Regional Board stated, "Discussion of what the LSM Tech Team is doing to respond to the 30
26  pages of questions from John Reaves – (John Dodge)." Mr. Dodge was one of the authors of the RI/FS,
27  and the Agenda reflects the coordination of the RI/FS Parties' consultants and the RI/FS consultants,

28

and that they worked with the Regional Board. In the same Agenda, Steve Figgins, a consultant for CSD, was the person identified to discuss, "Status of Ag Investigation Report rewrite and re-submittal to the RWQCB." Yet the RI/FS Parties have refused to disclose anything about those discussions or meetings. A true and correct copy of the Draft Agenda is attached as **Exhibit 8**. A year earlier, on March 27, 2015, the Draft Agenda stated Dan Johnson, with SCS Engineers, would discuss, "DATA COLLECTION STATUS – Discuss proposed data collection efforts to show ongoing Nitrogen and Phosphorous sources due to former Ag operations." A true and correct copy of that *Draft* Agenda is attached as **Exhibit 9-1**. The Final Agenda for the same date provided additional information regarding opinions of the Tech Team over watershed modeling. Several instances identified required tech team approval before proceeding. The Ag Study had to be approved before proceeding. A true and correct copy of the *Final* Agenda starts at **Exhibit 9-2**.

27.     The RI/FS Parties' consultants repeatedly singled out Hollandia as one of the allegedly big potential polluters in the RI/FS, something completely undermined by the data. In contrast, the RI/FS did not do any detailed review and ranking of any other particular source of nutrients, historically or present, such as the other dairies (Wilgenburg and others) and egg farm (Prohoroff), golf courses and avocado groves above the lake, a large sedimentation pond within the housing complex near the lake, with sludge that could enter the lake during a storm through a connecting concrete channel, and any of the many agricultural activities in the watershed.

28.     The RI/FS found countless citrus groves, orchards, and vineyards that once were, or still are, located in the watershed as sources, but the RI/FS Parties' consultants did not try to assess those and their historic nutrient loading, or to rank such loads relative to Hollandia or the RI/FS Parties. For instance, the RI/FS reported that "agricultural activities are a significant contributor to nutrient loads to the Lake." (RI/FS, p.202) The highest levels of nutrients came from "Twin Oaks tributary … where agricultural land use is more common" (RI/FS, p.ES-2). That tributary entered the creek downstream of Hollandia, yet no specific site or source was investigated, not even a small current dairy. The RI/FS Parties' consultants failed to discuss the relative nutrient loading from these other sources, which would have shown Hollandia's relative contributions to be, under the worst of circumstances,

1   nondetectable, according to Hollandia's consultants. There have to be communications and documents

2   that reveal the RI/FS Parties' and/or RI/FS consultants decisions to selectively target Hollandia, avoid

3   targeting specific sites in the highest nutrient source areas, and to avoid or minimize focus on the

4   RI/FS Parties themselves.

5       29.     The RI/FS has proposed many remedial measures for the entire watershed, including

6   tributaries that enter the creek upstream and downstream of Hollandia, which are designed to address

7   the PADs' stormwater requirements. On September 3, 2015, the Regional Board said, "([T]he San

8   Diego Water Board agrees with … (CDC's) assertion that there is some work being done (by the

9   PADs) related to the RI/FS that is above and beyond what is required in the (IO) … ." The RI/FS

10  Parties contend Hollandia should pay for all of the remedies, even though some of them could not have

11  anything to do with Hollandia. An example is the proposed settling basin called La Cienega in Twin

12  Oaks Valley. CDC's consultant, Nick Buhbe, expressed his opinion to the Regional Board that La

13  Cienega "is not influenced by Hollandia." The RI/FS Parties simply disclosed the RI/FS and

14  appendices in discovery. To my knowledge, it appears only VWD and CDC produced the above e-

15  mail, dated March 4, 2016, from CDC's consultant, Nick Buhbe of Great Ecology, to the Regional

16  Board and all the consultants. A true and correct copy of the e-mail is attached as **Exhibit 10**.

17      30.     CDC produced the June 2, 2016, letter from the Regional Board to CDC where the

18  Board concluded the investigation against Hollandia that was discussed in the RI/FS and appendices

19  did not show evidence of past contributions or a present pathway for nutrients to the creek. A true and

20  correct copy of the relevant portion of the letter is attached as **Exhibit 5.** In my opinion, based on

21  relevance, Hollandia should be able to discover the biases that affected the consultants' decisions

22  regarding the RI/FS, their decisions about what to test or not test, what opinions to express or not

23  express, whether to be candid about exculpatory evidence or not, what facts or opinions to minimize or

24  veto, and the decision-making behind their statements about Hollandia.

