**From:** Jeff Caufield Jeff@caufieldjames.com
**Subject:** RE: Joint Motion to Compel
**Date:** February 27, 2018 at 12:13 PM
**To:** John Reaves john@lawreaves.com, Matt McMillan mattm@caufieldjames.com
**Cc:** Kerry Stack kstack@thomaslucaslegal.com, Doug Simpson dsimpson@simpsonlawfirm.com

John,

I read you motion and it is barely intelligible and fraught with simply invented arguments and allegations.

Nothing I saw had merit such that we would consider modifying our responses.

Moreover, as we've indicated, to the extent that additional communications with the Regional Board (which are already publicly available anyway) we've followed up with Great Ecology to see if they can locate any additional communications with the RWQCB that have not already been produced.

Thanks,

Jeff

**From:** John Reaves [mailto:john@lawreaves.com]
**Sent:** Tuesday, February 27, 2018 11:30 AM
**To:** Matt McMillan <mattm@caufieldjames.com>
**Cc:** John Reaves <john@lawreaves.com>; Kerry Stack <kstack@thomaslucaslegal.com>; Jeff Caufield <Jeff@caufieldjames.com>; Doug Simpson <dsimpson@simpsonlawfirm.com>
**Subject:** Re: Joint Motion to Compel

Agreed it is withdrawn. I think it is a useful tool to continue to meet and confer with you and the other parties. When will you be in a position to say whether you agree with any of our points?

John

Attorney and Credentialed Mediator

**Law Offices of**
**JOHN H. REAVES**
**A Professional Corporation**
2488 Historic Decatur Rd., Ste. 200
San Diego, CA 92106
Telephone (619) 525-0035
Fax (619) 525-0077
john@lawreaves.com
www.lawreaves.com

This e-mail may contain material that is confidential, privileged and/or attorney work product for the sole use of the intended recipient. Any review, reliance, or distribution by others or forwarding without express permission is strictly prohibited. If you are not the intended recipient, please contact the sender and delete all copies.

On Feb 27, 2018, at 10:41 AM, Matt McMillan <mattm@caufieldjames.com> wrote:

John:



EXHIBIT 1-1

Based on the order we received this morning, the Court granted the parties' Joint Motion to Extend Discovery Deadlines (see Doc. No. 228) such that the filing deadline for any joint motion for resolution of a discovery dispute is now May 2, 2018. In light of this order, please confirm that Hollandia withdraws the Joint Motion for Determination of Discovery Dispute re: CDC that you sent last night in anticipation of the previously-ordered deadline of March 5, 2018, per the email below.

Matthew D. McMillan, Esq.
Caufield & James, LLP
2851 Camino Del Rio South, Suite 410
San Diego, CA 92108
Office: (619) 325-0441
Fax: (619) 325-0231

*This email communication may contain CONFIDENTIAL INFORMATION, WHICH ALSO MAY BE LEGALLY PRIVILEGED, and is intended only for the use of the intended recipients identified above. If you are not the intended recipient of this communication, you are hereby notified that any unauthorized review, use, dissemination, distribution, downloading, or copying of this communication is strictly prohibited. If you are not the intended recipient and have received this communication in error, please immediately notify us by reply email, delete the communication and destroy copies.*

**From:** John Reaves [mailto:john@lawreaves.com]
**Sent:** Monday, February 26, 2018 10:32 PM
**To:** Jeff Caufield <Jeff@caufieldjames.com>; Matt McMillan <mattm@caufieldjames.com>; Doug Simpson <dsimpson@simpsonlawfirm.com>
**Cc:** John Reaves <john@lawreaves.com>; Kerry Stack <kstack@thomaslucaslegal.com>
**Subject:** Joint Motion to Compel

Out of an excess of caution, attached is Hollandia's portion of a Joint Motion for Determination of Discovery Dispute re CDC, within the existing Order's deadline. Should the court not grant the pending joint motion to extend time to file a joint motion for all parties, this keeps us on track. Should the court grant the motion to file the joint motion for all later, Hollandia will withdraw this draft and file another motion in accord with that ruling.

Attorney and Credentialed Mediator
**Law Offices of**
**JOHN H. REAVES**
**A Professional Corporation**
2488 Historic Decatur Rd., Ste. 200
San Diego, CA 92106
Telephone (619) 525-0035
Fax (619) 525-0077
john@lawreaves.com
www.lawreaves.com

This e-mail may contain material that is confidential, privileged and/or attorney work product for the sole use of the intended recipient. Any review, reliance, or distribution by others or forwarding without express permission is strictly prohibited. If you are not the intended recipient, please contact the sender and delete all copies.

*1- 2*

| | |
|---|---|
| **From:** | James Dodson Esq. <dodson@jeffscottlaw.com> |
| **Sent:** | Saturday, November 7, 2009 10:38 PM |
| **To:** | 'Constantine Kontaxis'; 'Rosenbaum, S. Wayne'; cfilar@escondido.org; 'Ryan, Erica'; 'Lormon, John J.'; marco@coastlawgroup.com; sara@coastlawgroup.com; scott.norris@sdcounty.ca.gov; 'Deak, Thomas'; Todd.Snyder@sdcounty.ca.gov; thomas.bosworth@sdcounty.ca.gov; bfrasier@csusm.edu; 'Donna Bearman'; Francds@roadrunner.com; mdenneny2@gmail.com; terrydthielen@att.com; eliwhitney@sbcglobal.net; 'Kenneth H. Lounsbery'; kreis29@roadrunner.com; tlichterman@nctd.org; Michael.Cowett@bbklaw.com; 'Chiara Clemente'; 'John Robertus'; Bill Rucker; Dennis Lamb; warren.lydecker@USA.net; carbuff841 @roadrunner.com; mgeneau@roadrunner.com; cneuffer@escondido.org; Jepp@ci.escondido.ca.us; Francds@roadrunner.com; mdenneny2@gmail.com; donalexander@roadrunner.com; jaw4sale@yahoo.com; arkon1@aol.com; tweetedmonds@sbcglobal.net; rexedmonds@ltsp.com; lisaseiler@roadrunner.com |
| **Subject:** | LSM Participation Agreement |
| **Attachments:** | Paticipation Agreement (General Review).doc; Working Group Common Interest Agreement (General Review).doc |

Interested Parties:

Attached are drafts of the voluntary Participation Agreement and Common Interest Agreement for the Parties who will be involved in developing and implementing strategies for improving water quality in Lake San Marcos and the Upper San Marcos Creek Watershed.  The attached are works in progress and your comments regarding the attached draft agreements are welcomed.  During the scheduled meeting at the RWQCB offices on November 10, 2009, I will present an outline of the substantive intent-the goals and objectives- of the attached agreements.  Your comments regarding the attached drafts are also welcome at the meeting.  However, as time is short, the productivity of the discussion will be enhanced if your comments at the meeting are framed to address broader principles and concepts rather than detailed drafting issues.  We will make time available to address the drafting issues at a later date and I welcome suggested revisions by return email.

Regards,

Jim

James R. Dodson
Law Office of Jeffrey G. Scott
16935 West Bernardo Drive, Suite 170
San Diego, California 92127
Telephone: [858] 675-9896
Facsimile: [858] 675-9897

THE INFORMATION CONTAINED IN THIS ELECTRONIC MESSAGE IS PROTECTED BY THE ATTORNEY-CLIENT AND/OR ATTORNEY-WORK-PRODUCT PRIVILEGES.  IT IS INTENDED ONLY FOR THE USE OF THE INDIVIDUAL NAMED ABOVE, AND THE PRIVILEGES ARE NOT WAIVED BY VIRTUE OF THIS HAVING BEEN SENT BY E-MAIL.  IF THE PERSON ACTUALLY RECEIVING THIS E-MAIL OR ANY OTHER READER OF THE E-MAIL IS NOT THE NAMED RECIPIENT OR THE EMPLOYEE OR AGENT RESPONSIBLE TO DELIVER IT TO THE RECIPIENT, ANY USE, DISSEMINATION, DISTRIBUTION OR COPYING OF THIS COMMUNICATION IS STRICTLY PROHIBITED.  IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR, PLEASE IMMEDIATELY NOTIFY US BY TELEPHONE. AND RETURN THE ORIGINAL MESSAGE TO VIA A RESPONSE TO THIS E-MAIL OR RETURN THIS TO US AT THE ABOVE ADDRESS VIA THE POSTAL SERVICE.  THANK YOU.

1



EXHIBIT 2    VWD0079397



**From:** Nick Buhbe
**Sent:** Wednesday, November 05, 2014 5:46 PM
**To:** 'Steve Figgins'; Timothy Simpson (tssimpson@gsi-net.com); Helen M. Davies (hdavies@ci.escondido.ca.us); 'gbrugger@exponent.com' (gbrugger@exponent.com); Sudi Shoja; Thornberry, Reed; Andy Komor (akomor@pacewater.com); Alborz Wozniak; Pryatel, Chuck (CPryatel@scsengineers.com); Ioana Petrisor, Ph.D.; Kyle Darton (Kyle.Darton@sdcounty.ca.gov); Daniel E. Johnson (djohnson@scsengineers.com); Laurie.Walsh@waterboards.ca.gov
**Cc:** Tim Gallagher (timg@thegallaghergroup.com)
**Subject:** DRAFT Public Workshop Agenda


All –

Please find attached the Draft Agenda for the Public Workshop. I would like to return to Laurie for distribution via Lyris by this Friday (she has been cc'd). Please comment or confirm approval.


NOTE: When I receive approval/edit requests from at least one representative of all 6 entities (RB included), I will finalize by removing the "mediation confidential" and "draft," and making other edits as requested. Please notify me if you object to that approach, and I will be happy to work on an alternative approval process.


Thank you,

NIck

2

EXHIBIT 3-1          VWD0079489

**Nick Buhbe**

Director of Ecology



1020 Prospect Street, Suite 310, La Jolla, CA 92037
C | 619.985.9111 P | 858.750.3201 F | 858.750.3205 E | nbuhbe@greatecology.com
www.greatecology.com | RSS | Facebook | LinkedIn | Twitter

**From:** Steve Figgins [mailto:sfiggins@matrixneworld.com]
**Sent:** Monday, November 03, 2014 2:59 PM
**To:** Timothy Simpson (tssimpson@gsi-net.com); Helen M. Davies (hdavies@ci.escondido.ca.us);
'gbrugger@exponent.com' (gbrugger@exponent.com); Sudi Shoja; Thornberry, Reed; Andy Komor
(akomor@pacewater.com); Alborz Wozniak; Pryatel, Chuck (CPryatel@scsengineers.com); Nick Buhbe; Ioana Petrisor,
Ph.D.; Kyle Darton (Kyle.Darton@sdcounty.ca.gov); Joe Walsh (joe.walsh@clydeco.us); Daniel E. Johnson
(djohnson@scsengineers.com)
**Cc:** Tim Gallagher (timg@thegallaghergroup.com)
**Subject:** Mediation Settlement Confidnetial

Attached are the DRAFT notes from today's LSM Tech Team Conf call. Please make any edits or list things I missed and I
will finalize and distribute these. Thanks- Steve

**Steve Figgins**

Irvine Office Manager

Matrix New World Engineering, Inc.

2355 Main St.

Suite 210

Irvine, CA 92614

C: 949.293.0999

3

3-2          VWD0079490

P: 949.222.0870

# MATRIXNEWORLD
### Enabling Progress

www.matrixneworld.com

Certified WBE, DBE, SBE Business

VWD0079491

3-3



**From:** Loflen, Chad@Waterboards [mailto:Chad.Loflen@waterboards.ca.gov]
**Sent:** Monday, October 05, 2015 10:24 AM
**To:** Gary Brugger
**Cc:** Dodge, John (jdodge@dbstephens.com); sfiggins@farallonconsulting.com
**Subject:** RE: Mediation Settlement Confidential

Thanks for the call Gary

If you go back to do additional toxicity studies I strongly recommend including sediment pyrethroids as we have seen those as identified as the primary culprit for toxicity in many of our urbanized waterbodies:

http://www.cdpr.ca.gov/docs/registration/canot/2014/ca2014-07.pdf

https://www.casqa.org/sites/default/files/library/technical-reports/casqa_review_of_pyrethroid_fipronil_and_toxicity_monitoring_data_-_july_2013.pdf

-Chad

Chad L Loflen

Senior Environmental Scientist

Monitoring Assessment & Research Unit

1

VWD0079472

EXHIBIT 4-1

California Water Quality Control Board – San Diego Region

2375 Northside Drive, Suite 100

San Diego, CA 92108

619-521-3370

http://www.waterboards.ca.gov/sandiego/


CALIFORNIA ENVIRONMENTAL PROTECTION AGENCY
SAN DIEGO REGIONAL WATER QUALITY CONTROL BOARD

**From:** Gary Brugger [mailto:bruggerg@exponent.com]
**Sent:** Monday, October 05, 2015 9:01 AM
**To:** Loflen, Chad@Waterboards
**Cc:** Gary Brugger; Dodge, John (jdodge@dbstephens.com); sfiggins@farallonconsulting.com
**Subject:** RE: Mediation Settlement Confidential

Am reading these data correctly? It looks like all the exceedances in the San Marcos Creek Watershed were taken in Cottenwood Creek

Thanks

Gary

**From:** Loflen, Chad@Waterboards [mailto:Chad.Loflen@waterboards.ca.gov]
**Sent:** Monday, October 05, 2015 8:21 AM
**To:** Gary Brugger
**Subject:** RE: Mediation Settlement Confidential

Hi Gary,

Could you please clarify what information you are looking for? Here is what I can quickly gather:

San Marcos Creek 3 is site 904CBSAM3. I referred you to those stations/data awhile back. They are in CEDEN:

http://ceden.org/index.shtml

This data was used in the last 303d list:
http://www.waterboards.ca.gov/sandiego/water_issues/programs/303d_list/ref_reports/index.shtml (search for San Marcos Creek). I've included the specific LOE decision below for your reference. It looks like they lumped the two stations together … see the highlighted section below. If you have more specific questions please let me know though it may take some time to get back to you as I was not involved in the last 303d list nor have I reviewed any of the data referenced.

**Lines of Evidence (LOEs) for Decision ID 17066**
LOE ID:                          8878

VWD0079473

4-2



**Water Boards**

CALIFORNIA

EDMUND G. BROWN JR.
GOVERNOR

MATTHEW RODRIQUEZ
SECRETARY FOR
ENVIRONMENTAL PROTECTION

---

**San Diego Regional Water Quality Control Board**

June 2, 2016

**In reply refer to/attn:**
**T10000003261:Smearon**

Mr. Pino Vitti
Citizens Development Corporation
1105 La Bonita Drive
San Marcos, California 92078

Mr. Reed Thornberry
City of San Marcos
One Civic Center Drive
San Marcos, CA 92069

**Subject:** **Draft Remedial Investigation/Feasibility Study Report, Lake San Marcos and Upper San Marcos Creek Watershed and Technical Memorandum: Current and Historical Lake and Golf Course Management Efforts– Lake San Marcos and San Marcos Creek, San Marcos, California (Site IDs #2090069 and 2090071)**

Messrs. Vitti and Thornberry:

The California Regional Water Quality Control Board, San Diego Region (San Diego Water Board), has reviewed the following documents for the subject case:

- *Draft Remedial Investigation/Feasibility Study (RI/FS) Report*. Prepared by Daniel B. Stephens & Associates, Inc., on behalf of Citizens Development Corporation (CDC) and the Public Agency Defendants. January 8, 2016 (Report).

- *Technical Memorandum: Current and Historical Lake and Golf Course Management Efforts*. Prepared by Great Ecology on behalf of CDC. April 2016 (Memo).

The Report was prepared following guidance of the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) and the National Contingency Plan (NCP). The Report describes work performed in general accordance with the RI/FS Work Plan (Work Plan)[1] and related correspondence.[2,3] The Memo was prepared following a request by the San Diego Water Board for information regarding lake management, residential/golf course landscaping practices, and other related information in a March 18, 2016, email to CDC. The two documents were reviewed together because the Memo provides supplemental information used to assist with review of the Report and compliance with Investigative Order R9-2011-0033 (Order) and Exhibit B (Scope of Work) of Addendum B of the Participation Agreement between the San Diego Water Board and the Participation Agreement members.

---

[1] Daniel B. Stephens & Associates, Inc. 2015. Remedial Investigation/Feasibility Study Work Plan. July 10.

[2] San Diego Water Board. 2015. Remedial Investigation/Feasibility Study (RI/FS) Work Plan, Lake San Marcos and Upper San Marcos Creek Watershed – Lake San Marcos and San Marcos Creek, San Marcos, California. August 14.

[3] Daniel B. Stephens & Associates, Inc. 2015. Response to Comments regarding Remedial Investigation/Feasibility Study (RI/FS) Work Plan, Lake San Marcos and Upper San Marcos Creek Watershed – Lake San Marcos and San Marcos Creek, San Marcos, California. August 31.