25      31.     Ironically, CDC is now fighting Hollandia's position that CDC recently asserted against

26  the PADs. VWD and CDC produced an e-mail from CDC's counsel, Jeff Caufield to the Regional

27  Board, dated September 4, 2013, in which he complained that the PADs had "refused to share data"

28

1  that was obtained after the PADs secured public funding, and that CDC was not aware of any legal

2  authority for the PADs to keep the data confidential. He went on to say, "[N]either CDC nor the public

3  can participate when data is being kept 'secret'." He also complained that the PADs' action violated

4  the "public participation plan" and "renders the process meaningless as neither CDC nor the public can

5  participate when the data is being kept 'secret.'" A true and correct copy of the e-mail is attached as

6  **Exhibit 11**.

7         32.    The RI/FS Parties have withheld communications, notes, memoranda, analyses, data,

8  and/or other documents, et cetera, between their consultants and other parties and their consultants

9  and/or the RI/FS consultants. There have been ongoing communications between consultants, who

10 formed a technical team to interface and meet with the Regional Board to comply with the IO/PA.

11 Other consultants were retained to prepare the RI/FS, and all these consultants communicated with

12 each other. The RI/FS stated that "The RI/FS Report has been completed in accordance with the RI/FS

13 work plan prepared by DBS&A, on behalf of and with assistance from CDC and the PA consultants,

14 dated July 10, 2015." (RI/FS, page 12) To my knowledge, the RI/FS Parties have not provided those

15 materials that they and their consultants obtained and generated in such regard or how they have dealt

16 with divergent interests.

17        33.    An example of divergent interests is the VWD alignment with Hollandia with regard to

18 lake flushing and sequestering of nutrients in deeper lake sediment, which would be opposed by CDC

19 and possibly the other PADs. The RI/FS Parties have wrongfully withheld various forms of

20 documentation and information detailing these internal differences to prevent an outside party like

21 Hollandia, or even the Regional Board, from getting a better understanding of the true facts and where

22 there are differences of opinion and lower confidence levels. That being said, despite the massive spills

23 of raw sewage by VWD into the lake in 2005 and later, the RI/FS consultants issued a Fact Sheet

24 regarding Lake San Marcos on August 1, 2017, which was posted on Geotracker, the Regional Board

25 website where postings are made concerning the IO. With regard to past sewage spills, the following

26 statement was made: "Given the relatively small volume of past spills, post-spill cleanup responses,

27 natural breakdown processes, and system flushing, accumulation of wastewater and solids on the lake

28

18

DECLARATION OF JOHN REAVES IN SUPPORT OF JOINT MOTIONS
FOR DETERMINATION OF DISCOVERY DISPUTE RE ISSUES OF PRIVILEGE RAISED BY ALL PARTIES
AND OTHER ISSUES AS TO EACH PARTY IN RESPONSE TO HOLLANDIA DAIRY'S DISCOVERY, SET ONE

1  bottom is expected to be minor." A true and correct copy of the fact sheet is attached as **Exhibit 12**.

2  The underlying analysis would clearly benefit Hollandia, as it does VWD, but the RI/FS had no such

3  discussion, and the RI/FS Parties have not described any of this in their discovery responses.

4    34.    Hollandia has a substantial need for the documents and information showing bias and

5  prejudice, including collusion. It would be more than an undue hardship to obtain substantially

6  equivalent documents and materials concerning bias reflected in past work - it would be impossible

7  because the RI/FS Parties would continue to assert privileges and forever block disclosure of these past

8  damaging actions.