EXHIBIT 5-1

Mr. Pino Vitti and Mr. Reed Thornberry          - 17 -                    June 2, 2016

**Section 6.2.6: Lake Ecology**

97.    Blue-green algae is used in this section for the first time. Previously only the term cyanobacteria is used. Ensure one term is used consistently for clarity throughout the document or, alternatively, explain both terms when first introduced.

**Section 6.2.7: Lake Site Conceptual Model Summary**

98.    The Report states that between 1974 and 2012, the lake received approximately 1,680 metric tons per year of sediment, equivalent to 0.09 tons per year per acre of watershed, and lost about 23 percent capacity. The Work Plan states that over this same period, the lake received approximately 2,500 metric tons per year of sediment, equivalent to 0.14 tons per year per acre of watershed, and lost about 34 percent capacity. Explain the discrepancies and verify the correct values.

**Section 7: RI Conclusions**

99.    The conclusion regarding the contribution of "significant quantities of nutrients" to San Marcos Creek by the former Prohoroff, Wilgenburg, and Hollandia properties appears to be based on soil data collected during the September 2015 SCS investigation. This conclusion, however, is not supported by the data. The maximum concentrations cited are the highest with respect to the targeted soil sampling locations only (i.e., those in proximity to historical agricultural operations). There are no background soil concentrations against which to compare these data and, therefore, it is not clear whether the soil data are representative of historical agricultural discharges or background. Further, the Report states that groundwater contributes limited nutrients to the creek and lake; therefore, there does not appear to be evidence of a pathway for the soil nutrients to the receiving water (the creek). Provide additional explanation.

100.   The Report states: "Supply well data indicate that groundwater in the central watershed is a potential source of total phosphorus (averaging 0.15 mg/L) to the lake." This is the first mention of this interpretation in the Report and is not supported by evidence. Section 4.1.4.2 of the Report discusses the sampling data for the city supply wells located within the central watershed area. The concentration data are summarized; however, there is no discussion with respect to the significance of these data as indicators of the contribution of groundwater to nutrients in the lake or creek. Please provide additional explanation. Examination of the centrally located water supply well total phosphorus data indicate that the average 0.15 mg/L concentration is much lower than the average concentration detected in both creek samples (1.1 mg/L summer, 0.74 mg/L winter) and in storm drain samples (0.37 mg/L summer, 0.42 mg/L winter).

101.   The information regarding the Twin Oaks tributary on page 172 regarding a disparity in the relative contribution of this tributary based on comparison of County field sampling data and model output requires further explanation. Further, as for the central watershed groundwater data conclusion discussed above, this is the first mention of this interpretation in the Report. The Report concludes that the disparity was caused by higher flow rates being used in the model than was reasonable, given field data collected during two sampling events. This resulted in higher average flux and loading from this area of the watershed in the model runs. The watershed sampling data cited in Section 4, however, indicate that the Twin Oaks tributary surface water concentrations were much higher than those of other creek reaches. The higher concentrations point to the Twin Oaks branch as a large contributor to load, perhaps even despite lower surface flow, because of the very high concentrations. Furthermore, the lower surface water flow for this branch was based on two sampling events only. Is this sufficient to calibrate the

5-2

Mr. Pino Vitti and Mr. Reed Thornberry          - 16 -                          June 2, 2016

the water budget (Table 4) over the 2012 to 2014 dry seasons is 243 AFY, and the average winter (November to March) watershed runoff value estimated for the water budget (Table 5) over the 2012 to 2014 wet seasons is 1,431 AFY. The average total runoff over this recent time period is thus 1,674 AFY, which is at the low end of the range cited in Section 6.2.2 of 1,500 to 4,000 AFY. Please rectify these values.

90.     The Report states that, "Refined watershed modeling...coupled with a lake model, will rigorously quantify the response of the watershed and lake to precipitation events." The models have been run for the lake and the watershed. What are the results of the modeling? Use these results to refine the site conceptual model as presented in Section 6.

91.     The Report states: "Mixing and other complex biogeochemical cycling also influence lake water quality." The Anderson (2010) report (Appendix D) states that internal nutrient loading from bottom sediments can account for more than 95 percent of the overall annual nutrient loading to the water column in shallow lakes during periods of drought. This indicates that biogeochemical cycling from the bottom sediments is a dominant process. Is this true for Lake San Marcos? How does this estimate of nutrient loading compare to the nutrient loads generated by the LimnoTech lake model? A description of in-lake processes and how they affect nutrient impairments in the lake, including how pollutant transport occurs from the bottom sediments to the water column, is required under item no. 7 of Directive B of the Order. Further, an understanding of internal loading and recycling of lake nutrients is one of the main objectives of Phase V of the Scope of Work for Addendum B of the Participation Agreement.

## Section 6.2.3: Lake Sedimentation

92.     This section refers to modeling in Section 3.3. Section 3.3 provides background information on climate in the project area. Please revise.

93.     Section 6.2.3 presents an estimated sediment yield for the watershed of about 0.09 metric tons per acre per year. Is this a reasonable estimate for this watershed? Why or why not?

94.     The Report states that, "Application of watershed and lake models...will provide more detailed insights into the generation of runoff, delivery of nutrients and suspended solids to the lake, and their retention and biogeochemical cycling." The models have been run for the lake and the watershed. What are the results of the modeling? Use these results to refine the site conceptual model as presented in Section 6.

## Section 6.2.4: Lake Nutrient Loading

95.     Groundwater data are available for various groundwater sources in the lake area (i.e., Tables 28, 30, 48, and 49). Include a statement as to the likely contribution of groundwater to nutrient loading to the lake based on these data, and not only based on modeling results.

96.     The RI portion of the Report does not provide evidence for the statement that, "Historical episodic releases from the watershed have also likely contributed to lake nutrient loading over time, such as at historical former dairy or poultry properties." We agree that historical episodic releases likely have added to the nutrient load, but do not see evidence of these contributions from the historical dairy or poultry operations. Please clarify.

5 - 3

Mr. Pino Vitti and Mr. Reed Thornberry          - 31 -                          June 2, 2016

minimal compared to other watershed sources. The golf course runoff data, however, as cited in the Memo and summarized above for stations H3 and H7, indicate that the concentrations are fairly similar and, in the case of some nitrogen data, exceed lake sample concentrations. The utility of the model to predict the significance of golf course runoff as a source of nutrient load to the lake is also questionable based on the discrepancy in fertilizer requirements compared to nutrient content of irrigation water as described in comment no. 197 above. Provide additional information to justify these statements.

**Section 3: Historical Lake Remediation Actions**

200.   We question the statement that CDC has a long history of implementing solutions to the nutrient issue at the lake. The majority of the remedial measures that have been attempted at the lake were executed between 40 and 50 years ago, as discussed in the Memo. We question the assertion that use of nutrient-rich lake water for golf course irrigation is a "net nutrient removal" process for reasons discussed in previous comments. Additionally, if treatments such as alum were successful in the 1970s why were these treatments not repeated? Refer also to comment no. 192 above.

In the subject line of any response, include the reference code **T10000003261:Smearon**. For questions or comments, or to arrange a meeting or conference call to discuss the content of this letter, contact me at (619) 521-3363 or at sarah.mearon@waterboards.ca.gov.

Respectfully,

*Sarah Mearon*

Sarah Mearon, PG
Engineering Geologist
Southern Cleanup Unit

SAM/jpa/sam

cc:   Mr. Steve Figgins, Farallon Consulting (sfiggins@farallonconsulting.com)
       Mr. Nick Bubhe, Great Ecology (nbuhbe@greatecology.com)

| Tech Staff Info & Use | |
|---|---|
| Order No. | R9-2011-0033 |
| Geotracker Global ID | T10000003261 |
| Cost Recovery IDs | 2090069, 2090071 |

5 - 4

### COOPERATION AGREEMENT
### BETWEEN
### THE CITY OF ESCONDIDO AND
### THE MEMBERS OF THE PARTICIPATION AGREEMENT

This Cooperation Agreement ("Agreement") is between the undersigned political subdivisions of the State of California, municipalities, and other organizations (collectively the "Members") to the Participation Agreement ("Participation Agreement") and the City of Escondido ("Escondido") (collectively, the "Parties").

The purpose of this Agreement is to provide the terms and conditions of Escondido working together with the Members to accomplish the Diagnostic Work as defined below. This Agreement also resolves claims for reimbursement of Transactional Costs as defined below. Escondido commits to cooperate with the Members to perform the Diagnostic Work and to make the payments described herein, and the Members agree to cooperate with Escondido and to contribute their funds for the Diagnostic Work.

WHEREAS, Escondido has been actively involved and supportive of the voluntary process undertaken to address the excess nutrient loads in Lake San Marcos and San Marcos Creek. Escondido desires to enter into this Agreement, that is separate and not a part of the Participation Agreement, with the Members for the diagnostic assessment of existing nutrient conditions, and the identification and assessment of the contributing and causal sources affecting nutrient conditions in Lake San Marcos ("Lake") and San Marcos Creek ("Creek") upstream from the Lake, all in accordance with the Diagnostic Scope of Work attached as Attachment A to this Agreement ("Diagnostic Work").

WHEREAS, Members, City of San Marcos ("San Marcos") and Vallecitos Water District ("Vallecitos") now seek reimbursement of their transactional costs incurred to date for the solicitation of Members to the Participation Agreement and for the negotiation and development of agreements for the remediation of the Lake and Creek, including legal fees, associated therewith ("Transactional Costs") from Escondido.

WHEREAS, Escondido denies any legal obligation to pay Transactional Costs, including legal fees, incurred by any Member, including San Marcos and Vallecitos.

WHEREAS, San Marcos, Vallecitos, and Escondido now wish to resolve any and all claims, including past, present or future claims, involving payment for Transactional Costs, including legal fees, incurred by any Member, including San Marcos and Vallecitos as against Escondido.

NOW, THEREFORE, in consideration of the mutual covenants, agreements, representations, and warranties contained in this Agreement, and other valuable consideration, the Parties hereby agree as follows:

1.      Escondido will pay San Marcos and Vallecitos a lump sum payment of Fifteen Thousand Dollars ($15,000.00) as payment in full for their Transactional Costs, including legal


EXHIBIT 6-1

| Task No. | Task Description | Objective | PA Work Group[2,3] Scope of Work | Lake San Marcos Owner(s)[4] Scope of Work |
|---|---|---|---|---|
|  | **Phase V – In Lake Processes and Lake Management** - QAPP, Work Plan, In Lake Diagnostics and Biological Measurements, Lake Management Data, and Analysis of Data Report -- To Be Conducted Concurrently with other Phases |
|  | *Note – Tasks Denoted by a ✪ are Data Gaps Recommended by Dr. Anderson's Final Report , Water Quality Management in Lake San Marcos Analysis of Available Data Final Report February 2010 ( Dr. Anderson Report) – Gaps in Understanding i-v pgs 13 and 14. Other Tasks are related to implementing those Data Gaps (ie QAPP, Work Plan). Tasks Denoted by a ♦ are generalized needs identified by the Dr. Anderson Report ♦) – Gaps in Understanding item v pg 14* |
| I | Understand In-Lake Process | Determine Internal Nutrient Loading of Lake | ✔ | |
| 1 | Develop Draft QAPP and Monitoring Plan (SWAMP) and Work Plan For In Lake Only Processes Data Collection and Lake Management Tasks I, J, K | Standardized Data Collection Protocols | ✔ | |
| 2 | Review Draft Work Plan and QAPP by RWQCB and PA Work Group | Approval by RWQCB/ PA Work Group | ✔ | |
| 3 | Final Draft Work Plan and QAPP | | ✔ | |
| 4✪ | Depth profiling (2 vertical profiler systems with pH, EC, DO, temp, Turb) and Quarterly oversight of Task - sonde maintenance, data management. | Collect Seasonal Lake Data | ✔ | |
| 5✪ | Determine Depth and Volume of Accumulated Sediment (Sub-bottom and bathymetric survey conducted at the same time) | Understand Internal Loading and Recycling of Lake Nutrients | ✔ | |
| 6✪ | Contributions from Shallow Sediments | Understand Internal Loading and Recycling of Lake Nutrients | ✔ | |
| 7✪ | Sediment Chemistry | Understand Internal Loading and Recycling of Lake Nutrients | ✔ | |
| 8✪ | Core Sediment Samples | Understand Internal Loading and Recycling of Lake Nutrients | ✔ | |
| 9✪ | Water Chemistry - In-lake Sampling | Understand Seasonal Lake Water Quality | ✔ | |

A-5

6-2

| Task No. | Task Description | Objective | PA Work Group[2,3] Scope of Work | Lake San Marcos Owner(s)[4] Scope of Work |
|---|---|---|---|---|
| 10❂ | Biological Measurement - Biomass | Determine Biological influence of Nutrient Internal Loading – Determine ecology and food web of lake and influence on sediment recycling | ✔ | |
| 11❂ | Biological Measurement - Lake Flora | Determine Biological influence of Nutrient internal Loading determine influence on sediment recycling and water qualty | ✔ | |
| 12❂ | Fish and wildlife study | Determine Biological influence of Nutrient Internal Loading – determine influence on sediment recycling and water qualty | ✔ | |
| 13❂ | Food Web - Trophic Study | Determine Biological influence of Nutrient Internal Loading - evaluate zooplankton community effect on water column and sediment recycling | ✔ | |
| J | Understand Lake/Golf Course Well Use and Management | Determine External and Internal Loading Influence and Sources of Nutrients at Lake | ✔ | |
| 1❂ | Assess and Summarize Groundwater Pumping Records from Water Rights Permit From Lake | Understand Groundwater Budget | ✔ | |
| 2❂ | Assess and Summarize Recreational Use Records( Boating) At Lake | Understand potential influences to internal recycling and sediment influence on Lake Water Quality | ✔ | |
| 3❂ | Assess and Summarize Other Available Lake and Use Management Records | Understand potential influences to internal recycling of lake sediment | ✔ | |
| 4 | Interpret Lake Data and Estimate Affect on Nutrient Budget | Understand potential influences to internal recycling | ✔ | |

115351/000001/1338696.11

6-3

| Task No. | Task Description | Objective | PA Work Group[2,3] Scope of Work | Lake San Marcos Owner(s)[4] Scope of Work |
|---|---|---|---|---|
| K | **Lake Only Data Analysis and Interpretation** | **Identify Direct Internal and External Sources of Nutrient Loading to Lake (i.e. Immediate vicinity of Lake)** | ✔ | |
| 1◑ | Direct Lake water quantity inputs: groundwater vs. surface water sources, including seasonal and annual variation | Understand seasonal effects to various sources of influence to lake | ✔ | |
| 2◑ | Relative proportions of different sources of groundwater, including seasonal and annual variation directly influencing lake levels | Understand groundwater influence to nutrient loading into Lake | ✔ | |
| 3◑ | Relative loadings of N and P from various external sources to Lake, including seasonal and annual variation | Understand influences to nutrient loading | ✔ | |
| 4✪ | Amount of accumulated sediment in Lake; historical decrease in Lake water storage volume | Understand potential influences to internal recycling | ✔ | |
| 5✪ | Amounts of N and P in Lake sediment reservoir | Understand potential influences to internal recycling | ✔ | |
| 6✪ | Seasonal patterns in Lake thermal stratification: estimated frequency of Lake turnover | Understand potential influences to internal recycling | ✔ | |
| 7◑ | Relative importance of external vs. in-Lake sources of N and P | Understand nutrient budget for lake | ✔ | |
| 8✪ | Historical patterns in Lake sediment chemistry based on core samples | Understand potential influences to internal recycling | ✔ | |
| 9✪ | Estimated quality of sediment that would be released from the Lake if water is released from the lower Dam outlet (based on core sample results) | Understand potential influences to internal recycling | ✔ | |

A-7

6-4

| Task No. | Task Description | Objective | PA Work Group[2, 3] Scope of Work | Lake San Marcos Owner(s)[4] Scope of Work |
|---|---|---|---|---|
| 10⚙ | Biological condition of Lake, effects of current nutrient conditions on biota, and effects of fish and wildlife on current nutrient levels | Understand influences to nutrient loading | ✔ | |
| 11 | Draft Summary Review of Findings and Lake Management Recommendations for Public Review | Opportunity for Public Review and Input on Preliminary Findings | ✔ | |
| 12 | Final Summary Review of Findings and Lake Management Recommendations | | ✔ | |