9    35.    Here, the RI/FS Parties were not the subject of a criminal investigation or under threat

10  of litigation by the Regional Board so long as they worked toward their response to the IO/PA. The

11  IO/PA calls for the assessment of nutrient sources in the watershed and solutions to cleaning up the

12  creek and lake of excessive nutrients. They had to do this work irrespective of litigation, both to fulfill

13  demands of the Regional Board with regard to the IO/PA, and for the PADs to comply with their

14  respective MS4 stormwater permits. The RI/FS Parties did not need an attorney to decide how to

15  respond to the technical mandates of the IO/PA or to direct their consultants.

16    36.    The communications sought are expected to reveal biases and prejudices among the

17  RI/FS Parties' counsel and their consultants and/or RI/FS consultants in the selection of tests, selective

18  targeting of investigations, location of tests, environmental conditions during testing, modeling to meet

19  desired outcomes, assumptions made, suppression of exculpatory evidence for Hollandia, sweeping

20  dissension under the rug, and avoidance of developing certain evidence against the RI/FS Parties, such

21  as the continuous source of nutrients from golf courses, avocado groves, and a settling basin beside the

22  lake, or the failure of the PADs to protect the watershed from too many nutrients and their agreement

23  to do work outlined in the PA to avoid both the IO and a TMDL.

24    37.    It is highly likely there are communications among all the consultants revealing

25  collusion to single out Hollandia for a disproportionately high degree of blame and to conceal the

26  absence of evidence against Hollandia, or exculpatory evidence, and to avoid revealing information

27  that is damaging to the RI/FS Parties' own liability position.

28

38.    The PADs assert a common interest or joint defense agreement (JDA) privilege based on a "Common Interest Agreement" (CIA) amongst them. The PADs signed the agreement between October and November 2011. The PADs signed after the Regional Board issued the IO to CDC on September 20, 2011, and just three months after the PADs entered the PA with Addendum B (the latter with the Regional Board, signed by the Board on June 17, 2011). I believe COE joined the PA through a "Cooperation Agreement" at roughly the same time, but there was no date next to the signature. The CIA sought to encompass the work the PADs had agreed to do in the above agreements in lieu of being added to the IO and in exchange for the Regional Board's "covenant not to sue." CIA, p.1-2; Add. B, section 2, 16.

39.    The PA states CSD, CSM, and COE "are required by the San Diego Municipal Stormwater Permit, Order No. R9-2007-0001, to regulate surface water discharges from their respective municipal separate storm sewer systems (MS4s) … to the maximum extent practicable (MEP)." PA, p.1. The PADs expressed concerns in the PA about their possible past and present discharges of "Nutrients" and that the Regional Board could issue a Cleanup and Abatement Order or take other enforcement actions against them. They expressed concern about enforcement under the Clean Water Act (federal law) and the Porter-Cologne Water Quality Control Act (state Water Code) (not CERCLA). CIA, p.1. They agreed to determine causal sources of nutrients to the creek and lake and implement remediation pursuant to a plan that they would submit to the Regional Board for approval (what became the RI/FS). PA, p.2. They agreed to achieve certain "water quality" objectives in the watershed, creek and lake as necessary to comply with law and in anticipation of TMDLs for nutrients. Add. B, section 2. **Exhibit 14-6a**. They agreed to keep everything confidential but allowed for the fact they might have to disclose some of the shared information upon a Public Records Act request. CIA, section 6(d).

40.    In an e-mail dated December 2, 2016, Jim Dodson, counsel for VWD, wrote the Regional Board and stated he had been involved in "representation to (VWD) with respect of the development of TMDLs for Lake San Marcos and San Marcos Creek …." A true and correct copy of

1   the Draft Agenda is attached as **Exhibit 13**. That was only produced after the meet and confer with

2   VWD.

3       41.     In the June 2011 Addendum B, the Regional Board agreed it would not sue the PADs if

4   they performed the work outlined in the PA, including the development of an alternative to a formal

5   TMDL program. By the time the PADs entered the CIA, the legal threat had passed, and time for

6   technical compliance had begun. A true and correct copy of the relevant portion of Addendum B is

7   included in **Exhibit 14**.