**Phase VI**

**CONTINGENCY TASK – ADDITIONAL GROUNDWATER DATA AND GROUNDWATER MODEL TO OCCUR INSTEAD OF TASK D**

This task will not be initiated until review and assessment of findings from Task by RWQCB and PA Work Group are inconclusive

| Task No. | Task Description | Objective | PA Work Group Scope of Work | Lake San Marcos Owner(s) Scope of Work |
|---|---|---|---|---|
| L⚙💧 | Develop Groundwater Model | Determine Groundwater Influence Nutrient Load to Lake Based on Modeling and focused Data Collection | ✔ | |
| 1 | Select Groundwater Module(s) | Identify appropriate EPA Ground water modules for nutrient load | ✔ | |
| 2 | Conceptual Groundwater Model | Develop data inputs for concept groundwater model | ✔ | |
| 3 | Refine Conceptual Model | Refine data sets for groundwater model and Assess Ground Water Data needed to complete model inputs. | ✔ | |
| 4⚙💧 | Gather Additional Field Data Required for Model Completion | Based on Data, gather current field data to complete refined concept model. | ✔ | |
| 5⚙💧 | Differentiate Groundwater Sources into lake – Groundwater Quality | Identify Groundwater Nutrient Sources into lake (legacy Agriculture, existing Agriculture, other) | ✔ | |
| 6⚙💧 | Differentiate Groundwater Quality /quantity into Lake | Determine Groundwater quality and quantity inputs into lake | ✔ | |
| 7 | Understand Ground Water Budget into Lake | - Calibrate/Validate Groundwater Model | ✔ | |

G-5

SCS ENGINEERS

| 8 | The organochlorine pesticide (OCP) and leaching analyses were not included in the FSP. Provide rationale for inclusion of these analyses for select samples. | OCPs and SPLP were added as addendum to scope per phone discussions and e-mails. Rationale: investigative. |
|---|---|---|
| 9 | Provide a well sampling field form for OW4 that includes depth to water and water quality parameters measured during well purging. | The field notes are attached to this response for RWQCB's consistency check. |
| 10 | The data cited in this section require context to be of value in meeting the objectives of the investigation. The Report does not include any discussion or interpretations of the data. The Report should consider the following study questions, for example: | The LSM Technical Team specifically requested SCS to exclude discussion and interpretations of the data collected therefore it is not in our contracted scope to respond to items 10a through 10j. |
| | a. What are typical nutrient concentrations in soil and groundwater in the watershed (i.e., background concentrations)? How do these concentrations compare to the data collected during this investigation? | |
| | b. What are the upgradient nutrient concentrations in groundwater? How do these concentrations compare to the data collected during this investigation? | |
| | c. What are typical nutrient concentrations in soil and groundwater in former agricultural areas? How do these concentrations compare to the data collected during this investigation? | |
| | d. What is the relationship among the various forms of nitrogen and among the various forms of phosphorus that were detected in the soil and groundwater samples? How do these various forms relate to the identification of source areas? | |
| | e. What is the difference, if any, between the nutrient signatures in soil and groundwater in former livestock operational areas compared to those in agricultural areas used for crops only? | |
| | f. What are the spatial relationships (both vertical and lateral) among the various data with respect to the suggested agricultural source areas? | |
| | g. What are the spatial relationships (both vertical and lateral) among the various data with respect to the interpreted groundwater flow directions? | |
| | h. What significance does the leaching data have on the results of the investigation? | |
| | i. Is the OCP concentration detected in sample MB1-4 above the Regional Screening Level for the detected compound? | |

EXHIBIT 7

**DRAFT AGENDA – UPPER SAN MARCOS CREEK/LAKE SAN MARCOS NUTRIENT DIAGNOSTIC EFFORT MONTHLY UPDATE CALL WITH SDRWQCB**

DATE: April 29, 2016  TIME: 10:00 AM - 11 AM  PST;  **CALL IN NUMBER:** Dial-In: 1-949-438-1239 (no passcode) (***Note this is the new conference call in number***)

A. INTRODUCTIONS/Roll Call/ (Steve Figgins)

B. DISCUSSION REGARDING PILOT STUDIES, WHAT SPECIFIC PERMITS WILL BE REQUIRED AND ASSISTANCE/REQUIREMENTS FROM THE RWQCB/USACE ETC.–(All)

C. STATUS OF AG INVESTIGATION REPORT REWRITE AND RE-SUBMITTAL TO THE RWQCB - (Steve Figgins)

D. RWQCB STATUS REPORT ON THE REVIEW OF THE RI/FS, AND DISCUSSION OF ESTIMATED TIMETABLE TO FINALIZE THE RI/FS- (All)

E. DISCUSSION OF WHAT THE LSM TECH TEAM IS DOING TO REPOND TO THE 30 PAGES OF QUESTIONS FROM JOHN REAVES– (John Dodge)

F. DISCUSSION OF ADDITIONAL DATA COLLECTION EFFORT TO SUPPORT PILOT STUDIES AND FEASIBILITY STUDY/REMEDY IMPLEMENTATION – (All)

G. DISCUSSION OF LIMNOTECH REVIEW OF THREE RAIN EVENTS DATA TO BETTER UNDERSTAND RAINFALL PATTERNS AND RUNOFF FROM DIFFERENT AREAS – (John Wolfe)

H. ANYTHING ELSE?

I. ACTION ITEM LIST BY NEXT CONFERENCE CALL- Next monthly update call scheduled for May 27th, 2016 at 10:00 AM PST.

**EXHIBIT** *8*

VWD0079626

**DRAFT AGENDA – UPPER SAN MARCOS CREEK/LAKE SAN MARCOS NUTRIENT DIAGNOSTIC EFFORT MONTHLY UPDATE CALL WITH SDRWQCB**

**DATE:** March 27th, 2015 **TIME:** 10-11 AM  PST; **CALL IN NUMBER:** Dial-In: 1-949-438-1239 (no passcode) (*Note this is a new conference call in number*)

A. INTRODUCTIONS/Roll Call -(Steve Figgins)

B. UPDATE –Watershed Model updates -(Steve Figgins)

C. STATUS REPORT on upcoming SCS Technical Memorandums from recent wet weather and cumulative groundwater data collection efforts- (Dan Johnson)

D. LSM TECH TEAM/RWQCB DIALOGUE – Laurie was going to have some discussions to start the ball rolling (Laurie Walsh)

E. Status report on the RI/FS RFP Process– (Tim Simpson)

F. DATA COLLECTION STATUS- Discuss proposed data collection efforts to show ongoing Nitrogen and Phosphorous sources due to former AG operations (Dan Johnson)

G. OTHER ISSUES/QUESTIONS?

H. ACTION ITEM LIST BY NEXT CONFERENCE CALL- Next monthly update call scheduled for April 24th at 10:00 AM PST.

EXHIBIT 9-1

**FINAL AGENDA – UPPER SAN MARCOS CREEK/LAKE SAN MARCOS NUTRIENT DIAGNOSTIC EFFORT MONTHLY UPDATE CALL WITH SDRWQCB**

**DATE:** March 27th, 2015 **TIME:** 10-11 AM PST; **CALL IN NUMBER:** Dial-In: 1-949-438-1239 (no passcode) (***Note this is a new conference call in number***)

A. INTRODUCTIONS/Roll Call - (Steve Figgins)

B. UPDATE –Watershed Model updates -(Steve Figgins) Tetra tech reran the watershed model, limno tech evaluated the watershed model. Limno tech said they would need to want to use a different soil data set because they wanted to use a soil group of data that has far more detail (tetratechs was too course – in the opinion of the Tech Team), tech Team thinks this "upgrade" to the model will give a much more confident prediction to what is being contributed from the watershed to the lake. This will also bring the model forward to march 2015 to include the wet weather events. Tech team is meeting today – one goal is to get agreement is to go with this option and get approval to get Limno Tech started on this work.

C. STATUS REPORT on upcoming SCS Technical Memorandums from recent wet weather and cumulative groundwater data collection efforts- (Dan Johnson) - ground water sampling – nutrients (nitrate and nitratite) were above the reporting limits. TDS were above 1000 mg/l . Reasonable to assume that some nitrogern and phosphors are beign discharged to the lake from ground water. Wet weather sampling – Feb 28- march 2,2014 and Dec 2-3 of 2014, 90% complete on putting the report together for that work and issuing to the Tech Team. Conc – for Total P were above BP obj for Total below for Nitrate. Majority of loading is coming from location at via vera cruz – coming from the Creek. Load from area around the lake are an order of magnetite below those that are coming from the creek.

D. LSM TECH TEAM/RWQCB DIALOGUE – Laurie was going to have some discussions to start the ball rolling (Laurie Walsh)

E. Status report on the RI/FS RFP Process– Tim Simpson- RFP is out on the street.

RI/FS for the lake and the watershed. Developed a bid doc and RFP. Targeted completion date- Oct 2015 (to the tech team) – waterboard will be a part of the process and be a part of the feasibility analysis and

First deliverable is a work plan to the Water Board.

Hope to have selected a consultant by middle of April.

Team worried that the judge may lift the stay on discovery and no one in the tech team wants that because it will slow things down tremendously.

Idea to have a RAB- to discuss the remedy technologies and even at the work plan stage.



EXHIBIT 42    **VWD0044076**

**FINAL AGENDA – UPPER SAN MARCOS CREEK/LAKE SAN MARCOS NUTRIENT DIAGNOSTIC EFFORT MONTHLY UPDATE CALL WITH SDRWQCB**

**DATE:** March 27th, 2015 **TIME:** 10-11 AM  PST;  **CALL IN NUMBER:**  Dial-In: 1-949-438-1239 (no passcode) (***Note this is a new conference call in number***)

CDC has Limno Tech working on the watershed and lake model sequentially – once that is complete we will have a working watershed model that will interface with the lake model, then Limno tech can run "the model" to run restoration scenarios and predict effects on lake cleanup. Want to know if and what would be required if they wanted to do a pilot test this summer and what would be required from out office to do a pilot test if chem addition was use or these other options:

Alum

Phos lock

Oxygen release compound

Mixing or other mechanical means.

F. DATA COLLECTION STATUS- Discuss proposed data collection efforts to show ongoing Nitrogen and Phosphorous sources due to former AG operations (Dan Johnson) – going to be doing surface water sampling (in the creek) a dry weather grab sample (4 samples) two up and two down stream of the two dairies (holandia and Vilgenberg)  and the chicken ranch (Herrellowff) near cal state san marcos (may be residual effects of their operations)and two wet weather to the sample locations will be presented to the Tech Group.  Work plan to be before the group by end of next week.  Sampling should start as soon as they get ok from the Tech Group.

G. OTHER ISSUES/QUESTIONS?

H. ACTION ITEM LIST BY NEXT CONFERENCE CALL- Next monthly update call scheduled for April 24th at 10:00 AM PST.

Get Steve Figgins an email that describes who on the water board will be on the team

VWD0044077

9-3

Begin forwarded message:

**From:** "Nick Buhbe" <nbuhbe@greatecology.com>
**Subject: RE: Work plan upload**
**Date:** March 4, 2016 at 6:02:44 PM PST
**To:** "Mearon, Sarah@Waterboards"
<Sarah.Mearon@Waterboards.ca.gov>
**Cc:** "Steve Figgins (sfiggins@farallonconsulting.com)"
<sfiggins@farallonconsulting.com>, "Gary Brugger
(gbrugger@exponent.com)" <gbrugger@exponent.com>, "Timothy
Simpson (tssimpson@gsi-net.com)" <tssimpson@gsi-net.com>, "Andy
Komor (akomor@pacewater.com)" <akomor@pacewater.com>, "Ioana
Petrisor, Ph.D." <ipetrisor@greatecology.com>

Sarah-
The "0400" stations, of which 0460 was one, were all intended to represent the North Twin Oaks
Valley. That is a separate tributary from the main stem of San Marcos Creek and is not influenced
by Hollandia, Wilgenburg, or Prohoroff facilities.  However, there were and are agricultural land
uses in that watershed and upstream of 0460, so considering it a "control" is likely inappropriate,
depending on the context of your question.

I am certain it was *not* chosen to represent an *a priori*  "control" since the objective of the
monitoring was to characterize dry and wet weather flows within different sub-watersheds of the
Lake San Marcos Watershed.

Hope that helps, and have a good weekend,
Nick


Nick Buhbe, M.S.
Director of Ecology & Western Region



EXHIBIT  10

**From:** Jeff Caufield <Jeff@caufieldjames.com>
**Sent:** Thursday, September 5, 2013 9:35 AM
**To:** Jeff Caufield; Walsh, Laurie@Waterboards
**Cc:** Pino Vitti; Matt McMillan; Rebecca Vargas
**Subject:** RE: CDC-Information Request

FYI. Thank you for your assistance!

We really appreciate it.

Jeff Caufield

**From:** Jeff Caufield
**Sent:** Thursday, September 05, 2013 9:23 AM
**To:** Jeff Caufield; 'Laurie Walsh (lwalsh@waterboards.ca.gov)'
**Cc:** 'Pino Vitti'; Matt McMillan; Rebecca Vargas
**Subject:** RE: CDC-Information Request

Dear Laurie:

Since yesterday PAWG has apparently changed their position and it sounds like we are going to receive information in the near future.

Thanks,

Jeff

**From:** Jeff Caufield
**Sent:** Wednesday, September 04, 2013 11:40 AM
**To:** Laurie Walsh (lwalsh@waterboards.ca.gov)
**Cc:** 'Pino Vitti'; Matt McMillan; Rebecca Vargas
**Subject:** CDC-Information Request

Dear Ms. Walsh,

I am writing to advise you of an issue of very serious concern. I believe that CDC is also meeting with your directly on this issue.

It is my understanding that Tetra Tech is under a contract with the Regional Board pursuant to a USEPA grant of public funds to prepare a watershed model for San Marcos Creek. Accordingly, it is my understanding that Tetra Tech is working for the Regional Board on this project. I would like to receive a copy of the contract between the Regional Board and Tetra Tech and the USEPA related to this watershed model. I would also like to receive a copy of the grant application and associated paperwork.

As you are aware, a substantial amount of data has been collected on both the watershed and Lake San Marcos. As part of the process, CDC has collected data on the Lake and surrounding properties and shared that with PAWG. CDC has chosen to fully cooperate and has been timely providing data to PAWG despite the fact that data has not been provided to CDC in a reciprocal fashion. CDC has also gone to substantial time and effort to assist, provide access and equipment

1



VWD0060320

to not only sample the Lake but also surrounding properties. Unfortunately, PAWG has unilaterally refused to share data in return and has asserted ALL data currently being provided to Tetra Tech is "confidential" and refused to provide access to the ftp site that the data is being uploaded onto for Tetra Tech.

First, I am unaware of any legal authority upon which data being provided to a consultant that is under a public contract with the Regional Board receiving public funding from the USEPA can be considered "confidential." If there is some authority and/or agreement with the Regional Board allowing such information to be withheld from CDC and/or the public, please let us know.

Second, the "public participation plan" submitted by PAWG calls for and requires as part of the public participation process that this information be open and available to the public. Accordingly, PAWGs refusal to provide this information upon request is a violation of that public participation plan and renders the process meaningless as neither CDC nor the public can participate when data is being kept "secret."

Third, PAWG's unilateral decision to withhold this data from CDC and the public may also expressly violate the terms of the EPA funding grant and jeopardize the funding of this modeling effort.

Finally, this information is critical to CDC's ongoing efforts to characterize the lake, collect data and/or otherwise aid and assist in the remediation efforts of the Lake.

I don't know whether you were previously aware of the situation and would request your assistance in resolving it. We would request the Regional Board immediately direct PAWG to provide CDC and the public with access to the Tetra Tech ftp site and all information being provided to Tetra Tech, including all recent information collected by PAWG at the Lake and surrounding properties. Please also consider this request to be under the California Public Records Act.

Very truly yours,

Jeffery L. Caufield
Caufield & James LLP

11-2

VWD0060321

8-1-17

## Lake San Marcos Frequently Asked Questions (FAQs)

*Dredging*

**Q.** *The lake has experienced multiple sewage spills. Have the lake sediments been tested for pollutants? Will the lake be dredged? [July 2017]*

**A.** Past sewage spills were discussed in the 2016 Remedial Investigation and Feasibility Study (RI/FS). Given the relatively small volume of past spills, post-spill cleanup responses, natural breakdown processes, and system flushing, accumulation of wastewater and solids on the lake bottom is expected to be minor. Accordingly, dredging is not currently being considered to address nutrient issues.

Dredging was considered in the Feasibility Study and was ruled out because it is highly disruptive to lakeside recreation, aesthetics, and habitat, and is not a cost-effective method to improve water quality issues in the lake resulting from elevated nutrient levels. Sediment sampling and analysis was conducted in 2013 and 2014. The samples were analyzed for nutrients, metals, and other pollutants. The analytical results are included in the 2016 RI/FS in Appendix AH.

*Watershed Information*

**Q.** *Identify the watershed management area this project is located in and provide a link to the Carlsbad Water Quality Improvement Plan (WQIP). [July 2017]*

**A.** The project is located in the Carlsbad Watershed Management Area (WMA).

The Carlsbad WMA Water Quality Improvement Plan can be found here.