8       42.     The RI/FS Parties do not have the same cause in this litigation. CDC claims all the

9   defendants, including the PADs, are "jointly and severally liable under CERCLA for general damages

10  and all costs or expenses, including attorneys' fees, that it has incurred…." Dkt. No. 1: CDC

11  Complaint 3:16-17. Further, as CDC reported in its Status Report filed December 13, 2013, "the

12  present lawsuit is the only lawsuit currently pending in which CDC and the other named parties are

13  litigating questions of liability under CERCLA, among other claims, in relation to the alleged releases

14  and discharges of hazardous substances at and around the Lake." Dkt. No. 91; 4:2-5) In its Status

15  Report filed March 27, 2015, the RI/FS Parties noted they would have adverse differences until they

16  reached their own settlement: "[I]n the event CDC and the Public Entities successfully resolve their

17  claims against each other through mediation without Hollandia's participation, CDC and the Public

18  Entities then intend to pursue their claims against Hollandia. In that event, Hollandia would face the

19  uphill battle of litigating the agreed-upon allocation of liability by CDC and the Public Entities who

20  would then be aligned against Hollandia." Dkt. No. 116; 2:9-13. The consultants represent various

21  interests of the RI/FS Parties, which are adverse in many regards. VWD counsel recently

22  acknowledged that the PADs are still adverse. Ms. Troy wrote on April 11, 2018, as part of our meet

23  and confer discussions, "[T]he investigative [sic] … was conducted by five adversarial parties in this

24  complex CERCLA litigation…." A true and correct copy is attached as **Exhibit 22-3.**

25      43.     Even though the RI/FS Parties might try to claim an unwritten JDA with respect to the

26  IO/PA (as CDC is not a party to CIA), none of the RI/FS Parties described terms of any alleged oral

27

28
DECLARATION OF JOHN REAVES IN SUPPORT OF JOINT MOTIONS
FOR DETERMINATION OF DISCOVERY DISPUTE RE ISSUES OF PRIVILEGE RAISED BY ALL PARTIES
AND OTHER ISSUES AS TO EACH PARTY IN RESPONSE TO HOLLANDIA DAIRY'S DISCOVERY, SET ONE

1    JDA in their discovery responses or meet and confer except CDC in the context of agreements within

2    mediation such as cost sharing.

3          44.    The Regional Board does not keep all of its records, such as e-mails, and it is not

4    possible to determine what CDC or others may have sent to or received from the Regional Board by e-

5    mail unless each party produces all such documents. I recently provided counsel for the Regional

6    Board, Catherine Hagan, an e-mail that VWD had produced that included staff members of the

7    Regional Board and various of the RI/FS Parties' consultants, and mentioned that the Regional Board

8    had not produced it and other like it when I had made a Public Records Request. On April 4, 2018, I

9    wrote, "We are starting to get some examples of consultant communications with RB staff in the LSM

10   matter that were not part of the RB production in response to my PRA request. Here is an example, and

11   in it note that the consultants frequently marked the communications a 'mediation confidential,'

12   although they clearly were not. Perhaps whoever looked for documents to produce in response to the

13   PRA request thought they really were confidential??? That is just one example. I also see many

14   documents that were not marked as confidential that were not produced, which is a bit more puzzling.

15   Were all areas that might contain LSM material checked as part of the production, or have any

16   documents been segregated in any way and been overlooked? Can you please review and let me know

17   what you find? It appears there are many documents that should have been produced that were not." A

18   true and correct copy is attached as **Exhibit 23-2.**

19         45.    Ms. Hagan explained on April 12, 2018, that not all records are kept, and thus she could

20   not state that all records had been produced to Hollandia pursuant to a Public Records Request. "I do

21   not believe it's likely that they would inadvertently withhold records from the filing system based on a

22   mediation/confidential label.  In other words, segregating such documents would need to be done

23   deliberately and I don't believe that has been the case. … With regard to the types of records you

24   mention in your email, I have only seen the example you provided but please be aware that staff would

25   not ordinarily retain such an email as a board record.  Laurie Walsh is listed as a cc on the email, the

26   email concerned a draft workshop agenda and contemplated a final agenda would later be distributed.

27   I would not have expected Laurie to have preserved and uploaded such an email to ECM under these

28

1    circumstances.  Because all but attorneys, the Executive Officer and the Assistant Executive Officer

2    have 90 day retention time for emails, unless Laurie had uploaded or otherwise save the email, it

3    would have been automatically deleted (and not archived) after 90 days.  It is definitely the case that

4    staff can print or save an email or other document that does not need to be saved per the retention

5    policy with the result that it is in the board's possession but was not uploaded to the ECM filing

6    system." **Exhibit 23-1.**

7         46.    Therefore, any refusal by CDC or others to provide communications it had with the

8    Regional Board, based upon a claim they are equally available to Hollandia, is not true. It appears

9    many e-mails were exchanged between the RI/FS Parties and their consultants with the Regional

10   Board, and I am only aware of VWD, CSM, and CDC producing some of them, which overlapped.

11   Unlike VWD and CSM, CDC produced a substantial amount, but it is unclear if that or the combined

12   productions are complete.