*Water Quality*

**Q.** *Why hasn't lake clarity improved after the initial alum treatment? [July 2017]*

**A.** An initial pilot-scale alum treatment was conducted in late May 2017. Water clarity at the lake is affected primarily by algae, which, in turn, is driven by phosphorus levels, among other factors. The alum treatment was intended to remove phosphorus from the water column and sediments. Because alum binds phosphorus in the water column and does not affect algae directly, changes in water clarity may not be immediate. Accordingly, improved lake water clarity is often (but not always) seen in the days and weeks following alum treatment. Water clarity may not improve until after several alum applications, depending on the amount of phosphorus in the water column, as well as in the underlying lake sediments.

Updated 8/1/17

EXHIBIT 12

| | |
|---|---|
| **From:** | James Dodson <dodson@scottjacksonlaw.com> |
| **Sent:** | Friday, December 2, 2016 11:29 AM |
| **To:** | John.Anderson@waterboards.ca.gov |
| **Cc:** | James.Smith@waterboards.ca.gov; David.Gibson@waterboards.ca.gov; Athena Troy; Neal Meyers (nmeyers@meyersfozi.com); James Gumpel |
| **Subject:** | Lake San Marcos |
| **Attachments:** | Addendum B.docx; Addendum B.pdf |

Dear Mr. Anderson,

This office serves as General Counsel for Vallecitos Water District; and, together with the law firm of Meyers Fozi, have been providing legal representation to the District in respect of the development of TMDLs for Lake San Marcos and San Marcos Creek and in respect of the lawsuit filed by Citizens Development Corporation (CDC) against the District, the City of San Marcos, the County of San Diego, the City of Escondido, and Hollandia.  As you know, the District, the City of San Marcos, the County, the City of Escondido, and CDC have been productively engaged in mediation, with Tim Gallagher serving as the mediator, and conducting extensive diagnostic studies in the lake and watershed in a good faith effort to develop lake and watershed models, completing an RI/FS, and apportioning abatement responsibility among the parties.

Recently, the parties' technical representatives learned from conversations with you of the likely issuance of a clean-up and abatement order by the Regional Board to effect implementation of the recommended abatement strategy.  Unfortunately, the technical representatives were not able to identify the parties or other entities to be named in the order.

This case has been somewhat unusual in that the Regional Board and certain parties have sought to establish a model approach to the development of TMDLs  focusing on conducting investigation, feasibility analysis, abatement planning, and abatement implementation through voluntary participation in lieu of compulsory participation under the various orders available to the Regional Board.  To this end, the District, the San Marcos Unified School District, Caltrans, the County of San Diego, and the City of San Marcos executed the Participation Agreement.  A related agreement entitled, "Addendum B to Participation Agreement" was also executed by the same parties and the Regional Board through David Gibson.  In the Recitals, the Regional Board expressed its purpose in signing Addendum B as follows, "To provide leadership, to promote the voluntary and timely progression of the work, to define the process of coordination between the Members and the RWQCB, to ensure reasonable public participation, and to provide regulatory supervision and timely completion of the covered work … ."  As used in Addendum B, the term "Member" is defined as, " … a party which is both a Member under the Participation Agreement and a party to this Addendum."  Caltrans and the San Marcos Unified School District have since withdrawn from the Participation Agreement and, by definition, from Addendum B.  For your convenience, I have attached a copy of Addendum B to this email (in two formats).

The scope of the Addendum, as it pertains to the participating parties, is described in the definition of "Matters Addressed" as follows, "The Matters Addressed in this Addendum shall include (a) the collective discharges of the Members and the individual discharges of the Members occurring prior to the Effective Date that caused or contributed to the Nutrient impairment in the Impaired Water Bodies ("Members' Discharges"), (b) the Members' Discharges occurring after the Effective Date, to the extent the same represent a continuation of discharges occurring prior to the Effective Date and are the subject of the investigation, cleanup and/or abatement of Nutrient impairment in the Impaired Water Bodies, and (c) the Scope of Work described in Exhibit B … ."  Of course, Addendum B did nothing to exculpate persons who did not sign the agreement from responsibility.  For example, the Addendum defines "Work Group" as follows, " 'Work Group' shall mean the Members and all Non-Members which are, after the Effective Date, working in coordination with the RWQCB to perform the Work, whether as Members under the Participation Agreement and this Addendum B, or as Non-Members under an enforcement order or other agreement.

1



EXHIBIT 13-1     VWD0075098

"Work" is defined under Addendum B, in part, as follows, " 'Work' shall mean the (a) diagnostic assessment of existing Nutrient conditions, as well as the identification and assessment of the contributing and causal sources and pathways affecting Nutrient conditions in the Lake and Creek ("Diagnosis Work"); (b) identification and feasibility assessment of alternative processes, means, methods, and technologies for abating the Nutrient conditions in the Lake and Creek, improving the existing Nutrient water quality conditions in the Creek and Lake, and determining feasible site-specific Water Quality Objectives (the "Feasibility Work"); (c) development of an abatement plan to achieve the Water Quality Objectives within a reasonable period of time ("Abatement Planning Work"); (d) implementation of the Abatement Plan ("Implementation Work"); (e) pre-and-post project Nutrient monitoring in the Creek and Lake ("Monitoring Work"); and (f) work incidental thereto ("Incidental Work") all as is reasonably necessary to achieve the Project Purpose described in Section 4 of this Addendum to the reasonable satisfaction of the RWQCB."

The "Project Purpose" is described in Section 4 as "...the Feasible abatement of the Nutrient impairment related conditions in the Lake and the Creek, as necessary to achieve existing or site specific Water Quality Objectives providing reasonable protection of designated beneficial uses." The RWQCB and the Members agreed that the Work shall be performed by the Work Group pursuant to a scope of work described in Exhibit B to Addendum B. Addendum B also provided that to the extent the RWQCB or the State Board, by enforcement order or agreement, assigned some or all of the Work to Non-Members ("Non-Members Work"), the Members' obligations to perform the Scope of Work under Addendum B shall be modified and/or reduced to the full extent of the Non-Members Work.

Section 2 acknowledges that the parties executed Addendum B voluntarily in consideration of the RWQCB's covenant not to sue set forth in Section 16. Subject to certain limitations not applicable here,
Section 16 of Addendum B provides in part that, "... for as long as the Members are in good faith substantially complying with the obligations of this Addendum, and in consideration for the Scope of Work that will be performed and the payments that will be made by the Members under the terms of this Addendum, the RWQCB covenants not to sue, take enforcement action, or take other administrative action against the Members relating to the Matters Addressed, as described in Section 1(f) hereof."

John, these and other provisions of Addendum B clearly preclude the naming of Member parties who are working in good faith to meet their obligations under Addendum B. Certainly, this includes the District, the County, and the City of San Marcos.

John, I am available if you should have any questions or comments. In any case, I would appreciate the opportunity to discuss this with you in the event you are inclined to name signatories to Addendum B in the order proposed to be issued by the Regional Board.

Regards,

Jim

James R. Dodson
Law Office of Scott & Jackson
16935 West Bernardo Drive, Suite 170
San Diego, California 92127
Telephone: [858] 675-9896
Facsimile: [858] 675-9897

THE INFORMATION CONTAINED IN THIS ELECTRONIC MESSAGE IS PROTECTED BY THE ATTORNEY-CLIENT PRIVILEGE AND/OR ATTORNEY-WORK-PRODUCT DOCTRINE. IT IS INTENDED ONLY FOR THE USE OF THE INDIVIDUAL NAMED ABOVE, AND THE PRIVILEGES ARE NOT WAIVED BY VIRTUE OF THIS HAVING BEEN SENT BY E-MAIL. IF THE PERSON

2

VWD0075099

ACTUALLY RECEIVING THIS E-MAIL OR ANY OTHER READER OF THE E-MAIL IS NOT THE NAMED RECIPIENT OR THE
EMPLOYEE OR AGENT RESPONSIBLE TO DELIVER IT TO THE RECIPIENT, ANY USE, DISSEMINATION, DISTRIBUTION OR
COPYING OF THIS COMMUNICATION IS STRICTLY PROHIBITED.  IF YOU HAVE RECEIVED THIS COMMUNICATION IN
ERROR, PLEASE IMMEDIATELY NOTIFY US BY TELEPHONE, AND RETURN THE ORIGINAL MESSAGE TO VIA A RESPONSE TO
THIS E-MAIL OR RETURN THIS TO US AT THE ABOVE ADDRESS VIA THE POSTAL SERVICE.  THANK YOU.

VWD0075100

# PARTICIPATION AGREEMENT AMONG THE

# LAKE SAN MARCOS WORK GROUP

115351/000001/1148769.16



PARTICIPATION AGREEMENT AMONG THE
LAKE SAN MARCOS WORK GROUP

This Participation Agreement ("Agreement") is made by the undersigned parties, including political subdivisions of the State of California, organizations, and individuals (collectively, the "Members"), as follows:

RECITALS

Whereas, the Lake San Marcos ("Lake") is an approximate 60-acre lake located in the unincorporated area of the County of San Diego ("County") just outside the southwestern limits of the City of San Marcos ("San Marcos");

Whereas, the watershed draining into San Marcos Creek ("Creek") includes, but is not limited to, waste discharges subject to the control of the San Diego Regional Water Quality Control Board ("Regional Board");

Whereas, San Marcos and the Vallecitos Water District ("Vallecitos") are the "Members";

Whereas, other entities and individuals may elect to participate as Members pursuant to Section 5.2;

Whereas, the Members may agree to perform some of the Work with parties who are not Members pursuant to a written agreement among the Members and such other parties pursuant to a separate Work and Cost Sharing Agreement to be attached hereto;

Whereas, the County, San Marcos and the City of Escondido ("Escondido") (the "MS4 Co-Permittees") are required by the San Diego Municipal Stormwater Permit, Order No. R9-2007-0001, to regulate surface water discharges from their respective municipal separate storm sewer systems (MS4s) to various waterways, such as creeks, streams, lakes and the ocean, to the maximum extent practicable (MEP);

Whereas, the Members and other persons and entities, who are not Members, may have discharged or represent individuals who may have discharged and may in the future discharge nitrogen and phosphorous (collectively, "Nutrients" or "Pollutants") into the Creek and/or the Lake;

Whereas, the Regional Board, has the authority to issue Cleanup and Abatement Orders ("CAO") and/or engage in other investigative or enforcement actions against any discharger to address past discharges and to abate future discharges of Pollutants into the Creek and/or the Lake;

- 1 -

115351/000001/1148769.16

14-16

Whereas, the Lake consists of an impoundment of San Marcos Creek by means of a privately-owned manmade dam at its southern end (the "Dam"), that retains water, sediment and Pollutants in the Lake;

Whereas, Citizens Development Corporation ("CDC") is the fee simple owner of the land underlying the Lake and the Dam and holds an appropriative License for Diversion and Use of Water, Permit 6305, License 7224, issued by the State Water Resources Control Board ("State Board"); Division of Water Rights and holds certain riparian rights (collectively "Water Rights");

Whereas, the Members desire to assess the presence of, and to determine the causal and contributing sources of Nutrients in the Creek and the Lake;

Whereas, the Members further desire to assess and evaluate the relative feasibility and effectiveness of reasonably available means and methods to abate Nutrient conditions in the Creek and Lake;

Whereas, the Members desire to develop and implement a remediation strategy and plan, for approval by the Regional Board, addressing the causal and contributory sources of Nutrients in the Creek and Lake to improve Nutrient water quality conditions in the Creek and Lake in accordance with such plan (collectively the "Work");

Whereas, the Members intend to fairly allocate the responsibility and costs of the Work, and such other activities as necessary to complete the obligations required by this Agreement, among themselves and other parties responsible for causing or contributing to Nutrients in the Creek and Lake while making provision for reasonable de minimis party buy-out agreements;

Whereas, the Members desire to implement a process for involving public participation to enable interested persons to provide input at meaningful times during the progress of the Work;

Whereas, the Members will conduct the Work under the terms and conditions of this Agreement in lieu of potential regulatory enforcement proceedings commenced by the State Water Resources Control Board ("State Board"), the Regional Board, or any other public agency having jurisdiction, or a lawsuit among the Members or a lawsuit initiated by a citizen;

Whereas, without admitting any fault or liability in connection with the water quality conditions in the Creek and/or Lake, the Members wish to voluntarily (1) devote their resources to respond efficiently to conduct the Work, (2) share common legal, technical, administrative and other costs, as agreed to by the Members; (ii) identify and pursue other entities and persons potentially responsible for the impairment of the Creek or the Lake; and (3) cooperate among themselves for these purposes;

- 2 -

14-1c

agreements with de minimis parties whose contribution of Nutrients to the Creek and Lake is determined to be an acceptably small percentage of the total Nutrient load in or to these waters.

8.14   Incurred Transactional Costs.   Certain Members of the Work Group have contributed substantial resources to the solicitation of Members and the negotiation and development of this Agreement, the Administrative Agreement with the Regional Board, and Common Interest Agreement.   Such Members shall be entitled to recover a reasonable amount of such expenditures from the other Members and New Members. The reasonable value shall be determined in good faith by a majority vote of the Work Group.   At a reasonable time in the future, the requesting Member(s) shall identify in writing its/their reasonable cost and expenses in providing the above described services. The Work Group shall evaluate the reasonableness of the costs and expenses requested and approve the request, by a majority vote, or identify those cost and expenses in dispute.   The dispute shall be resolved pursuant to the Dispute Resolution provisions set out in Section 12 of this Agreement.   The reimbursement to the requesting Member can be by cash payment or credit against its allocable portion of Shared Costs.

8.15   Public Participation.   Early public notification and meaningful opportunity for public participation is an important means for the public to be informed of planned Work activities and to provide timely input addressing public concerns as key decisions are being made concerning the Work and future use of the water bodies.   The Work Group will develop a public participation plan for approval by Regional Board that would, among other things, provide for the distribution of fact sheets, a contact number and/or website or other means to provide current information to the interested public concerning Work activities and the overall status of the Work and providing for meaningful opportunities, throughout the planning process, for members of the public to voice their concerns and opinions on site-specific issues and proposed Work activities.

SECTION 9
DENIAL OF LIABILITY AND INDEMNIFICATION

9.1   Reservation of Rights.   This Agreement and the activities engaged in pursuant to the Agreement shall not constitute, or be interpreted, construed or used as evidence of any admission of liability, law or fact, a waiver of any right or defense, nor an estoppel against any Member by Members as among themselves or by any other person or governmental body.   However, nothing in this section is intended or should be construed to limit, bar or otherwise impede the enforcement of any term or condition of the Agreement against any party to this Agreement.

9.2   Covenant-Not-To-Sue and Reservation of Rights.   Except in accordance with Sections 19, Members to this Agreement, unless precluded by statute, covenant not to initiate, bring, or support any claim, order, demand, enforcement action or other civil or administrative proceeding against each other arising out of or related in any way to

- 18 -

14-2

water quality conditions relating to the Nutrient impairment of the Creek or Lake or for any liability or responsibility therefore, and agree to resolve any such disputes among themselves in accordance with the Dispute Resolution procedures set out in Section 12 of this Agreement. Except as provided in this section, each Member expressly reserves the right to claim, bring a cause of action, and/or to commence a proceeding in any judicial, administrative and/or other forum against any person not a Member to this agreement.

9.3     Right of Separate Counsel.  Each Member reserves the right, at its own expense, to select and retain its own counsel to represent such Member on any matter; provided, however, that (i) a Member retaining its own counsel shall nevertheless continue to be obligated for Shared Costs assessed to that Member, including the expenses of common counsel, except where a Member declines participation in a suit as provided in Section 7.10; and (ii) Member's separate counsel have no responsibility or authority to direct litigation on behalf of the Work Group.

9.4     Indemnification.   No Member or its representative(s) serving on the Steering Committee or subcommittee shall be liable to any Member for any claim, demand, liability, cost, expense, legal fee, penalty, loss or judgment incurred or arising as a result of any acts or omissions taken or made authorized by or at the direction of the Work Group.

Each Member agrees to indemnify, defend and hold harmless, to the fullest extent permitted by law (including such laws that apply uniquely to public entities), any Member and its governing body, officers, employees, representative(s), successors and assigns from and against any claim, demand, liability, cost, expense, legal fee, penalty, loss or judgment (collectively "liability") arising from or in connection with the good-faith performance of any duties or obligations under this Agreement performed at the direction of the Steering Committee or Work Group, by any Member or its governing body, officers, employees, contractors, representative(s), successors or assigns ("Acting Member") including, but not limited to, any liability arising from any contract or agreement signed by the Acting Member at the request of the Steering Committee or the Work Group to the extent that any such acts or omissions are performed at the direction of the Work Group.  This indemnification shall not apply to any liability arising from a criminal proceeding where the Acting Member had reasonable cause to believe that the conduct in question was unlawful and this indemnification shall not apply to the extent the Acting Member's acts or omissions were reckless, or the result of willful misconduct.