13        47.    CDC's response to ROG No. 18 did not set forth all material facts such as where or how

14   manure is listed as a hazardous substance under CERCLA. Hollandia seeks to have CDC identify each

15   alleged hazardous substance on the EPA List of Lists of hazardous substances and exactly how manure

16   is a RCRA characteristic waste. These points go to the heart of CDC's claim against Hollandia and

17   whether there is a basis for federal jurisdiction. Hollandia contends there are no nutrients, manure, or

18   chemicals in nutrients or manure that are on the definitive EPA "List of Lists," which itemizes every

19   CERCLA "hazardous substance" by a chemical identification and often by percentage solutions. See

20   example of the List of Lists entry for ammonia, requiring a 20% concentration. A true and correct copy

21   of the relevant portion of the List is attached as **Exhibit 15**. That is one of the substances some of the

22   parties refer to loosely in their response, such as "ammonia as N." Moreover, the other parties simply

23   list the substances the Regional Board included for creek and lake impairment without identifying

24   which of those the PADs contend are CERCLA "hazardous substances."

25        48.    Based on discussion in the meet and confer with VWD, I expect at least one of the

26   RI/FS Parties to claim it would be burdensome to respond to a request for communications that go

27   back several years, yet any burden would be due to the RI/FS Parties asserting improper privileges and

28

1   failing to segregate true privileged material from discoverable material. Bias of the RI/FS Parties'

2   consultants, manipulation of testing and results under the claim of mediation or a PDA, so as to

3   unfairly "target" Hollandia for litigation purposes and inflame the Regional Board, justify production

4   of such documents. The allegations against Hollandia by all parties go back over 60 years, so any

5   limitation in the time frame requested by the parties would be inherently unfair and prejudicial in my

6   opinion. The RI/FS Parties seek untold millions from Hollandia. Hollandia seeks full discovery into the

7   inner workings of their investigation, opinions, decisions, reconciliations, suppressions, and any bias

8   against Hollandia.

9          49.      In weighing proportionality, the discovery sought goes to the heart of the RI/FS Parties'

10  perceived attempt to stigmatize Hollandia and unfairly shift liability to Hollandia by directing their

11  consultants to perform investigations with predetermined outcomes and failing to acknowledge and

12  disclose exculpatory evidence. The RI/FS Parties are perceived as trumping up the "evidence" and

13  trying to shift costs of removing nutrients across the entire watershed, including the creek and the lake,

14  to Hollandia, even though the PADs are required under their stormwater permits to do that. The lake

15  has been in existence since about 1962, and CDC claims all nutrients entering the lake since that time

16  are still in the lake causing problems and that Hollandia remains an ongoing source. The Regional

17  Board required CDC to investigate the historical nutrient loading to the lake and examined various

18  remedial measures that CDC took 40 to 50 years ago but then discontinued. See, **Exhibit 5-4**.

19  Therefore, CDC put the source and quantity of nutrients from around the watershed since about 1962

20  at issue in this case. Hollandia's dairy operations closed in 2003, and any contributions to the lake

21  during its operations, if any, would likely have long since been flushed out or buried, consistent with

22  the opinion of the RI/FS Parties' own consultants, as seen in **Exhibit 12**, discussed in paragraph 33.

23  ("Given the relatively small volume of past spills, post-spill cleanup responses, natural breakdown

24  processes, and system flushing, accumulation of wastewater and solids on the lake bottom is expected

25  to be minor.") That has no impact on what the PADs should have done in the past or what they plan to

26  do in the future. The full costs of the remediation recommended in the RI/FS is $11.3 million (RI/FS,

27  p. 242), but that does not include the costs of investigation and other damages that some of the parties

28

1   are also seeking against Hollandia. Millions of dollars are at stake here, and discovery into the entire

2   RI/FS process that the parties have made secret so as to learn the full extent of the bias and collusion is

3   critical and only accessible by discovery against the RI/FS Parties.