Payments under this section shall be a Shared Cost in accordance with Section 8.1 of this Agreement, and shall be allocated among each Member that (1) was a Member when the action was taken or omission made that gives rise to this indemnification or (2) subsequently joins the Work Group.

The terms of this Section shall survive the termination of the Agreement and the withdrawal or removal of any Member, but a withdrawn or removed Member shall have

- 19 -

14-3

no liability under this Section for any acts, omissions, performance of duty or other events authorized after the effective date of withdrawal or removal.

## SECTION 10
## CONFIDENTIALITY AND USE OF INFORMATION.

10.1   <u>Preservation of Privilege</u>.   Information disclosed by the Members to common counsel may be disclosed to any other Member, and each Member hereby expressly consents to treat such disclosure to it as being for the sole purpose of asserting any common claims or defenses arising out of the Creek or Lake.   Such disclosure shall not be deemed a waiver of the attorney-client privilege or work product immunity or any other privilege.

10.2   <u>Confidentiality of Information</u>.   Each Member agrees that information received from any other Member or its counsel, from common counsel, or from any technical consultant retained by the Work Group pursuant to this Agreement, unless otherwise provided for, shall be subject to the confidentiality provisions of the Common Interest Agreement.

## SECTION 11
## INSURANCE

11.1   <u>Preservation of Coverage</u>.   The Members do not intend hereby to make any agreement that will prejudice any Member with respect to its insurers and, by entering into this Agreement, the Members anticipate that the actions taken pursuant to this Agreement will benefit such insurers.   If any insurer makes any claims that any aspect of this Agreement provides a basis for rejection or limitation of coverage of a Member, the Work Group will attempt, consistent with the objectives and provisions of this Agreement, to return any Member subject to such claim to a position that is satisfactory to such insurers.

11.2   <u>Disclosure of Terms of Agreement to Insurance Carriers</u>.   Subject to the conditions contained in the Common Interest Agreement, a Member may provide a copy of this Agreement to its insurer(s) for purposes of asserting a claim for insurance coverage at the Creek or Lake.   Prior to delivery of the Agreement to an insurance carrier, the Member shall obtain a signed copy of the following language from the insurance company and the Member shall transmit the original of the signed language to the Chairperson of the Steering Committee:

> The undersigned, on behalf of _____ understands that the Lake San Marcos and Upper San Marcos Creek Work Group Participation Agreement includes a Common Interest Agreement concerning confidential document between the signatories thereto.   The undersigned agrees that it will not disclose

- 20 -

*14-4*

# ADDENDUM B TO PARTICIPATION AGREEMENT

## SAN DIEGO REGIONAL WATER QUALITY
## CONTROL BOARD PROVISIONS

EXHIBIT 14-5

13225(c), 13267(b), 13304(a), and 13370 et seq. (collectively, the Water Code Obligations).

(o)   "Work Group" shall mean the Members and all Non-Members which are, after the Effective Date, working in coordination with the RWQCB to perform the Work, whether as Members under the Participation Agreement and this Addendum B, or as Non-Members under an enforcement order or other agreement.

2.   Voluntary Participation by the Members.   The Members have entered into this Addendum and the Agreement voluntarily, in consideration of the RWQCB's covenant not to sue set forth in Section 16 of this Addendum, to develop and implement a pilot program whereby the Members would develop and conduct the Work in accordance with a voluntary process as expressed in the Agreement.   The Members have entered into this Addendum and the Agreement with the goal of contributing their allocated share (as defined in the Agreement) toward achieving lasting water quality for the Lake and the Creek in advance of the schedule reasonably contemplated under the formal TMDL process for the Impaired Water Bodies, and with the goal of developing a structural framework for such voluntary process that can be used as an effective alternative to the formal TMDL process for achieving water quality improvements at a quicker pace than in other impaired water bodies throughout Region 9 and other Water Quality Control Board Regions.   The Members desire to work collaboratively with the RWQCB to develop effective procedures and strategies for such voluntary process and to describe and implement their allocated share of the Work necessary to achieve the Project Purpose.

3.   RWQCB Jurisdiction.   Pursuant to Porter-Cologne Water Quality Control Act ("Water Code") §§13000 et seq., the RWQCB has jurisdiction over the surface waters and ground waters within the Watershed.   This jurisdiction includes, but is not limited to, the right to formulate, adopt, and amend the Basin Plan and/or other water quality control plans pursuant to Water Code §§13240 et seq.; to impose waste discharge requirements pursuant to Water Code §§13260 et seq.; to administer the federal National Pollutant Discharges Elimination System ("NPDES") permits pursuant to the federal Water Pollution Control Act ("Clean Water Act") §402 and Water Code §§13370 et seq.; and, to take enforcement actions as provided in Water Code §§13200 et seq. and §§13300 et seq.   The RWQCB contends and the Members dispute that the RWQCB has a sufficient factual and legal basis for exercising its authority to compel the Members and Non-Members, individually or collectively, to perform the Work, as defined in Section 1(m) herein, and as described in Exhibit B which is incorporated herein by

115351/000001/1173244.23

14-6a

Members' motion for reconsideration shall constitute an "action" of the RWQCB within the meaning of 23 CCR Section 2050. Should the RWQCB not issue a decision on the Members' motion for reconsideration of the Independent Hearing Officer's determination, the failure to do so shall constitute a "failure to act" of the RWQCB within the meaning of 23 CCR Section 2050. The Members may petition such "action" or "failure to act" to the State Board for review in accordance with applicable law. Following State Board action on the petition, which may include a review of the matter or a denial of the petition without such review, the Members may seek judicial review in accordance with applicable law.

     (f)   <u>Interim Effect of Dispute Resolution Invocation</u>.   The invocation of Dispute Resolution procedures under this Section shall not extend, postpone or affect in any way any obligation of the Members under this Addendum unless the RWQCB agrees otherwise or unless so ordered by the State Board or a court of competent jurisdiction.

16.   <u>Covenant Not to Sue by RWQCB</u>. Subject to Section 15 and subsections (a) and (b) of this Section 16, and for as long as the Members are in good faith substantially complying with the obligations of this Addendum, and in consideration for the Scope of Work that will be performed and the payments that will be made by the Members under the terms of this Addendum, the RWQCB covenants not to sue, take enforcement action, or take other administrative action against the Members relating to the Matters Addressed, as described in Section 1(f) hereof. The RWQCB's covenant not to sue the Members shall take effect upon the Effective Date, and shall extend only to the Members or former Members who entered into settlement agreements with the Members as approved pursuant to Section 28 of this Addendum, and their respective governing bodies, directors, council members, supervisors, officers (whether or not elected), employees, contractors, consultants, representatives, successors and assigns, and does not extend to any Non-Member or Terminated Member as of the effective date of such Member's termination from this Addendum, or any other person or entity who might otherwise be potentially responsible for causing or contributing to Nutrient impairment in the Impaired Water Bodies who does not become a Member under the Agreement and who is not a signatory to this Addendum. Further, the RWQCB covenant not to sue shall be subject to the following:

     (a)   <u>Rights Against Third Parties</u>. Nothing in this Section shall limit the RWQCB's rights against any Non-Member, Terminated Member or third person or entity, including, without limitation, the RWQCB's right to sue, take enforcement action, or take any other administrative action against any

- 13 -

14-66

CITY OF SAN MARCOS

By:_____
   Its:_____

Dated: _____, 2011

CITY OF ESCONDIDO

By:_____
   Its:_____

Dated: _____, 2011

CALIFORNIA DEPARTMENT OF TRANSPORTATION

By:_____
   Its:_____

Dated: _____, 2011

SAN MARCOS UNIFIED SCHOOL DISTRICT

By:_____
   Its:_____

Dated: _____, 2011

VALLECITOS WATER DISTRICT

By: _____
   Its: GENERAL MANAGER

Dated: JULY 7, 2011

- 26 -

115351/000001/ 173244.23

14-7



**United States Environmental Protection Agency**

Office of Solid Waste and Emergency Response

EPA 550-B-15-001
March 2015
www.epa.gov/emergencies

# LIST OF LISTS

## Consolidated List of Chemicals Subject to the Emergency Planning and Community Right-To-Know Act (EPCRA), Comprehensive Environmental Response, Compensation and Liability Act (CERCLA) and Section 112(r) of the Clean Air Act

- EPCRA Section 302 Extremely Hazardous Substances
- CERCLA Hazardous Substances
- EPCRA Section 313 Toxic Chemicals
- CAA 112(r) Regulated Chemicals for Accidental Release Prevention

EXHIBIT 15-1a

compound categories), which have N.A. listed for the CAS Number in the consolidated table, are also listed in Appendix E of this document with further explanation of each chemical category, where information was available.

**RQ.** The CERCLA RQ column in the consolidated list shows the RQs (in pounds) for chemicals that are CERCLA hazardous substances.

**Metals.** For metals listed under CERCLA (antimony, arsenic, beryllium, cadmium, chromium, copper, lead, nickel, selenium, silver, thallium, and zinc), no reporting of releases of the solid form is required if the mean diameter of the pieces of the solid metal released is greater than 100 micrometers (0.004 inches) (Ref: Footnote after Table 302.4 in 40 CFR 302.4). The RQs shown on the consolidated list apply to smaller particles.

Note that the consolidated list does not include all CERCLA regulatory synonyms. See 40 CFR part 302, Table 302.4 for a complete list.

**Sulfur monochloride.** (formula $S_2Cl_2$) is listed with an incorrect CAS number of 12771-08-3, which is found on the CERCLA Hazardous Substances list. The correct CAS number should be 10025-67-9, however, the List of Lists will still include the CAS number of 12771-08-3 because it has not been changed on the CERCLA list. According to the Chemical Abstract Services which assigns CAS numbers, the correct CAS number for sulfur monochloride is 10025-67-9, which is now included on the List of Lists with an explanatory footnote.

CAS number 12771-08-3 is assigned to the substance sulfur chloride (formula SCl⁻) which was listed as a synonym for sulfur monochloride when EPA finalized the Clean Water Act Designation of Hazardous Substances rule (43 FR 10474, March 13, 1978). The CAS number 10025-67-9 is used for sulfur monochloride on EPA's TSCA Inventory and EPA's Substance Registry Services lists.

### (3) CAA Section 112(r) List of Substances for Accidental Release Prevention

Under the accident prevention provisions of section 112(r) of the CAA, EPA developed a list of 77 toxic substances and 63 flammable substances. Threshold quantities (TQs) were established for these substances. The list and TQs identify processes subject to accident prevention regulations. The list of substances and TQs and the requirements for risk management programs for accidental release prevention are found in 40 CFR part 68. This consolidated list includes both the common name for each listed chemical under section 112(r) and the chemical name, if different from the common name, as separate listings.

The CAA section 112(r) list includes several substances in solution that are covered only in concentrations above a specified level. These substances include ammonia (concentration 20% or greater) (CAS number 7664-41-7); hydrochloric acid (37% or greater) (7647-01-0); hydrogen fluoride/hydrofluoric acid (50% or greater) (7664-39-3); and nitric acid (80% or greater) (7697-37-2). Hydrogen chloride (anhydrous) and ammonia (anhydrous) are listed, in addition to the solutions of these substances, with different TQs. Only the anhydrous form of sulfur dioxide

iii


EXHIBIT 15-16

| NAME | CAS/313 Category Codes | Section 302 (EHS) TPQ | Section 304 EHS RQ | CERCLA RQ | Section 313 | RCRA CODE | CAA 112(r) TQ |
|---|---|---|---|---|---|---|---|
| 2-Aminoanthraquinone | 117-79-3 | | | | 313 | | |
| 4-Aminoazobenzene | 60-09-3 | | | | 313 | | |
| 4-Aminobiphenyl | 92-67-1 | | | 1 | 313 | | |
| 1-Amino-2,4-dibromoanthraquinone | 81-49-2 | | | | 313 | | |
| 1-Amino-2-methylanthraquinone | 82-28-0 | | | | 313 | | |
| 5-(Aminomethyl)-3-isoxazolol | 2763-96-4 | 500/10,000 | 1,000 | 1,000 | | P007 | |
| Aminopterin | 54-62-6 | 500/10,000 | 500 | | | | |
| 4-Aminopyridine | 504-24-5 | 500/10,000 | 1,000 | 1,000 | | P008 | |
| Amiton | 78-53-5 | 500 | 500 | | | | |
| Amiton oxalate | 3734-97-2 | 100/10,000 | 100 | | | | |
| Amitraz | 33089-61-1 | | | | 313 | | |
| Amitrole | 61-82-5 | | | 10 | 313 | U011 | |
| Ammonia | 7664-41-7 | 500 | 100 | 100 | | | |
| Ammonia (anhydrous) | 7664-41-7 | 500 | 100 | 100 | X | | 10,000 |
| Ammonia (conc 20% or greater) | 7664-41-7 | | | See ammonium hydroxide | X | | 20,000 |
| Ammonia (includes anhydrous ammonia and aqueous ammonia from water dissociable ammonium salts and other sources; 10 percent of total aqueous ammonia is reportable under this listing) | 7664-41-7 | | | | 313 | | |
| Ammonium acetate | 631-61-8 | | | 5,000 | | | |
| Ammonium benzoate | 1863-63-4 | | | 5,000 | | | |
| Ammonium bicarbonate | 1066-33-7 | | | 5,000 | | | |
| Ammonium bichromate | 7789-09-5 | | | 10 | 313c | | |
| Ammonium bifluoride | 1341-49-7 | | | 100 | | | |
| Ammonium bisulfite | 10192-30-0 | | | 5,000 | | | |
| Ammonium carbamate | 1111-78-0 | | | 5,000 | | | |
| Ammonium carbonate | 506-87-6 | | | 5,000 | | | |
| Ammonium chloride | 12125-02-9 | | | 5,000 | | | |
| Ammonium chromate | 7788-98-9 | | | 10 | 313c | | |
| Ammonium citrate, dibasic | 3012-65-5 | | | 5,000 | | | |
| Ammonium fluoborate | 13826-83-0 | | | 5,000 | | | |
| Ammonium fluoride | 12125-01-8 | | | 100 | | | |
| Ammonium hydroxide | 1336-21-6 | | | 1,000 | X | | |
| Ammonium oxalate | 5972-73-6 | | | 5,000 | | | |
| Ammonium oxalate | 6009-70-7 | | | 5,000 | | | |
| Ammonium oxalate | 14258-49-2 | | | 5,000 | | | |
| Ammonium picrate | 131-74-8 | | | 10 | | P009 | |
| Ammonium silicofluoride | 16919-19-0 | | | 1,000 | | | |
| Ammonium sulfamate | 7773-06-0 | | | 5,000 | | | |
| Ammonium sulfide | 12135-76-1 | | | 100 | | | |
| Ammonium sulfite | 10196-04-0 | | | 5,000 | | | |
| Ammonium tartrate | 3164-29-2 | | | 5,000 | | | |
| Ammonium tartrate | 14307-43-8 | | | 5,000 | | | |
| Ammonium thiocyanate | 1762-95-4 | | | 5,000 | | | |
| Ammonium vanadate | 7803-55-6 | | | 1,000 | 313c | P119 | |
| Amphetamine | 300-62-9 | 1,000 | 1,000 | | | | |
| Amyl acetate | 628-63-7 | | | 5,000 | | | |
| iso-Amyl acetate | 123-92-2 | | | 5,000 | | | |
| sec-Amyl acetate | 626-38-0 | | | 5,000 | | | |
| tert-Amyl acetate | 625-16-1 | | | 5,000 | | | |

A-2

EXHIBIT 15-2

Message

| | |
|---|---|
| **From:** | Steve Figgins [sfiggins@farallonconsulting.com] |
| **Sent:** | 10/16/2017 10:13:29 PM |
| **To:** | Sarah Mearon - San Diego Water Board (Sarah.mearon@waterboards.ca.gov) [Sarah.mearon@waterboards.ca.gov];<br>John Anderson - San Diego Water Board (John.Anderson@waterboards.ca.gov)<br>[John.Anderson@waterboards.ca.gov] |
| **CC:** | Tim Simpson - GSI Environmental Inc (tssimpson@gsienv.com) [tssimpson@gsienv.com];<br>aappel@ci.escondido.ca.us; Nick Buhbe - GREATecology (nbuhbe@greatecology.com) [nbuhbe@greatecology.com];<br>Ioana G. Petrisor (Environmental.forensics@gmail.com) [Environmental.forensics@gmail.com]; Gary Brugger<br>[/o=Exponent/ou=Site1/cn=Environmental/cn=bruggerg]; Sudi Shoja [sudi@engineersolutionsservices.net]; Reed<br>Thornberry - City of San Marcos (RThornberry@san-marcos.net) [RThornberry@san-marcos.net]; Greg Smith - PACE<br>| Advanced Water Engineering (gsmith@pacewater.com) [gsmith@pacewater.com]; andy@pacewater.com; John<br>Wolfe - LimnoTech (jwolfe@limno.com) [jwolfe@limno.com]; Jo Ann Weber - San Diego County<br>(joann.weber@sdcounty.ca.gov) [joann.weber@sdcounty.ca.gov]; Elisha Wakefield (ewakefield@limno.com)<br>[ewakefield@limno.com] |
| **Subject:** | Response to Warren's email |

Sarah/John- The LSM Tech Team discussed Warren's email on our weekly call today. Here are some of my notes from the call-

Discussion by the group regarding email from Warren about continued problems In the lake- We've lowered the Phosphorous (P) in the lake. Gary- this is a common condition in a lake at the start of treatment. First, you start controlling the P, reduce algae, and start improving water quality, which then improves clarity and allows light to penetrate further into the lake. This creates an environment favorable to growing grasses in the lake, where they are taking Phosphorous and other nutrients from the sediments. Andy has seen some lakes clear quickly, and Gary has seen some that take a while to get there. It will likely take us a while to remove enough P from the lake so it's not available to the larger plants. So in short, we are at the start of a long-term process. Nick said that grass is another form of vegetation taking P from the sediments and not the water column. Elisha- it's been a wet year and that may have kicked up the sediments allowing movement of seeds in the sediments that has spurred additional growth.