4       50.   Hollandia said during the meet and confer that categories could be used if each category

5   were clear enough to identify truly privileged documents from contested documents in line with the

6   discussion we had. None of the RI/FS Parties has provided a privilege log that satisfies Hollandia's

7   request or provides sufficient information to enable me to determine how they are applying the

8   privilege to particular documents. Moreover, in many instances, they lump different categories

9   together, such as mediation and/or common interest regarding their IO/PA work. Such broad categories

10  were apparently intended to sweep in all of the consultants notes, work, conferences, studies, analyses,

11  and compromises, even when discussed with the Regional Board. CSD never produced a privilege log.

12  A true copy of the amended privilege log produced by CDC is attached as **Exhibit 18**. A true copy of

13  the amended privilege log produced by COE is attached as **Exhibit 19**. A true copy of the amended

14  privilege log produced by VWD is attached as **Exhibit 20**. A true copy of the amended response by

15  CDC to Interrogatory No. 7 is attached as **Exhibit 21**.

16      51.   The RI/FS Parties were nonnegotiable on all of the privilege, mediation, and work

17  product issues raised in this motion except for VWD, CSM, and CDC providing some communications

18  with the Regional Board. CSD agreed to do so but did not actually do so prior to this filing. It is

19  unclear how much CDC produced because it claimed at times documents with the RWQCB were

20  equally available to Hollandia.

21      52.   Hollandia seeks sanctions against all of the parties and their counsel of record, jointly

22  and severally, as deemed appropriate by this Court in an amount of at least $50,000, payable to the

23  Law Office of John H. Reaves, APC, within ten (10) days from the entry of the Court's order on this

24  issue. That amount is a compromise of the total costs and a conservative and reasonable amount based

25  upon a subset of the overall time devoted to the meet and confer process and preparation of the Joint

26  Motions and related documents, and specifically the following: John Reaves, Esq., a lawyer since

27  1983, at his hourly rate of $300 worked in excess of 150 hours on the following tasks: researching and

28

refining meet and confer statements to each of the parties, most of which were drafted by Catherine Rowlett, Esq., who is charged at $225 per hour; preparing for and participating in meeting and conferring with each of the parties; assessment of supplements/amendments; research, writing, reviewing and gathering of information and exhibits relevant to the Joint Motions, editing and refining all Joint Motions, Discovery Statements, and Declaration of Reaves in conjunction with assistance from Elidia Dostal, Esq,, a lawyer since 2002 and former associate at Latham & Watkins, who is charged at $225 per hour. Rowlett spent in excess of 35 hours on research and preparing drafts of meet and confer statements, and Dostal spent in excess of 200 hours to assist in research and preparation and editing of the Joint Motions and related documents as mentioned above. Kerry Stack, Esq., a lawyer since 1987, who is charged at $200 per hour, also spent in excess of 25 hours, including reviewing discovery documents for sufficiency and code compliance, preparing for and attending meet and confer conferences and/or participating in telephonic meet and confer communications, reviewing and editing drafts of the Joint Discovery Motions and/or Discovery Statements, and reviewing documents for potential inclusion as supporting exhibits. A reasonable, discounted approximation of the costs per task is as follows: Preparation of meet and confer letters and the actual meet and confers for all parties - $15,000; Joint Motion and Discovery Statement regarding privileges - $25,000; Joint Motion and separate Discovery Statement for each party for other discovery issues - $5,000 each (5 x $5,000). Hollandia requests the Court award sanctions in an amount it believes is appropriate.

     I declare under penalty of perjury that the foregoing is true and correct under the laws of the United States and California.

DATED: May 17, 2018

By:   /s/ John H. Reaves
John H. Reaves, Esq.,
Attorney for Hollandia Dairy, Inc.

DECLARATION OF JOHN REAVES IN SUPPORT OF JOINT MOTIONS
FOR DETERMINATION OF DISCOVERY DISPUTE RE ISSUES OF PRIVILEGE RAISED BY ALL PARTIES
AND OTHER ISSUES AS TO EACH PARTY IN RESPONSE TO HOLLANDIA DAIRY'S DISCOVERY, SET ONE