So these are some of the reasons we are seeing a change in the ecology of the lake. It doesn't mean we are not making progress, as we are. I hope this helps Sarah with your response to Warren.

Regards- Steve

*Steve Figgins, Principal*
Farallon Consulting, L.L.C. | 2355 Main Street, Suite 210 | Irvine, California  92614
sfiggins@farallonconsulting.com | Office: (949) 222-0870 | Mobile: (949) 293-0999



FARALLON
C O N S U L T I N G

Celebrating 16 Years of Quality Service
*Please consider the environment before printing this e-mail.*

This correspondence contains confidential or privileged information from Farallon Consulting and may be "Attorney-Client Privileged" and protected as "Work Product." The information contained herein is intended for the use of the individual or party named above. If you are not the intended recipient, note that any copying, distribution, disclosure, or use of the text and/or attached document(s) is strictly prohibited. If you have received this correspondence in error, please notify us immediately. Thank you.

EXHIBIT 16

CSME0007537

Message

| | |
|---|---|
| **From:** | Timothy Gallagher [timg@thegallaghergroup.com] |
| **Sent:** | 3/1/2018 12:38:44 AM |
| **To:** | Steve Figgins [sfiggins@ekiconsult.com]; Mearon, Sarah@Waterboards [Sarah.Mearon@Waterboards.ca.gov]; John Wolfe [jwolfe@limno.com] |
| **CC:** | Gary Brugger [/o=Exponent/ou=Site1/cn=Environmental/cn=bruggerg]; Nick Buhbe - GREATecology (nbuhbe@greatecology.com) [nbuhbe@greatecology.com]; Tim Simpson - GSI Environmental Inc (tssimpson@gsienv.com) [tssimpson@gsienv.com]; Greg Smith - PACE | Advanced Water Engineering (gsmith@pacewater.com) [gsmith@pacewater.com]; Dendy Lofton (dlofton@limno.com) [dlofton@limno.com] |
| **Subject:** | RE: Response to Comments on 2nd Interim Lake Alum Pilot Report |

And I am working on funding

From: Steve Figgins [mailto:sfiggins@ekiconsult.com]
Sent: Wednesday, February 28, 2018 4:35 PM
To: Mearon, Sarah@Waterboards <Sarah.Mearon@Waterboards.ca.gov>; John Wolfe <jwolfe@limno.com>
Cc: Gary Brugger - Exponent <gbrugger@exponent.com>; Nick Buhbe - GREATecology (nbuhbe@greatecology.com) <nbuhbe@greatecology.com>; Tim Simpson - GSI Environmental Inc (tssimpson@gsienv.com) <tssimpson@gsienv.com>; Greg Smith - PACE | Advanced Water Engineering (gsmith@pacewater.com) <gsmith@pacewater.com>; Dendy Lofton (dlofton@limno.com) <dlofton@limno.com>; Timothy Gallagher <timg@thegallaghergroup.com>
Subject: RE: Response to Comments on 2nd Interim Lake Alum Pilot Report

Sarah- apologies as the rain event this week, which was a success, got in the way of responding.

The rainfall in the Lake San Marcos area was greater than 0.5 inches. LimnoTech and their sampling team were able to get stormwater samples for the Jar Testing as well as observe flows in La Cienega basin and collect stormwater samples there as well. We got a positive break!

Nick reported on our Monday call that they are working on the Algaecide permit. Nick please update Sarah as to the progress.

John Wolfe/Dendy Lofton can respond regarding the updated SAP/QAPP for the watershed work.

We are working on funding issues and should have an answer fairly soon regarding the requested March 16th date for the workplan addendum. We may need some additional time and will keep you apprised.

Nick- please provide a status report for the SAP/QAPP addedndum for the downstream monitoring.

Thanks everyone- Regards- Steve

From: Mearon, Sarah@Waterboards [mailto:Sarah.Mearon@Waterboards.ca.gov]
Sent: Wednesday, February 28, 2018 4:27 PM
To: John Wolfe <jwolfe@limno.com>
Cc: Steve Figgins <sfiggins@ekiconsult.com>
Subject: RE: Response to Comments on 2nd Interim Lake Alum Pilot Report

Hello

I didn't get a response to these questions (see below).

Also I have not seen the updated SAP/QAPP for the watershed work. Was that still going to be submitted? CDC has also said a SAP/QAPP addendum will be submitted for the downstream monitoring.

*17*

CSME0007721

Thanks,
SM

**From:** Mearon, Sarah@Waterboards
**Sent:** Monday, February 26, 2018 10:53 AM
**To:** 'John Wolfe' <jwolfe@limno.com>
**Cc:** sfiggins@ekiconsult.com
**Subject:** RE: Response to Comments on 2nd Interim Lake Alum Pilot Report

Thanks – the responses look fine. Please ensure this is uploaded to Geotracker.

We didn't mention the work plan addendum for the alum/algaecide application in April on the call on Friday – is March 16 looking good for the work plan addendum deadline? Also, please let me know ASAP what the status is for the algaecide permitting.

**From:** John Wolfe [mailto:jwolfe@limno.com]
**Sent:** Friday, February 23, 2018 4:00 PM
**To:** Mearon, Sarah@Waterboards <Sarah.Mearon@Waterboards.ca.gov>
**Cc:** sfiggins@ekiconsult.com
**Subject:** Response to Comments on 2nd Interim Lake Alum Pilot Report

Dear Sarah –

I am attaching a Response to your comments on our 2nd Interim Lake Alum Pilot Report.  If you have any questions or would like to discuss the responses, please give me a call.

John

---

John R. Wolfe, Ph.D., PE, BCEE
Vice President
880 Apollo Street, Suite 337, El Segundo, CA 90245
Office: 310-939-7293    Mobile: 419-704-0095    email:jwolfe@limno.com

**LimnoTech**    www.limno.com
Water Environment | Scientists Engineers

17-2

CSME0007722

*Citizens Dev. Corp. Inc. v. County of San Diego, et al.,*
**Case No. 12-0334-GPC (KSC)**
**CDC PRIVILEGE LOG**
**February 20, 2018**

| Date | Category Description | Objection | Present Location |
|------|---------------------|-----------|------------------|
| 1961 - Present | Communications and correspondence by and between CDC's attorneys and CDC, its officers, directors, employees, attorneys, agents, consultants, insurers and others acting on its behalf, including emails, letters, texts, and all such other communications and correspondence. | Attorney-Client Privilege ("A/C"); Attorney Work Product ("AWP"). | Counsel for CDC. |
| 2011 - Present | Documents, information, and tangible things prepared in anticipation of litigation or for trial by or for CDC or its representative, including its attorneys, agents, consultants, or insurers, including without limitation, CDC's attorneys' internal memoranda, communications and correspondence, and other trial preparation materials. | A/C; AWP. | Counsel for CDC. |
| 2011 - Present | Documents prepared by, for, and in connection with work performed by CDC's experts and consultants, including their files, reports, invoices, photographs, recommendations, identities, opinions, communications and correspondence, and other information within the scope of FRCP 26(a)(2). | A/C; AWP; Expert information barred under 10/17/17 Scheduling Order Regulating Discovery (Doc. No. 214); Mediation and Settlement Privilege and Confidentiality; Joint Defense Privilege; Common Interest Privilege. | Counsel for CDC. |
| 2012 - Present | Mediation-confidential information created during and for mediation, including without limitation, documents, information, and correspondence prepared by counsel, experts and consultants, mediator, insurers, and others during and for mediation, and communications among such mediating parties, counsel, experts and consultants, mediator, insurers, and others during and for mediation and settlement negotiation purposes. | A/C; AWP; Expert information barred under 10/17/17 Scheduling Order Regulating Discovery (Doc. No. 214); Mediation and Settlement Privilege and Confidentiality; Joint Defense Privilege; Common Interest Privilege. | Counsel for CDC; Counsel for Mediating Parties; Mediator. |

EXHIBIT 18

**CDC v. County of San Diego, et al.**
**Revised Privilege Log for the City of Escondido**
**March 30, 2018**

Responding Party City of Escondido hereby serves a revised privilege log.  This privilege log supersedes the previously served privilege log served by the City of Escondido that was dated January 12, 2018.

| Date Range | Category Description | Privilege |
|---|---|---|
| 1888 to present | Communications and records of communications between the City of Escondido, its councilmembers, officers, departments, boards, commissions, employees, agents, consultants, insurers and others acting on its behalf, and its attorneys for the purpose of providing legal advice, including minutes of closed sessions. | Attorney-client privilege; Attorney work product |
| 2011 to present | Communications and records of communications among the parties to the Participation Agreement, Addendum B, Cooperation Agreement and Common Interest Agreement, their respective councilmembers, officers, directors, departments, boards, commissions, employees, agents, consultants, attorneys, insurers and others acting on their behalf relating to the aforementioned agreements, the investigation and remediation of Lake San Marcos and San Marcos Creek, and this litigation. | Attorney-client privilege; Attorney work product; Joint defense privilege; Common interest privilege |
| Approximately 2012 to present | Documents prepared by, for, and in connection with work performed by the Escondido's experts and consultants, including GSI, other than documents sent or provided to the Regional Water Quality Board or other regulatory agency. | Attorney-client privilege; Attorney work product |
| Approximately 2012 to present | Communications and records of communications among the parties, their respective councilmembers, officers, directors, departments, boards, commissions, employees, agents, consultants, attorneys, insurers and others acting on their behalf relating to the mediation or settlement of this case. | Mediation/settlement privilege; Joint defense privilege; Common interest privilege; Attorney work product |
| Approximately 2012 to present | Communications and records of communications between the parties, their respective councilmembers, officers, directors, departments, boards, commissions, employees, agents, consultants, attorneys, insurers and others acting on their behalf, and mediator Timothy Gallagher, relating to the | Mediation/settlement privilege; Joint defense privilege; Common interest privilege; |

EXHIBIT 19-1

| | mediation or settlement of this case. | Attorney work product |
|---|---|---|

19·2

Neal S. Meyers, Esq. (SBN 109625)
Athena Troy, Esq. (SBN 260092)
Meyers Fozi & Dwork, LLP
1808 Aston Avenue, Suite 100
Carlsbad, CA  92008
Tel:  (760) 444-0039; Fax:  (760) 444-0130
Email:  nmeyers@meyersfozi.com
        atroy@meyersfozi.com

Attorneys for Defendant,
Vallecitos Water District

# UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CITIZENS DEVELOPMENT CORPORATION, INC., a California Corporation, | Case No.: 3:12-cv-00334-GPC (KSC) |
| | Judge: Hon. Gonzalo P. Curiel |
| Plaintiff, | |
| v. | **VALLECITOS WATER DISTRICT'S AMENDED PRIVILEGE LOG** |
| COUNTY OF SAN DIEGO, a California municipal corporation; CITY OF SAN MARCOS, a California municipal corporation; CITY OF ESCONDIDO, a California municipal corporation; VALLECITOS WATER DISTRICT, a California municipal corporation; HOLLANDIA DAIRY, a California corporation; and DOES 1 through 100, inclusive, | |
| Defendant(s). | |
| AND RELATED ACTIONS | |

///

1

EXHIBIT 20-1

# PRIVILEGE LOG

**RECORDS OF:**   Vallecitos Water District

**Re:**   Citizens Development Corporation, Inc. v. County of San Diego et al.,
United States District Court, Southern District of California
Case No. 3:12-cv-00334-GPC (KSC)
**Request for Production No. 1**
Propounding Party:       Defendant, Hollandia Dairy, Inc.
Responding Party:        Defendant, Vallecitos Water District

**DATE:**   March 7, 2018

The Vallecitos Water District hereby amends the privilege log that it served on December 22, 2017 and replaces it in entirety with the privilege log set forth below.

| | DATE(S) | DESCRIPTION OF DOCUMENT OR CATEGORY OF DOCUMENTS | AUTHOR(S) | APPLICABLE PRIVILEGES/ GROUNDS |
|---|---|---|---|---|
| 1 | 1955 - Present | Written communications by and between Responding Party's attorneys and its board members, officers, employees, accountants, consultants or other advisors arising out of or connected with legal advice sought by Responding Party, including, but not limited to matters such as sanitary sewer overflows, compliance with regulatory requirements, the Participation Agreement and related agreements, the instant litigation, investigation and remediation of the impairments at the Creek and Lake, the IO, the RI/FS. | Athena Troy, Neal Meyers, James Dodson, Blaise Jackson, Jeffrey Scott, Dennis Lamb, Glenn Pruim, James Gumpel, Ed Pedrazzi, Tom Scaglione, Eric Garcia, James Gumpel, Andy Komor, Greg Smith, Keisuke Ikehata, Sébastien Sauvé | Attorney-Client, Burdensome/Costly, Attorney Work Product (including attorney-expert communications protected pursuant to FRCP 26(b)(4)), Mediation/Settlement, Common Interest/Joint Defense, Not Relevant/Not calculated to lead to discovery of admissible evidence |
| 2 | **REMOVED** | **REMOVED** | **REMOVED** | **REMOVED** |
| 3 | Approx. 2009-2012 | Written communications by and between various Lake San Marcos Stakeholders/Lake San Marcos Voluntary Parties, including their board members attorneys , directors, officers, employees, accountants, consultants or other advisors, regarding participation in voluntary funding for pre-lawsuit investigative work, applying for funding through the State Water Resource Control Board's Cleanup and Abatement Account, and negotiations regarding entering into the Participation Agreement, Addendum B, Cooperation Agreement, and the Common Interest Agreement. | Citizens Development Corporation, La Jolla Development Group, LDG Holdings, LLC, City of San Marcos, County of San Diego, City of Escondido, Vallecitos Water District, California Dept. of Transportation, San Marcos Unified School District, California State University San Marcos, California Coastkeeper Alliance, CERF, Palomar Community College, interested Lake San Marcos Community Homeowners, the Lake San Marcos Remediation Group, the Lake San Marcos | Burdensome/Costly, Mediation/Settlement, Common Interest/Joint Defense, Not Relevant/Not calculated to lead to discovery of admissible evidence |

20-2

| | DATE(S) | DESCRIPTION OF DOCUMENT OR CATEGORY OF DOCUMENTS | AUTHOR(S) | APPLICABLE PRIVILEGES/ GROUNDS |
|---|---|---|---|---|
| | | | Community Association, the Lake San Marcos Task Force, the President's Council of LSM Homeowners Associations, including each of their respective board members attorneys directors, officers, employees, accountants, consultants or advisors | |
| 4 | Approx. 2012-Present | Written communications between Responding Party and its board members , attorneys, directors, officers, employees, accountants, consultants or advisors and its insurers/public agency liability pool arising out of or connected with the instant litigation, investigation and remediation of the impairments at the Creek and Lake, the IO, the RI/FS, and other matters relating to the mediation with Timothy Gallagher. | Athena Troy, Neal Meyers, Ken Luther, Silje Roalsvik, Bob Plotz, Brenna Barillari, Chris Goss, Pauline Genets, Jennifer Colletti, Andrew R. McCloskey, Sonia Waisman, John Conway, Robert Greenfield, Tosh Kobayashi, Joann Dickinson, Jeffrey Labovitch, Robert D. Dennison | Attorney-Client, Burdensome/Costly, Attorney Work Product, Not Relevant/Not calculated to lead to discovery of admissible evidence, Mediation/Settlement, Common Interest/Joint Defense, Collateral source, Privacy |
| 4 | Approx. 2013-present | Documents consisting of technical memorandums, analysis, and opinions (both draft and final versions) prepared by Responding Party's retained litigation consultants, including but not limited to PACE Advance Water Engineering.. | Athena Troy, Neal Meyers, James Dodson, Andy Komor, Greg Smith, Keisuke Ikehata, Sébastien Sauvé. | Attorney-Client, Mediation/Settlement, Attorney Work Product (including attorney-expert communications protected pursuant to FRCP 26(b)(4)) Burdensome/Costly, Mediation/Settlement, Common Interest/Joint Defense, Not Relevant/Not calculated to lead to discovery of admissible evidence |
| 6 | Executed Oct. 2011 | Common Interest Agreement In Anticipation of Litigation. | City of San Marcos, County of San Diego, City of Escondido, Vallecitos Water District, California Dept. of Transportation, San Marcos Unified School District, including each of their respective attorneys directors, officers, employees, accountants, consultants or advisors | Common Interest/Joint Defense, Not Relevant/Not calculated to lead to discovery of admissible evidence Attorney-Client, Mediation/Settlement, Not Relevant/Not calculated to lead to discovery of admissible evidence |

3

20-3

| | DATE(S) | DESCRIPTION OF DOCUMENT OR CATEGORY OF DOCUMENTS | AUTHOR(S) | APPLICABLE PRIVILEGES/ GROUNDS |
|---|---|---|---|---|
| 7 | Approx. 2009-Presen | Written communications and documents exchanged between Responding Party, City of San Marcos, City of Escondido, County of San Diego, CalTrans , San Marcos Unified School District and each of their respective board members, attorneys directors, officers, employees, accountants, consultants or advisors arising out of or connected with the Participation Agreement and related agreements, the instant litigation, investigation and remediation of the impairments at the Creek and Lake, the IO, the RI/FS, and all other matters which are subject to the 2011 Common Interest Agreement In Anticipation of Litigation entered into between these entities. | Athena Troy, Neal Meyers, James Dodson, Blaise Jackson, Jeffrey Scott, Bob Smith, Ernest Slome, Berj Parseghian, Helen Peak, John Lormon, Michael McGuiness, Adam Phillips, Thomas Vandenburg, Benjamin Kanani, Joshua Levine, Suzanne R. Varco, Linda C. Beresford, Rudy Perrino, Bejan Atashkar, Sage Knauft, Tom Deak, Andre Monette, Rebecca Andrews, Glenn Mueller | Common Interest/Joint Defense, Mediation/Settlement, Attorney Work Product (including attorney-expert communications protected pursuant to FRCP 26(b)(4)), Burdensome/Costly, Common Interest/Joint Defense, Not Relevant/Not calculated to lead to discovery of admissible evidence |
| 8 | Approx. 2012-2014 | Written communications and documents exchanged by between Vallecitos Water District, City of San Marcos, City of Escondido, and County of San Diego and each of their respective board members, attorneys, directors, officers, employees, accountants, consultants or advisors and attorney Philip Giacinti (retained Bankruptcy counsel for Public Agencies) arising out of or connected with the CDC Bankruptcy, including the agreement to retain Mr. Giacinti's services. | Athena Troy, Neal Meyers, James Dodson, Blaise Jackson, Jeffrey Scott, Bob Smith, Ernest Slome, Berj Parseghian, Helen Peak, John Lormon, Michael McGuiness, Adam Phillips, Thomas Vandenburg, Benjamin Kanani, Joshua Levine, Rudy Perrino, Bejan Atashkar, Sage Knauft, Tom Deak, Greg Smith, Andy Komor, Tim Simpson, Sean Porter, Gary Brugger, Alborz Wozniak, Steve Figgins, Scott Norris, Paul Nuti, Sudi Shoja, Marlene Tyner, Dan Johnson, John Wolfe, Mike Marsden, John Dodge, John Anderson, Cory Jones, Fiona Jin, John Wolfe, Elisha Wakefield, Mike Marsden, Giovani Palmieri, Tim Decke, Dendy Lofton | Attorney-Client, Attorney Work Product, Common Interest/Joint Defense, Mediation/Settlement, Burdensome/Costly, Not relevant/Not calculated to lead to discovery of admissible evidence |
| 9 | Approx. 2012-Present | Written communications and documents exchanged between Responding Party, Citizens Development Corporation, Inc., City of San Marcos, City of Escondido, County of San Diego, Hollandia Dairy, and each of their respective board members , attorneys, directors, officers, employees, attorneys, accountants, consultants or advisors arising out of or connected with the instant litigation, investigation and remediation of the impairments at the Creek and Lake, the IO, the RI/FS, and other matters relating to the mediation with Timothy Gallagher. | Athena Troy, Neal Meyers, James Dodson, Blaise Jackson, Jeffrey Scott, Jeffrey Caufield, Ken James, Doug Simpson, Jan Greben, Christine Monroe, Bob Smith, Ernest Slome, Berj Parseghian, Helen Peak, John Lormon, Michael McGuiness, Adam Phillips, Thomas Vandenburg, Benjamin Kanani, Joshua Levine, Suzanne R. Varco, Linda C. Beresford, Rudy Perrino, Bejan Atashkar, Sage Knauft, Tom Deak, John Reaves, Kerry Stack, Greg Smith, Andy Komor, Nick | Common Interest/Joint Defense, Mediation/Settlement, Attorney Work Product (including attorney-expert communications protected pursuant to FRCP 26(b)(4)), Burdensome/Costly, Common Interest/Joint Defense, Not Relevant/Not calculated to lead to discovery of admissible |

4

3:12-cv-00334-GPC (KSC)

20-4

| | DATE(S) | DESCRIPTION OF DOCUMENT OR CATEGORY OF DOCUMENTS | AUTHOR(S) | APPLICABLE PRIVILEGES/ GROUNDS |
|---|---|---|---|---|
| | | | Buhbe, Tim Simpson, Sean Porter, Ioana Petrisor, Gary Brugger, Alborz Wozniak, Steve Figgins, Scott Norris, Paul Nuti, Sudi Shoja, Marlene Tyner, Dan Johnson, John Wolfe, Mike Marsden, John Dodge, John Anderson, Cory Jones, Fiona Jin, John Wolfe, Elisha Wakefield, Mike Marsden, Giovani Palmieri, Tim Decke, Dendy Lofton | evidence |
| 10 | Approx. 2013-Present | Written communications and documents exchanged by and between Timothy Gallagher and Responding Party, Citizens Development Corporation, Inc., City of San Marcos, City of Escondido, County of San Diego, Hollandia Dairy, and each of their respective board members, attorneys, directors, officers, employees, accountants, consultants or advisors arising out of or connected with the instant litigation, investigation and remediation of the impairments at the Creek and Lake, the IO, the RI/FS, and other matters relating to the mediation with Timothy Gallagher. This includes documents prepared by mediator Timothy Gallagher for purposes of furtherance of the mediation with Tim Gallagher, including but not limited to Gallagher's Statement of Findings on Allocation for Settlement Purposes, dated Jan. 23, 2017 | Timothy Gallagher, Athena Troy, Neal Meyers, James Dodson, Blaise Jackson, Jeffrey Scott, Jeffrey Caufield, Ken James, Doug Simpson, Jan Greben, Christine Monroe, Bob Smith, Ernest Slome, Berj Parseghian, Helen Peak, John Lormon, Michael McGuiness, Adam Phillips, Thomas Vandenburg, Benjamin Kanani, Joshua Levine, Suzanne R. Varco, Linda C. Beresford, Rudy Perrino, Bejan Atashkar, Sage Knauft, Tom Deak, John Reaves, Kerry Stack, Greg Smith, Andy Komor, Nick Buhbe, Tim Simpson, Sean Porter, Ioana Petrisor, Gary Brugger, Alborz Wozniak, Steve Figgins, Scott Norris, Paul Nuti, Sudi Shoja, Marlene Tyner, Dan Johnson, John Wolfe, Mike Marsden, John Dodge, John Anderson, Cory Jones, Fiona Jin, John Wolfe, Elisha Wakefield, Mike Marsden, Giovani Palmieri, Tim Decke, Dendy Lofton | Mediation/Settlement, Joint Defense/Common Interest, Attorney Work Product (including attorney-expert communications protected pursuant to FRCP 26(b)(4)), Burdensome/Costly, Not relevant/Not calculated to lead to discovery of admissible evidence |

Dated: March 7, 2018          Meyers Fozi & Dwork, LLP

By: _Athena Troy_
_____

Neal S. Meyers
Athena Troy
Attorneys for Defendant,
Vallecitos Water District

20-5

Jeffery L. Caufield (SBN 166524)
jeff@caufieldjames.com
Kenneth E. James (SBN 173775)
ken@caufieldjames.com
CAUFIELD & JAMES, LLP
2851 Camino Del Rio South, Suite 410
San Diego, California 92108
Telephone: 619-325-0441
Facsimile: 619-325-0231

Attorneys for Plaintiff and Counter-Defendant
Citizens Development Corporation, Inc.

Douglas J. Simpson
THE SIMPSON LAW FIRM
3111 Camino Del Rio North, Suite 400
San Diego, CA 92108
Phone: 619-437-6900
dsimpson@simpsonlawfirm.com

Attorneys for Counter-Defendant
Citizens Development Corporation, Inc.

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CITIZENS DEVELOPMENT CORPORATION, INC., a California corporation, | Case No.: 12CV00334 GPC KSC |
| Plaintiff, | **CITIZENS DEVELOPMENT CORPORATION, INC.'S AMENDED RESPONSES TO HOLLANDIA DAIRY, INC.'S INTERROGATORIES, SET ONE** |
| v. | |
| COUNTY OF SAN DIEGO, a California municipal corporation, CITY OF SAN MARCOS, a California municipal corporation, CITY OF ESCONDIDO, a California municipal corporation, VALLECITOS WATER DISTRICT, a California municipal corporation, HOLLANDIA DAIRY, INC., a California corporation, and DOES 1 through 100, inclusive, | Action Filed: February 8, 2012 Trial Date:    Not Set |

EXHIBIT 21-1

1   available online through the State Water Resources Control Board's GeoTracker database

2   located at http://geotracker.waterboards.ca.gov.

3        Additional communications are reflected in the following documents:

4   CDC0061894-CDC0061895; CDC0061929-CDC0061932; CDC0061945; CDC0062220;

5   CDC0062223; CDC0062225-CDC0062233; CDC0062248-CDC0062266.

6   **INTERROGATORY NO. 7:**

7        Please IDENTIFY and set forth all facts describing COMMUNICATIONS to and

8   from YOU and all PARTIES, including but not limited to the RWQCB, since the LAKE

9   was created with regard to ENVIRONMENTAL CONDITIONS at the LAKE, including

10  but not limited to all aspects of the IO and RI/FS.

11  **AMENDED RESPONSE TO INTERROGATORY NO. 7:**

12       Responding Party objects to this request and its use of the term "IDENTIFY" as

13  compound, unduly burdensome and oppressive because they contain several discreet

14  subparts (*i.e.,* (1) describe the subject information and "set forth all facts", (2) identify

15  documents, and (3) identify witnesses), which subparts cause the total number of

16  interrogatories to exceed the 25-interrogatory limit in violation of the Court's Scheduling

17  Order Regulating Discovery, filed October 17, 2017 (Doc. No. 214) and FRCP 33(a).

18  Responding Party objects to the term "ENVIRONMENTAL CONDITIONS" as vague and

19  ambiguous, compound, overbroad, misleading, and unduly burdensome and oppressive

20  because it requires Responding Party to speculate as to Hollandia's intended scope and

21  meaning. Responding Party objects to this request as vague and ambiguous, overbroad,

22  compound, unintelligible, seeks documents and information that are not relevant to a

23  party's claims or defenses nor likely to lead to discovery of admissible evidence, unduly

24  burdensome and oppressive. Responding Party further objects to the scope of the request

25  as vague and ambiguous, overbroad, unduly burdensome and oppressive as it seeks

26  information concerning broadly-stated subject matter covering a period of approximately

27  60 years or more, such that Responding Party's compliance with this request would be

28  unreasonably difficult, time-consuming, and expensive. Thus, the request seeks

21.2

1   information beyond the scope of FRCP 33(a)(2) and 26(b)(1). Responding Party further
2   objects as this request seeks documents and information protected from disclosure by the
3   attorney-client privilege, attorney work-product doctrine, and mediation privilege and
4   confidentiality. The request seeks confidential communications between CDC and other
5   parties that occurred within the context of mediation, as part of settlement discussions,
6   and/or as part of the Early Neutral Evaluation process. Parties including Hollandia agreed
7   to keep discussions confidential as part of the mediation process that has been ongoing for
8   years. Additionally, the request improperly seeks disclosure of expert information,
9   including communications with experts, currently barred by the Court's Scheduling Order
10  Regulating Discovery of October 17, 2017 (Doc. No. 214), and FRCP 26(a)(2)(D).
11  Moreover, this interrogatory violates the attorney work-product doctrine that encourages
12  attorneys to do their own work—the interrogatory seeks documents and information that
13  are equally available to Hollandia because Hollandia has had approximately 1100 boxes of
14  CDC documents available for review since 2015, and because written communications
15  with the RWQCB are matters of public record available to Hollandia via a California Public
16  Records Act request. CDC has produced records from which the answers can be derived
17  via word searches, and the cost of preparing such a summary or abstract is substantially the
18  same for Hollandia as for CDC, within the meaning of FRCP 33(d).

19         Subject to and without waiving any of the foregoing objections, Responding Party
20  responds as follows: CDC has consulted with its personnel, and does not have a corporate
21  memory of all communications with all persons over all the decades of CDC's existence
22  concerning all environmental activities. CDC has produced tens of thousands of pages of
23  records that can be word searched. Relying on the records noted, in 2008–2009, there was
24  a year of monthly meetings between CDC, RWQCB and others. CDC0004277. David
25  Gibson, Executive Officer, San Diego Regional Water Quality Control Board, met with
26  members of the Lake Remediation Group and the LSM Task Force, and had a meeting and
27  a boat ride on December 31, 2009. CDC0004301, CDC0004302 and CDC0004330. David
28  Gibson spoke about lake conditions on March 25, 2010. CDC 0004301, CDC0004329, and

21-3

1  CDC0004356. A meeting was planned with RWQCB on or about March 7, 2012 to discuss
2  Nautilus Environmental Lake Study Plan, and make changes thereto. CDC0003931 and
3  CDC0003970. The Lake Study Workplan was submitted for approval in or about
4  December 2011. CDC0004232. Pete Peuron of the RWQCB met at the site with golf course
5  superintendent, Randy Hopton, on August 30, 2007 and discussed pumping of lake water
6  to the golf course. CDC0013906–908. Other public workshops, public presentations, and
7  public meetings with the RWQCB were held on or about December 4, 2012
8  (CDC0055804); January 31, 2013 (CDC0056129); August 20, 2013 (CDC0056146);
9  December 3, 2014; December 14, 2016 (CDC0056135). CDC met with RWQCB staff on
10  or about June 18, 2013 and August 6, 2013. Further communications are matters of public
11  record, including within the RI/FS, available at the RWQCB offices, and available online
12  through the State Water Resources Control Board's GeoTracker database located at
13  http://geotracker.waterboards.ca.gov. Potential witnesses include current and former staff
14  at the RWQCB, including but not limited to, Sarah Mearon, Laurie Walsh, John Anderson,
15  David Gibson, Kelly Dorsey, Eric Becker, and Julie Chan who may be contacted at San
16  Diego Regional Water Quality Control Board, 2375 Northside Drive, Suite 100, San Diego,
17  CA 92108-2700, tel: (619) 516-1990; current and former staff at the State Water Resources
18  Control Board, including but not limited to, Mitchell Moody, State Water Resources
19  Control Board, 1001 I St., 14th Floor, P.O. Box 2000, Sacramento, CA 95814, (916) 341-
20  5383; Kyle Wooldridge, SWRCB (same address as above), tel: (916) 323-9405; Laura
21  LaValle, SWRCB (same address as above), tel: (916) 341-5422; personnel employed (or
22  previously employed) by the California Department of Water Resources, Division of
23  Safety of Dams, 2200 X Street, Suite 200, Sacramento, CA 95818, phone (916) 227-4644;
24  Pino Vitti, CDC, 1105 La Bonita Drive, San Marcos, CA 92078, phone (858) 755-0216,
25  who may be contacted through counsel of record; former CDC owners and employees,
26  such as Ronald N. Frazar, Erik Richard, Fred Schmidt, and others, whose addresses and
27  telephone numbers are unknown; Alan Miller, 2383 Lochridge Place, Escondido, CA,
28  phone (760) 871-5318; current and former residents of the Lake San Marcos Community

21-4

1   area, whose contact information is public record; and personnel, employees, agents, and
2   other representatives of Defendants, Counter-Claimants, and Cross-Claimants City of San
3   Marcos, City of Escondido, County of San Diego, and Vallecitos Water District, who may
4   be contacted through their respective counsel of record.

5          Additional   communications   are   reflected   in   the   following   documents:
6   CDC0055792-CDC0056345; CDC0060455-CDC0062365.

7   **INTERROGATORY NO. 9:**

8          Please IDENTIFY and set forth all facts describing all ARRANGEMENTS which
9   YOU have with any other PARTY, including but not limited to CalTrans and San Marcos
10  Unified School District, relating in any manner to the IO, including COMPLIANCE with
11  it, and including any Cooperation Agreement.

12  **AMENDED RESPONSE TO INTERROGATORY NO. 9:**

13         Responding Party objects to this request and its use of the term "IDENTIFY" as
14  compound, unduly burdensome and oppressive because they contain several discreet
15  subparts (*i.e.,* (1) describe the subject information and "set forth all facts", (2) identify
16  documents, and (3) identify witnesses), which subparts cause the total number of
17  interrogatories to exceed the 25-interrogatory limit in violation of the Court's Scheduling
18  Order Regulating Discovery, filed October 17, 2017 (Doc. No. 214) and FRCP 33(a).
19  Responding Party objects to the term "ARRANGEMENTS" as vague and ambiguous,
20  compound, overbroad, misleading, unintelligible, and unduly burdensome and oppressive
21  because it requires Responding Party to speculate as to Hollandia's intended scope and
22  meaning. Responding Party objects to this request as vague and ambiguous, overbroad,
23  compound, seeks documents and information that are not relevant to a party's claims or
24  defenses nor likely to lead to discovery of admissible evidence, unduly burdensome and
25  oppressive, and beyond the scope of FRCP 33(a)(2) and 26(b)(1). Additionally, the request
26  improperly seeks premature disclosure of expert witnesses, expert opinions, and
27  communications with experts in violation of the Court's Scheduling Order Regulating
28  Discovery of October 17, 2017 (Doc. No. 214), and FRCP 26(a)(2)(D). Responding Party

21-5

1 | contamination and pollution of the soil, surface water, and groundwater at and in the
2 | vicinity of Lake San Marcos.
3 | CDC identifies and incorporates herein by reference the RI/FS and the Investigative
4 | Order, both of which describe facts concerning potential historical sources of impacts to
5 | the lake and/or creek. San Marcos Creek, a principal tributary to the lake, is listed on the
6 | Clean Water Act Section 303(d) list of impaired water bodies on the basis of sediment
7 | toxicity, selenium, phosphorus, and dichlorodiphenyldichloroethylene (DDE). The lake is
8 | listed on the Clean Water Act Section 303(d) list on the basis of nutrients and ammonia as
9 | nitrogen.

DATED:  February 19, 2018          CAUFIELD & JAMES, LLP

*s/ Matthew D. McMillan*
Matthew D. McMillan, Esq.
Attorneys for Citizens Development
Corporation, Inc.

DATED:  February 19, 2018          THE SIMPSON LAW FIRM

*s/ Douglas J. Simpson*
Douglas J. Simpson, Esq.
Attorney for Counter-Defendant Citizens
Development Corporation, Inc.

21-6

From: **Athena Troy** atroy@meyersfozi.com
Subject: RE: VWD doc redactions - privilege issue
Date: April 11, 2018 at 10:40 AM
To: john@lawreaves.com
Cc: **Neal Meyers** nmeyers@meyersfozi.com, kstack@thomaslucaslegal.com

John:

Since February, I have bent over backwards to try to accommodate your repeated requests and answer your numerous questions. It is now clear to me that when it comes to my meet and confer efforts with you, no good deed goes unpunished.

Regarding your request below for us to go back and un-redact information in the recent production, my answer is no. Hollandia's RFP #5 asked the VWD to produce "YOUR COMMUNICATIONS with the RWQCB. . .," which I located and produced. You even acknowledged that I had produced more RWQCB emails with CDC's counsel than CDC itself had produced. You then asked me to go one step further and produce communications between the RWQCB and *other parties* that happened to have been forwarded at some point to my consultants inbox by someone else. Although not a single one of Hollandia's RFP's asked for us to produce communications between *other parties* and the RWQCB, and even though this endeavor took a considerable amount of time and effort on our part, as a matter of good faith I agreed to produce these additional emails. You are now apparently asking me to go back and un-redact information in other PACE emails that ***Hollandia's RFPs never even specifically asked us to produce in the first place***. The more I try to accommodate you, the more you keep coming back to me asking for more and more. This stops now.

In your email yesterday, you asked:

> Could you do me a favor and clarify exactly who you claim were VWD consultants or people entitled to a privilege? I am getting confused. I thought it was Andy Komor at PACE, not the parties associated with modeling, RI/FS, etc.
> What about the people who signed the Certification to the RI/FS - Dodge, Anderson, Ackerman, Shibata, and Cullen? Are you claiming a privilege for everything they did?
> Who/what else?

As I have made clear to you since my 18 page written response to your 28 page initial meet and confer that was submitted to me in the form of a "Joint Motion for Determination of Discovery Dispute. . .," (and need I point out the lack of professionalism implicit in the fact that your very first initial meet and confer effort with me was submitted to me in the form of a discovery motion?) - you have neither requested, nor has the VWD produced communications between the VWD and any specific person or entity other than the RWQCB. We keep going round and round in circles on this point. As I have explained to you again and again and again, we do not believe it is even necessary or appropriate to address the privilege objections in the first instance given that Hollandia's document requests cannot overcome the fundamental hurdles of reasonable particularity, relevance, and proportionality. You keep wanting to discuss the privilege objections, but you have not once in any of our discussions even attempted to respond to or otherwise address these more fundamental issues and concerns that I have repeatedly raised.

The numerous definitions that were imbedded into many of the document requests made it impossible



EXHIBIT 22-1

for us to even begin to comprehend what exactly Hollandia was asking for.  For example, RFP #'s 6 and 13 (which are essentially the same exact request) ask for VWD communications "with any PARTY" "relating in any manner to the IO". RFP no. 12 asks for "DOCUMENTS referring or related to any ARRANGEMENTS YOU have ever had with any other PARTY relating in any manner to the instant litigation." These requests  potentially capture every communications concerning Lake San Marcos and the instant litigation between the VWD, its attorneys, its consultants, and anyone in the entire world ever. The requests are so hopelessly overbroad and lack sufficient specificity to allow us to begin to know what to look for. You are well aware of the names of all of the parties, consultants, and attorneys that have been involved in this matter since the Regional Board first listed the lake and creek in 2009, and yet not one of your requests specifically identified any specific person or entity *by name* other than the RWQCB. Even after months of meet and confer efforts, it is still not even clear to me what additional communications you are looking for us to produce. Regardless, any communications between attorneys or between consultants (including DBSA, Limnotech, etc.) or between attorneys and consultants, or any combination of the above (see the various categories identified on our privilege log) is neither relevant to Hollandia's claims or defenses, nor is the amount of collective effort that the parties would have to undertake to locate, review and produce such documents proportionate to Hollandia's needs.

Additionally, you are well aware that the court's scheduling order regarding discovery **expressly bars expert discovery**. Your continued insistence that we  produce expert communications flies directly in the face of the courts explicit discovery order.

As to privilege, your legal analysis as to the scope of federal mediation privilege is simply wrong.  You have argued, ***citing only to an unpublished District  Court opinion***, that the federal mediation privilege only applies to matters offered at trial to prove liability.  To the contrary, most courts recognize what is essentially a federal common law mediation privilege that extends well beyond the text of FRE 408. See *Folb v. Motion Picture Industry Pension & Health Plans* (CD CA 1998) 16 F.Supp.2d 1164, 1180; *In re RDM Sports Group, Inc.* (BC ND GA 2002) 277 BR 415, 430. The privilege applies to communications made during the course of a formal mediation with a neutral mediator and ***protects all written or oral communications made during mediation "for any purpose . ."*** *Sheldone v. Pennsylvania Turnpike Comm'n* (WD PA 2000) 104 F.Supp.2d 511, 512-517—(emphasis added); see also *Folb v. Motion Picture Industry Pension & Health Plans* (CD CA 1998) 16 F.Supp.2d 1164, 1180.

Since Hollandia has not been participating in the remedial investigation efforts or most of the mediation, you may not be aware that since he was retained back in 2012, Mr. Gallagher has been intimately involved in assisting the parties resolve numerous disputes that have arisen with respect to the investigative work.  Without his assistance, I believe it is very likely that none of the work that has been accomplished so far would have been done at all. Disputes he assisted with included, among other things, 1) negotiation (and re-negotiation) of an interim cost-sharing agreement for payment of the work, 2) resolving disputes concerning which consultants or consultant would be retained to conduct the work, 3) resolving disputes regarding what work or testing was actually required/necessary, etc. In fact, the cost estimates that were made for the RI/FS are now being used as a starting point for settlement negotiations and allows the parties to have a frame work for figuring out what amount of money should be set aside in a remediation trust account.  Every single one of these discussions, whether or not the mediator was himself copied or the recipient of a particular email or conversation, were made during the course of the formal mediation with Mr. Gallagher. The parties would not and could not begin to approach actual settlement discussions until these critical components of the discussion were first addressed and resolved with the assistance of the mediator.

22-2

components of the discussion were first addressed and resolved with the assistance of the mediator. For all practical purposes, it is impossible to separate the investigative that was conducted by five adversarial parties in this complex CERCLA litigation from the mediation itself. If Judge Crawford were to order production of all communications between the parties having to do with the remedial investigation effort, it would have such a chilling effect on the mediation that the settlement discussions (and certainly the remedial investigation efforts) would very likely come to a complete standstill. The many adversarial parties, their attorneys, and their consultants (even the jointly retained consultants) need to have the ability to have conversations with each other and the mediator to discuss the path forward to the remedial investigation work without fear that anything they say in those discussions could be used against them later in litigation.

At this point I consider our meet and confer efforts at an end. We have reached an impasse and I am prepared to respond to whatever discovery motions you intend to file. Despite my earlier indication that I would try to make some accommodations for you as to the timing of the exchange of your draft motion, since none of the other parties were willing to agree to modify the timing of the exchange of draft motions, we will not do so either. The current deadline to file any joint discovery motion is **May 2**. I therefore expect you to provide me with a complete draft of any joint motion and any exhibits or supporting declarations a full five business days before May 2 (i.e no later than 8:00 am Wednesday, April 25). I also remind you that, contrary to the format of draft motions you have provided us with drafts of to-date, I expect that you will comply with Judge Crawford's civil chamber rules regarding the required format for the joint discovery motion.

Please do not contact me further regarding any discovery issues, as I do not believe that any further meet and confer discussions would be productive.

Athena Troy
Meyers Fozi & Dwork LLP
1808 Aston Avenue, Suite 100
Carlsbad, CA 92008
P: (760) 858-2285
F: (760) 444-0130

www.meyersfozi.com

Athena


**From:** John Reaves [mailto:john@lawreaves.com]
**Sent:** Tuesday, April 10, 2018 3:50 PM
**To:** Athena Troy <atroy@meyersfozi.com>
**Cc:** John Reaves <john@lawreaves.com>; Kerry Stack <kstack@thomaslucaslegal.com>; Neal Meyers <nmeyers@meyersfozi.com>
**Subject:** VWD doc redactions - privilege issue

Hi Athena,
With regard to the redactions, can you at least unredact the parties who are in the email and anything else that would not be privileged under any definition?
Thank you.

23-3



From: **Hagan, Catherine@Waterboards** Catherine.Hagan@waterboards.ca.gov
Subject: RE: Hollandia PRA requests re LSM
Date: April 12, 2018 at 11:51 AM
To: John Reaves john@lawreaves.com
Cc: Kerry Stack k.stack@thomaslucaslegal.com, Mearon, Sarah@Waterboards Sarah.Mearon@Waterboards.ca.gov, Anderson, John@Waterboards John.Anderson@waterboards.ca.gov

Hi John,

I apologize for the delay in responding to your email.  The short answer to your question is that I do not believe areas have been overlooked in responding to your prior requests for records concerning the Lake San Marcos matter. By way of explanation, unless a request simply seeks all files pertaining to a particular real property address (in which case, usually the Public Records Act coordinator simply provides access to the electronic public file in ECM), typically the Public Records Act coordinator who initially receives a request for records will request assistance from technical staff assigned to a matter or from legal counsel or both because broader requests involve not only ECM records but often also necessitate email searches and personal cubicle searches (pc, notes, etc) to be responsive.  To the best of my knowledge and having spoken with staff, in the case of requests for records related to Lake San Marcos, broader searches have been performed and records provided.  (In fact in the case of Lake San Marcos, it is my impression that requests from you have come directly to me and not through the Public Records Act coordinator.)  Sarah Mearon, and Laurie Walsh before her, are aware that the board is not a party to litigation or mediation in the Lake San Marcos matter and that even if a document is so labeled, it is nonetheless a public record.  While the Public Records Coordinator or other administrative staff are tasked with pulling up records from the electronic filing system in response to requests, assigned technical staff, and not the administrative staff, decide in the first place what records should be saved in accordance with the board's record retention policy and perform the indexing/uploading of records into the filing system.  So I do not believe it's likely that they would inadvertently withhold records from the filing system based on a mediation/confidential label.  In other words, segregating such documents would need to be done deliberately and I don't believe that has been the case.  With regard to the types of records you mention in your email, I have only seen the example you provided but please be aware that staff would not ordinarily retain such an email as a board record.  Laurie Walsh is listed as a cc on the email, the email concerned a draft workshop agenda and contemplated a final agenda would later be distributed.  I would not have expected Laurie to have preserved and uploaded such an email to ECM under these circumstances.  Because all but attorneys, the Executive Officer and the Assistant Executive Officer have 90 day retention time for emails, unless Laurie had uploaded or otherwise save the email, it would have been automatically deleted (and not archived) after 90 days.  It is definitely the case that staff can print or save an email or other document that does not need to be saved per the retention policy with the result that it is in the board's possession but was not uploaded to the ECM filing system.  To account for these situations, where broader searches are required, such as for Lake San Marcos/Hollandia Public Records Act requests, staff routinely checks their personal workspaces for hard copy files, electronic files, etc. and we produce those as responsive records unless they are exempt for some other reason (attorney client privilege, etc.).  I hope this email is helpful.  Please let me know if you have further questions.

Catherine George Hagan
Senior Staff Counsel
Office of Chief Counsel
State Water Resources Control Board
2375 Northside Drive, Suite 100
San Diego, CA  92108
Tel  619 521 3013

EXHIBIT 23-1

Tel. 619-521-5012
Fax 619-516-1994
E-mail: catherine.hagan@waterboards.ca.gov

**From:** John Reaves <john@lawreaves.com>
**Sent:** Wednesday, April 4, 2018 4:44 PM
**To:** Hagan, Catherine@Waterboards <Catherine.Hagan@waterboards.ca.gov>
**Cc:** John Reaves <john@lawreaves.com>; Kerry Stack <kstack@thomaslucaslegal.com>; Mearon, Sarah@Waterboards <Sarah.Mearon@Waterboards.ca.gov>
**Subject:** Re: Hollandia PRA requests re LSM

Hi Catherine,

We are starting to get some examples of consultant communications with RB staff in the LSM matter that were not part of the RB production in response to my PRA request. Here is an example, and in it note that the consultants frequently marked the communications a "mediation confidential," although they clearly were not. Perhaps whoever looked for documents to produce in response to the PRA request thought they really were confidential??? That is just one example. I also see many documents that were not marked as confidential that were not produced, which is a bit more puzzling. Were all areas that might contain LSM material checked as part of the production, or have any documents been segregated in any way and been overlooked? Can you please review and let me know what you find? It appears there are many documents that should have been produced that were not.
Thank you.
John

**From:** Nick Buhbe
**Sent:** Wednesday, November 05, 2014 5:46 PM
**To:** 'Steve Figgins'; Timothy Simpson (tsimpson@psi-net.com); Helen M. Davies (hdavies@ci.escondido.ca.us); 'gbrugger@exponent.com' (gbrugger@exponent.com); Sudi Shoja; Thornberry, Reed; Andy Komor (akomor@pacewater.com); Alborz Wozniak; Pryatel, Chuck (CPryatel@sysengineers.com); Ioana Petrisor, Ph.D.; Kyle Darton (Kyle.Darton@sdcounty.ca.gov); Daniel E. Johnson (djohnson@sysengineers.com); Laurie.Walsh@waterboards.ca.gov
**Cc:** Tim Gallagher (timg@thegallaghergroup.com)
**Subject:** DRAFT Public Workshop Agenda

All –

Please find attached the Draft Agenda for the Public Workshop. I would like to return to Laurie for distribution via Lyris by this Friday (she has been cc'd). Please comment or confirm approval.

NOTE: When I receive approval/edit requests from at least one representative of all 6 entities (RB included), I will finalize by removing the "mediation confidential" and "draft," and making other edits as requested. Please notify me if you object to that approach, and I will be happy to work on an alternative approval process.

Attorney and Credentialed Mediator
**Law Offices of**
**JOHN H. REAVES**
**A Professional Corporation**
2488 Historic Decatur Rd., Ste. 200
San Diego, CA 92106

23-2