1
2
3
4
5
6
7

8    UNITED STATES DISTRICT COURT

9    SOUTHERN DISTRICT OF CALIFORNIA

10

11   CITIZENS DEVELOPMENT                 Case No.:  12CV0334-GPC(KSC)
     CORPORATION, INC., a California
12   corporation,
                                          **ORDER RE: HOLLANDIA DIARY,**
13                          Plaintiff,    **INC.'S MOTION FOR**
                                          **DETERMINATION OF DISCOVERY**
14   v.                                   **DISPUTE [DOC. NO. 236]**

15   COUNTY OF SAN DIEGO, a California
16   municipal corporation; CITY OF SAN
     MARCOS, a California municipal
17   corporation; CITY OF ESCONDIDO, a
     California municipal corporation;
18   VALLECITOS WATER DISTRICT; a
19   California municipal corporation;
     HOLLANDIA DIARY, INC., a California
20   corporation,

21                          Defendants.
22

23

24          Currently pending before the Court is a Motion for Determination of Discovery

25   Dispute, pursuant to which defendant Hollandia Diary ("Hollandia") moves to compel the

26   production of further documents, and amended responses to interrogatories and requests

27   for admission from every other party to this case, namely plaintiff Citizens Development

28   Corp. ("CDC") and co-defendants City of San Marcos ("CSM"), County of San Diego

1

("CSD"), Vallecitos Water District ("VSD"), City of Escondido ("COE") (Hollandia's co-defendants are jointly referred to herein as "Public Agency Defendants" or "PADs").

Hollandia served a First Set of Interrogatories, Requests for Production of Documents and Requests for Admission on CDC and also on each of the PADs on November 2, 2017. After receiving responses and documents that Hollandia deemed to be insufficient, and after meet and confer discussions, Hollandia filed its Motion to Compel on May 17, 2018, seeking to compel CDC and each of the PADs to produce additional documents, as well as supplemental responses to the interrogatories and requests for admission. Doc. No. 236. Thereafter, the Court issued a briefing schedule. CDC and the PADs filed a joint brief in opposition to the Motion to Compel, in which they address objections that are common to all the responding parties. Doc. No. 240. They also each filed individual briefs, in which they address objections that are unique to each of them. Doc. Nos. 238-239 & 241-243. Hollandia has filed briefs in response to the jointly prepared opposition and also each of the individual opposition briefs. Doc. Nos. 253-263.

## **BACKGROUND**

CDC brought this action against defendants under 42 U.S.C. § 9607 et seq. of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA") and various other legal theories for the recovery of costs incurred in response to the release and threatened release of hazardous substances in to Lake San Marcos (the "Lake"), an artificially created lake created in 1946 and located in San Marcos, California that is owned and operated by CDC. Doc. No. 68. San Marcos Creek (the "Creek"), is a principal tributary for Lake San Marcos, that begins in the COE and travels through the CSM before depositing into the Lake. *Id.* ¶ 3.

The Lake is listed as an impaired water body by the California Regional Water Quality Control Board, San Diego Region ("RWQCB") under the Clean Water Act. According to RWQCB, the Lake receives direct and indirect discharges from a multitude of sources, including urban and suburban areas, private golf courses, agricultural land uses, and open space. *Id.* ¶ 5 & 6. Such discharges come from a wide array of sources including:

2

(a) improper waste disposal; (b) poor and/or unmanaged landscaping practices from commercial, recreational, and residential sites; (c) sanitary sewer overflows; (d) septic system failures; (e) groundwater infiltration; (f) the presence and operation of the dam; and (g) other non-point source discharges during storm events and dry weather conditions. *Id.* The illegal discharge, dumping, disposal, release, and/or abandonment of hazardous substances or wastes have caused contamination and pollution of the surface water and groundwater at and in the vicinity of the Lake. *Id.* ¶ 7.

In approximately June 2011, the PADs, other than COE, entered into a voluntary Participation Agreement ("PA") with RWQCB to address contamination at the Lake and Creek. Doc. No. 236, ¶ 15, Ex. 14. COE joined the PA through a Cooperation Agreement ("CA") at about the same time. *Id.* The PADS also agreed to keep technical information confidential between themselves, not to sue each other, and to resolve internal disputes by arbitration. *Id.*

On September 21, 2011, RWQCB issued an Investigative Order ("IO") alleging pollutants were released into the Lake and directing CDC to investigate the cause(s) and extent of nutrient impairment in the Lake and to prepare an investigative report and work plan (the Remedial Investigation/Feasibility Study is referred to herein as the "RI/FS") . Doc. No. 68, ¶¶ 4 & 13, Ex. 1.

Sometime in October and November, 2011, the PADs entered into a "Common Interest Agreement" (CIA). Doc. No. 236-1, ¶ 38. The CIA is described as seeking to encompass the work the PADs had agreed to do in the CA and PA in lieu of being added to the IO, and in exchange for RWQCB's "covenant not to sue." *Id.* CDC was not a party to the CIA. Doc. No. 240, p. 33.

Thereafter, on February 8, 2012, CDC initiated this action against the defendants, each of whom owned and/or operated real property in the Creek watershed and upgradient of the Lake. Doc. Nos. 1 & 68, ¶¶ 8-12. CDC claims it has incurred and will continue to incur substantial costs to investigate, monitor, and remediate the contamination and, therefore, seeks recovery from defendants alleging that they have caused and continue to

cause contamination and pollution of the surface water and groundwater at and in the vicinity of the Lake. Doc. No. 68, ¶¶ 8-14. CDC seeks declaratory and monetary relief under CERCLA and under state laws for continuing nuisance, trespass, equitable indemnity, and declaratory relief. *Id.* ¶¶ 15-17.

In early 2013, CDC and the PADs retained private mediator Timothy Gallagher, Esq., who worked with counsel, along with their respective clients, insurance carriers and environmental consultants in an effort to settle the case. Doc. No. 91-4. Mr. Gallagher has had numerous in-person mediation sessions, telephonic status conferences, and other communications with counsel, the insurance carriers, and environmental consultants. *Id.* Hollandia was invited to participate to participate in the mediations. It initially declined but later participated to a limited extent.

CDC and the PADs also entered into a general agreement to jointly fund the collection of monitoring and sampling data as part of the ongoing diagnostic work and investigation of the Lake, the Creek and their environs. *Id.* CDC and the PADs agreed to share and exchange the environmental data, reports, etc. generated from this and other past diagnostic work. Hollandia was invited to participate in, and jointly fund, the diagnostic work and investigation but declined to do so. Periodic progress updates were provided to Hollandia during the mediation sessions. *Id.*

As part of the joint diagnostic work at the Lake, CDC and the PADs formed a technical consultant working group, which consisted of their respective environmental consultants and experts who met regularly to address data collection needs, the joint computer modeling efforts related to both the surrounding watershed and the Lake, and other technical issues. *Id.* The primary purpose of this committee is to provide technical assistance and expertise in developing a consensus towards a feasible remediation strategy and plan for the Lake and watershed. The technical committee also coordinated with and provided monthly updates to the RWQCB. *Id.* Hollandia was not involved with the technical committee. *Id.*

CDC and the PADs, through a jointly-retained computer modeling consultant, developed two independent computer models to assist the parties in evaluating potential remediation strategies for the lake and surrounding watershed, among other goals. Doc. No. 240, p. 6. Although Hollandia declined to participate in the development of the two computer models, the other parties provided it with the modeling data. *Id.*

CDC and the PADs jointly funded the preparation of the RI/FS as part of mediation. *Id.* The goal of the RI/FS process, as it relates specifically to the Lake, Creek, and watershed, is to allow CDC and the PADs to gather sufficient information to make informed decisions on potential remedial actions, and to develop a comprehensive and reliable restoration strategy that satisfies RWQCB and the U.S. Environmental Protection Agency requirements, and incorporates community input. The RI/FS also allows the parties to determine the estimated remediation costs for purposes of settlement.

In March and October 2016, the parties, including Hollandia, gave their formal presentations to the mediator as part of the mediated allocation proceeding. Doc. No. 240, p. 7; see also Doc. No. 189, p. 2. The purpose of this proceeding was to allow the mediator to recommend an equitable allocation of liability for all parties based on the expert arguments and evidence presented, which the parties and their respective insurance carriers could use as a basis for settlement negotiations. Doc. No. 7.

On November 3, 2016, Hollandia formally withdrew from mediation, claiming "[i]t is apparent the case cannot settle at this time for various reasons, including the need for this Court to rule on the threshold issue of whether nutrients are 'hazardous substances' under CERCLA as part of the Motion for Judgment on the Pleadings to be heard on April 21, 2017." Doc. No. 182, pp. 1-2. Hollandia's Motion for Judgment on the Pleadings was denied on March 24, 2017. Doc. No. 207.

On June 5, 2017, the RWQCB approved the final RI/FS report. Hollandia has had access to the publically-available RI/FS and supporting documents, and participated during the public comment period, including submitting comments to the RWQCB outlining various objections and concerns.

Despite voluminous briefing the Court is unable to discern whether the responding parties inappropriately withheld documents, due to failings by all the parties. The Court, therefore, is enacting what it will colloquially refer to as "Operation Reset," an opportunity for the parties to start anew, with additional guidance from the Court.

**A.     The Parties have not Adequately Met and Conferred**

First, it is evident counsel did not make a sufficient effort to work through their disagreements and narrow their dispute before seeking judicial intervention, as is required. For example, on the whole, the discovery requests propounded by Hollandia are overly broad, and are often vague, ambiguous and compound, and were objected to as such. See e.g. Doc. No. 236, p. 26, Request for Production ("RFP") No. 1 (calling for "all 'documents' referring or related to 'recommendations' for 'maintenance' of the Lake since it was created, including but not limited to 'nutrient' and sediment prevention and removal.) CDC and the PADs legitimately complain the requests for documents are vague and ambiguous, contain no limitations in time, and provide little to no guidance as to scope. Although the Court concurs with much of their criticism of the written discovery requests, it will not deny Hollandia's motion outright, as the responding parties posit. Issues arising from the problematic structure of the discovery requests are something that could, and should, have been resolved by counsel, without the need for judicial intervention.[1]

In a document heavy case such as this one, at the outset of discovery, or at least at the outset of meet and confer discussions, a collaborative conversation between counsel should have occurred in order to reach a common agreement defining the scope of non-privileged discoverable documents. While the Court does not anticipate such dialogue would resolve the more complicated or nuanced aspects of the parties' dispute, in the

---

[1] The Court's observations regarding the problematic structure of Hollandia's discovery requests and the parties' failure to thoroughly meet and confer also applies to the parties' dispute regarding responses to Hollandia's interrogatories and requests for admission.

Court's experience such a discussion certainly should have narrowed the scope of the discovery requests, facilitated the responding parties' understanding as to what information Hollandia seeks, and also resulted in agreements about more germane issues such as what period of time will be subject to discovery and what categories of information are relevant, notwithstanding any privilege objections.

Instead of engaging in a collaborative process designed to reduce litigation expenses and promote an efficient exchange of discoverable information, counsel apparently simply agreed to disagree and proceeded with filing their discovery motion, tasking the Court with parsing through Hollandia's omnibus argument that it is entitled to amended discovery responses and any and all documents responsive to each of the subject document requests, as well as the responding parties' rebuttal that the motion should be denied outright for a multitude of reasons, including the responding parties' arguments they 1) cannot discern what information Hollandia seeks, and 2) have produced a sufficient number of documents to Hollandia.[2] [3]

## B. The Responding Parties have not Provided Sufficient Support to Withhold Documents

With that said, much of the parties' dispute as it relates to document production is regarding whether the privileges asserted by CDC and the PADs are applicable. Hollandia claims the responding parties wrongfully withheld the following categories of documents/information:

1. Communications and documents regarding a) how to comply with [IO] No. R9-2011-0033, dated September 20, 2011 [], in which the [RWQCB], Region 9 (Regional Board) ordered CDC "to investigate

[2] The Court does not loosely characterize the nature of the parties' extensive dispute. Briefing for this motion clocks in at a combined total of 1,219 pages, including exhibits, a new record for a discovery motion filed before this Court.

[3] Despite their contention they have produced a sufficient amount of documents to Hollandia, the responding parties offer no specificity as to what documents have been produced, whether these documents are responsive to any of Hollandia's document requests and, if so, which ones.

nutrient impairments in the Lake" and to recommend appropriate remediation; and b) how the PADs complied with their voluntary agreement to investigate nutrient sources in the watershed, creek and lake and to recommend appropriate remediation in lieu of being added to the IO, and to achieve nutrient reductions to comply with their storm water permits, pursuant to a [PA] signed with the [RWQCB] in 2011, that COE joined in a limited manner at the same time through a [CA]. The wrongfully withheld documents include communications between:

    a.    Counsel and non-client parties;

    b.    Counsel and his or her consultants regarding technical matters relating to compliance with the IO/PA where the dominant purpose was not legal advice;

    c.    Consultants and non-client parties; and

    d.    Communications and documents prepared or compiled by consultants as part of their work to comply with the IO/PA.

2.    Communications outside of formal mediation, including communications between:

    a.    Counsel and non-client parties and/or the non-client consultants.

3.    Communications with the [RWQCB] including:

    a.    Consultants' communications and meetings with the [RWQCB]; and

    b.    Counsel's communications/notes with the [RWQCB].[4]

---

[4] Hollandia reports that some, but not all, of the responding parties have produced documents reflecting communications with RWQCB. Doc. No. 236, p. 2-3. The responding parties do not contend any communications with the RWQCB are privileged and agree these documents have been or will be produced, "subject to reasonable limitations on time and scope." Doc. No. 240, p. 10. If the responding parties have not already completed their production of communications with RWQCB, they must do so forthwith.

4.      Technical work reflected in communications and documents prepared and compiled by consultants as part of their work to comply with the IO/PA.

5.      Communications between the RI/FS Parties' counsel or consultants with a separate group of consultants hired specifically to do lake and watershed modeling and to prepare the certified RI/FS for submission to the [RWQCB].

Doc. No. 236, pp. 2-3. [5] [6]

      CDC and the PADs claim the mediation privilege, attorney-client privilege, work-product doctrine, and by extension the joint defense/common interest doctrine, justify their withholding of documents and information. The information they have provided is entirely inadequate, however, to identify what documents were withheld, what privilege or doctrine was/were asserted for each of the documents withheld from production, by whom the privilege was asserted, or whether the asserted privilege is applicable.

      Fed. R. Civ. P. 26 (b)(5)(A)(ii) requires any party asserting a privilege as the basis for withholding information that is otherwise discoverable must "describe the nature of the documents, communications, or tangible things not produced or disclosed – and do so in a manner that, without revealing information itself privileged or protected, with enable other parties to assess the claim." Not one of the parties responding to Hollandia's Motion to Compel has satisfied their obligation under this Rule. See Ex. 18-20. CDC, CSM, VSD, & COE's are wholly inadequate and CSD failed to provide a privilege log altogether. Although typically when a party asserting a privilege fails make a prima facie showing the privilege protects the information being withhold, the privilege is waived, the Court will

---

[5] Hollandia offers no explanation as to which specific request for production of documents each of these categories of documents relate to. It is the Court's expectation that any party seeking to compel discovery responses will identify the subject discovery request and explain why the opposing party's response is claimed to be deficient.

[6] Despite the responding parties' protestations to the contrary, this information is clearly relevant and proportional to the needs of the case.

allow the responding parties a "re-do," as it is allowing Hollandia a second chance with respect to narrowing its discovery requests.

Hollandia contends CDC and the PADs' reliance on the asserted privileges is overreaching. Although it is impossible to discern specifically what CDC and the PADs are withholding, or on what basis, because the parties' dispute also extends to their interpretation of the legal authority for asserted privileges, the Court offers some general guidance about these protections and how they apply to the documents at issue, to the best the Court can discern what these documents are, based on the extremely limited information provided by the responding parties. The Court's expectation is that the parties will use this direction to further narrow the scope of their dispute.

## C.  **Mediation Privilege**

As a threshold issue, the parties have a fundamental disagreement regarding what protections exist for communications made in relation to or during mediation.  The responding parties contend all such communications are privileged, pursuant to *Folb v. Motion Picture Industry Pension & Health Plans*, 16 F.Supp.2d 1164, 1180 (C.D. Cal. 1998). Relying on *Molina v. LexMark Int'l*, 2008 WL 4447678 (C.D. Cal. Sept. 30, 2008), Hollandia argues Fed. R. Evid. 408 is the proper rule to analyze the scope of confidentiality as it relates to mediation communications. Doc No. 236, pp. 5-6.  Rule 408 makes conduct or statements made during compromise negotiations about the claim inadmissible to prove liability. See Fed. R. Evid. 408. As this is a fairly newly created privilege and not a well-settled area of law, the Court offers the following perspective as to how the holdings of *Folb* and *Molina* apply to the facts of this case.

### *Folb*

*Folb* involves a wrongful termination claim raised by a former employee of the Motion Picture Industry Pension & Health Plans ("the Plans"). *Folb*, 16 F.Supp.2d at 1166. The Plans claimed Folb was terminated because he sexually harassed a fellow employee, Vivian Vasquez. Folb sued the Plans, arguing this reason was pretextual, and that he was actually discharged in retaliation for whistle-blowing activity. *Id*. The Plans and Vasquez

had previously participated in a mediation in an attempt to settle Vasquez's claims against the Plans. *Id*. at 1167. Folb, who did not participate in that mediation, then sought to compel production of a mediation brief prepared by Vasquez's counsel, as well as "related correspondence regarding settlement negotiations between the Plans and [ ] Vasquez," claiming the documents would reveal the Plans' argument at the mediation that Folb did not sexually harass Vasquez. *Id*.

The court then considered what authority, if any, restricted dissemination to Folb of the mediation related communications between the Plans and Vasquez. Because Rule 408 pertains to the admissibility, as opposed to the discoverability, of information, the court recognized that Rule 408 only protects mediation participants from disclosure of information to the trier of fact, and not from discovery by a third-party. *Id*. at 1171. Noting that Fed. R. Evid. 501 allows courts to "define new privileges based on interpretation of 'common law principles ... in the light of reason and experience'" the court observed that caution should be exercised in creating new privileges given the potential cost to the public and the courts in the form of lost evidence. *Id*. at 1170-1171 (quoting *Jaffee v. Redmond*, 518 U.S. 1, 8, 116 S.Ct. 1923, 135 L.Ed.2d 337 (1996)). A court must determine whether the new privilege would constitute a "public good" by evaluating the factors outlined by the Supreme Court in *Jaffee*: "(1) whether the asserted privilege is 'rooted in the imperative need for confidence and trust[;]' (2) whether the privilege would serve public ends; (3) whether the evidentiary detriment caused by exercise of the privilege is modest; and (4) whether denial of the federal privilege would frustrate a parallel privilege adopted by the states." *Id.* (quoting *Jaffee*, 518 U.S. at 9-13.)

The court balanced these factors, with a particular emphasis on the first one, and "concluded that the proposed blanket mediation privilege is rooted in the imperative need for confidence and trust among participants." *Id*. at 1176. In doing so, the court reviewed the public policy implications of such a privilege and concluded that "a mediation privilege would serve important public ends by promoting consolatory relationships among parties to a dispute, by reducing litigation costs and by decreasing the size of state and federal

court dockets, thereby increasing the quality of justice in those cases that do not settle voluntarily." *Id*. at 1177. The court held there would be little "evidentiary detriment" to the creation of a mediation privilege because the evidence it protects from disclosure would not exist without the mediation privilege did not exist, meaning that without this privilege mediation communications would be chilled. *Id*. at 1178. The court then noted nearly every state had adopted a mediation privilege and that denial of the privilege would "frustrate the purposes of the state legislation." *Id*. at 1179. For these reasons, the court found it appropriate to adopt a federal mediation privilege applicable to communications made in conjunction with a mediation and held that this privilege precluded discovery of Vasquez's mediation brief. *Id*. at 1180.

The court emphasized that its creation of a federal mediation privilege was limited to the factual context before it, i.e., a situation in which a third party who did not participate in a formal mediation sought discovery of mediation-related communications. *Id*. at 1180. It held the privilege applied only to "communications between parties who agreed in writing to participate in a confidential mediation with a neutral third party." *Id*. The court elaborated "communications between parties during the mediation are protected. In addition, communications in preparation for and during the course of a mediation with a neutral must be protected. Subsequent negotiations between the parties, however, are not protected even if they include information initially disclosed in the mediation." *Id*. As to other details, the court observed that "the contours of such a federal privilege [will have] to be fleshed out over time." *Id*. at 1179.

### ***Molina***

*Molina* is a Labor Code violations class action that was originally filed by Molina against his former employer Lexmark International ("Lexmark") in Los Angeles Superior Court. *Molina*, 2008 WL 4447678. Two weeks before trial, Lexmark removed the case to federal court under the Class Action Fairness Act ("CAFA"). *Id*.; See 28 U.S.C. § 1332(d) (granting district courts original jurisdiction over any civil action in which the amount in controversy exceeds $5,000,000, and, inter alia, "any member of a class of plaintiffs is a

citizen of a State different from any defendant"). Lexmark contended that it first became aware "with any certainty" that the amount in controversy exceeded $5,000,000 only two weeks earlier, when it received a summary of damages prepared by Molina's expert witness. *Id*. *3. Thereafter, Molina filed a motion to remand, arguing that Lexmark's removal was untimely because it knew the amount in controversy exceeded $5,000,000 two years prior, as a result of communications that were made during a mediation. *Id.* Lexmark countered that the communications were subject to the mediation privilege adopted by *Folb* and, therefore, could not be disclosed by Molina. *Id.* *6.

Lexmark's attempt to invoke a federal mediation privilege in an entirely different context than was the case in *Folb* was rejected. *Id.* *8. The court recognized that *Folb* and its progeny involved the same context (i.e., third party attempts to discover the positions of their adversaries advanced during mediations in which the third party was not a participant). *Id.* The court then noted there is a fundamental difference between an evidentiary privilege and a party's duty to preserve confidentiality:

> Although "confidentiality" and "privilege" are often used interchangeably in discussions of mediation, the terms refer to two distinct concepts. See Scott H. Hughes, *The Uniform Mediation Act: To The Spoiled Go The Privileges*, 85 Marq. L.Rev. 9, 25-34 (2001) ("The twin principles of the duty of confidentiality and privilege are not identical and, therefore, generate confusion in the field of mediation" (footnote omitted)). "Confidentiality" refers to a duty to keep information secret, while "privilege" refers to protection of information from compelled disclosure. See *id*. Cf. Fred C. Zacharias, *Harmonizing Privilege & Confidentiality*, 41 S. Tex. L.Rev. 69, 72 (distinguishing between the duty of "confidentiality" set forth in professional rules protecting client confidences and the attorney-client privilege). Communications are confidential when the freedom of the parties to disclose them voluntarily is limited; they are privileged when the ability of third parties to compel disclosure of them, or testimony regarding them, is limited. See *Hughes*, supra, at 25-34.

*Id.* *10. The court then reasoned that Lexmark's claim of a "mediation privilege," actually invoked the duty of confidentiality that prevents parties to a mediation from disclosing mediation communications voluntarily. *Id.* *11. It contrasted that duty with the mediation

privilege adopted in *Folb*, which shields mediation discussions from discovery by third parties. *Id.* The court noted that although protecting mediation discussions from compelled discovery and requiring parties to keep mediation discussions confidential serve the same goal, "encouraging parties to attend mediation and communicate openly and honestly," they are conceptually distinct. *Id.* quoting *Folb*, 16 F.Supp. at 1172; and citing Ellen E. Deason, *The Quest for Uniformity in Mediation Confidentiality: Foolish Consistency Or Crucial Predictability*, 85 MARQ. L.REV. 79, 82 (2001).

Because of this distinction, the court found that Rule 408 "provides a better reference point for analyzing Lexmark's argument than does [the mediation privilege]." *Molina*, 2008 WL 4447678 *11. In the Ninth Circuit, the Court observed, Rule 408 does not make settlement offers inadmissible in the removal context as evidence of the amount in controversy. *Id.*

The court surmised the use of settlement offers as evidence of the amount in controversy has not hindered Rule 408's goal of encouraging open and honest discussion during negotiation, because concern that one's adversary will use statements during negotiation as proof of liability or wrongdoing, not concern that it will use the statements as proof of the amount in controversy, is the primary obstacle to forthright negotiation discussions. *Id.* *13. Accordingly, the court found that although the parties to a mediation generally have a duty to keep their discussions confidential, this duty does not prevent use of mediation discussions for the limited purpose of establishing the amount in controversy. *Id.*

The facts of the parties' dispute are akin to *Folb*. Hollandia, like Folb, seeks to compel discovery of communications that the responding parties claim occurred in connection with their mediation before Mr. Gallagher. Because this information is sought by a party that did not participate in the confidential discussions at issue, the mediation

privilege adopted in *Folb*, not Rule 408, is the controlling legal authority.[7]  Any documents withheld by the responding parties on the basis of their assertion of the mediation privilege must, therefore, fall within the very limited parameters set forth in that decision, which extends only to 1) communications to Mr. Gallagher, in his capacity as mediator; 2) communications between the parties during the mediation; and 3) communications between the parties in preparation for a mediation session with Mr. Gallagher.[8]  Subsequent negotiations between the parties are not protected even if they include information initially disclosed in the mediation.  Any party withholding documents on the basis of a mediation privilege claim must identity each withheld document on a privilege log and provide sufficient detail so as to enable Hollandia and the Court to assess the validity of the privilege claim for each document.

## D.    **Attorney-Client Privilege & the Work-Product & Common Interest Doctrines**

The parties' next major area of disagreement is over CDC and the PAD's assertion of attorney-client privilege and work-product protection and by extension the common interest doctrine, which is also referred to as the joint defense doctrine.

//

---

[7]  As discussed supra, Hollandia participated in some, but not all, of the mediation sessions with Mr. Gallagher. Presumably, the responding parties have not withheld any mediation related communication to which Hollandia was a participant or recipient, as such documents are subject to disclosure to Hollandia. The Court's analysis, therefore, relates only to mediation communications that were made to the exclusion of Hollandia.

[8]  Category number 3 is to be narrowly construed. The responding parties, their counsel, expert consultants and insurance carrier representatives have been engaged in a lengthy and involved ongoing investigation of the nutrient conditions at the Lake, Creek and environs for the purpose of responding to the IO. During part of the same period of time, the responding parties participated in multiple mediation sessions and conference calls with Mr. Gallagher in an effort to settle the case. Category number 3 is not a catch-all, whereby the responding parties can rely on the mediation privilege to withhold information about any and all communications made during the investigative process, simply because the investigative process yielded information that was used during the mediation. Any information withheld under category number 3 must be limited to communications between the parties that were made with the specific purpose of preparing for a specific and identifiable mediation session or other communication with Mr. Gallagher.

### *Attorney-Client Privilege*

The attorney-client privilege protects confidential communications between a client and an attorney from disclosure "(1) [w]here legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal adviser, (8) unless the protection be waived." *United States v. Graf*, 610 F.3d 1148, 1156 (9th Cir. 2010). "When determining whether a document seeks legal advice, courts have examined the nature, content, and context in which the document was prepared." *LightGuard Systems, Inc. v. Spot Devices, Inc.*, 281 F.R.D. 593, 593 (D. Nevada 2012). "'[A] party asserting the attorney-client privilege has the burden of establishing the [existence of an attorney-client] relationship and the privileged nature of the communication'" *Graf*, 610 F.3d at 1156, quoting *United States v. Ruehle*, 583 F.3d 600, 607 (9th Cir.2009). "To meet this burden, a party must demonstrate that its documents adhere to the essential elements of the attorney-client privilege adopted by [the Ninth Circuit]. [Citation omitted.] In essence, the party asserting the privilege must make a prima facie showing that the privilege protects the information the party intends to withhold." *In re Grand Jury Investigation*, 914 F.2d 1068, 1070-1071 (9th Cir. 1992).

The responding parties' brief makes a passing reference to the attorney-client privilege protecting discovery of the documents sought by Hollandia but offers no substantive explanation or argument as to how this particular privilege is applicable. See Doc. No. 240, p. 25. The attorney-client privilege protects communications between an attorney and his or her client. Given that Hollandia seeks to compel communications involving the responding parties' consultants, this privilege does not appear to actually be at issue. With that said, if the responding parties are, in fact, withholding any pre-litigation

communications on the basis of attorney-client privilege, these communications must be sufficiently identified in a privilege log.[9]

### ***Work-Product Doctrine***

The work-product doctrine, which is codified in Federal Rule of Civil Procedure 26(b)(3)(A), protects from disclosure "documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent)." The work-product doctrine applies to documents created by investigators working for attorneys, provided the documents were created in anticipation of litigation. *United States v. Nobles*, 422 U.S. 225, 239, 95 S.Ct. 2160, 45 L.Ed.2d 141 (1975). In reaching this conclusion, the Supreme Court stated:

> At its core, the work product doctrine shelters the mental processes of the attorney, providing a privileged area within which he can analyze and prepare his client's case. But the doctrine is an intensely practical one, grounded in the realities of litigation in our adversary system. One of those realities is that attorneys often must rely on the assistance of investigators and other agents in the compilation of materials in preparation for trial. It is therefore necessary that the doctrine protect material prepared by agents for the attorney as well as those prepared by the attorney himself.

*Id*. at 238–39, 95 S.Ct. 2160.

The phrase "in anticipation of litigation" has both temporal and motivational components. *Equal Rights Center v. Post Properties, Inc*., 247 F.R.D. 208, 208 (D. D.C. 2008). First, at the time the document was prepared, the attorney must have had a subjective belief that litigation was a real possibility, and that belief must have been objectively reasonable. Second, the party claiming the privilege must demonstrate that in light of the nature of the document and the factual situation in the particular case, the

---

[9] A party's duty to identify attorney-client privileged communications extends only to pre-litigation communications. See *Hernandez v. Best Buy Co.*, 2014 WL 5454505 at *10 (S.D. Ca. Oct. 27, 2014) citing *U.S. v. Bouchard Transp*. 2010 WL 1529248 at *2 (E.D. N.Y 2010).

document can fairly be said to have been prepared or obtained because of the prospect of litigation. *Id*. (citations & quotations omitted). Materials of this nature may only be ordered produced if they are otherwise discoverable under Rule 26(b)(1) and upon an adverse party's demonstration of "substantial need for the materials" as well as "undue hardship [in obtaining] their substantial equivalent by other means." Fed. R. Civ. P. 26(b)(3)(A)(i) & (ii).

The responding parties report that the documents Hollandia seeks can be broadly described as:

> communications among counsel and among consultants for the PADs and CDC related to their efforts to characterize contamination in San Marcos Creek and Lake San Marcos, remediate that contamination, and to identify others responsible for that contamination. These communications have multiple purposes. At a minimum, they assist counsel for each of the PADs and CDC in further efforts to prepare for and address issues presented by the instant litigation; they help counsel for the PADs and CDC prepare for and respond to potential litigation by the RWQCB to enforce the IO and PA, which is always threatened should they fail to comply; and they assist counsel in responding to and complying with the IO and PA. Each of the parties, by and through their consultants who have been retained by counsel, has contributed to the development of a remedial investigation and feasibility study and subsequent remedial measures, which are being used not only to comply with the IO and PA, but also to develop information needed to either help resolve the instant litigation or to prosecute the claims involved in it. (Troy Decl., ¶ 12; Perrino Decl., ¶ 2; Caufield Decl. ,¶ 10; Slome Decl., ¶ 8.) That RI/FS and the subsequent remedial measures would also be used in any ensuing litigation, should compliance with the IO and PA become at issue.

Doc. No. 240, pp. 27-28.[10]   The responding parties contend that other than communications with the RWQCB, these documents, are subject to work product protection through the common interest doctrine. *Id.* p. 26.

_____

[10] Not only is the responding parties' description of the documents that were withheld too general to assess whether the work-product doctrine has been properly asserted, some of their representations about the nature of the documents at issue raise a question as to whether the responding parties ever reviewed

Hollandia contends the responding parties' assertion of work-product protection is overreaching because the responding parties were not the subject of a criminal investigation or under threat of litigation by the RWQCB so long as they worked toward their response to the IO/PA. Doc. No. 240, p. 18. Hollandia argues the consultants would have undertaken the same work regardless of the threat of litigation in order to comply with the IO/PA and for the PADs to comply with their respective MS4 storm water permits. *Id.* As such, Hollandia states no party needed to consult an attorney "to decide how to respond to the technical mandate of the IO/PA or to direct their consultants." *Id.* It further contends the communications at issue will likely reveal the responding parties' colluded to single out Hollandia for a disproportionately high degree blame and to avoid revealing information that is damaging to their own liability positions. *Id.* p. 19.

As a preliminary matter, the Court notes Hollandia's position completely ignores the fact that the responding parties claim at least some of these communications were made in part because of *this* litigation, which was initiated not long after the RWQCB issued the IO.

When a document has multiple reasons for its creation, i.e., in anticipation of litigation but also for another purpose, it is said to have a "dual purpose" and the application of work product protection is determined by application of the "because of" standard in the Ninth Circuit. See, e.g., *In re Grand Jury Subpoena MarkTorf/Torf Environmental Mgmt. ("Torf"),* 357 F.3d 900, 908 (9th Cir. 2004). The "because of" standard does not consider whether litigation is a primary or secondary motive behind creation of a document, but rather considers "the totality of the circumstances and affords protection where the

---

the documents to verify they actually contain protectable information. For example, the responding parties state "[e]ach of the documents *will likely* contain the consultant's mental impressions, opinions on potential liability and exposure, apportionment of fault, and recommendations to the attorney who retained them for their work on the issues involved in the Lake and the Creek." Doc. No. 240, p. 29, emphasis added. The mere possibility that a document could contain work product does not give rise to protection for that document. Counsel must verify a document actually contains protectable information before claiming it is protected from disclosure.

document would not have been created in substantially similar form without the threat of litigation." *Id.*

The instant case is similar to the facts of *Torf*, where documents prepared by an environmental consultant to assist an attorney in preparation for litigation were held to be privileged under the "because of" standard." *Torf*, *supra*, 357 F.3d at 910. In *Torf*, a company retained an attorney, who in turn retained an environmental consultant, to assist the company with complying with Information Requests by the EPA for statutory violations, both civil and criminal, under CERCLA. The environmental consultant, in assisting with compliance with the Information Requests, conducted interviews, sampled and tested the hazardous products at issue, and investigated potentially hazardous properties, compiling the information for the attorney and company to use. *Id.*

The Ninth Circuit Court of Appeals held the consultant's reports were protected, despite the fact that they had a dual purpose of assisting in complying with the Information Request, stating that the documents, though containing some factual assertions, were entitled to work product protections because "their litigation purpose so permeates any non-litigation purpose that the two purposes cannot be discretely separated from the factual nexus as a whole." *Id.* at 910. The court rejected the argument that the environmental consultant in that case could have been retained directly by the company to assist with the Information Requests, thus destroying the work product arguments, and held that the work product protections still would have applied even if the company had retained him directly to act as environmental consultant on the cleanup, so long as the documents being sought "were also produced 'because of' litigation." *Id.* at 909. In other words, the fact that CDC and the PADs could have retained the consultants directly is irrelevant. So long as the responding parties establish that the communications have a dual purpose, one of them being that they were prepared in anticipation of, or because of, litigation, whether it be this case or the threat of litigation by RWQCB if the responding parties did not meet their obligations under the IO and PA, ***and*** the work-product privilege has not been waived, they are protected. *Id.*

### *Joint Defense or Common Interest Doctrine*

Work-product protection is typically waived by a party's voluntary disclosure of the information. *Nobles*, 422 U.S. at 230. "[T]he "common interest" or "joint defense" rule is an exception to ordinary waiver rules that is designed to allow attorneys for different clients pursuing a common legal strategy to communicate with each other." *In re Pacific Pictures Corp.*, 679 F.3d 1121, 1129 (9th Cir. 2012). "[T]he parties must make the communication in pursuit of a joint strategy in accordance with some form of agreement-whether written or unwritten." *Id.* The doctrine applies where (1) the communication is made by separate parties in the course of a matter of common interest; (2) the communication is designed to further that effort; and (3) the privilege has not been waived. *United States v. Bergonzi*, 216 F.R.D. 487, 495 (N.D. Cal. 2003).

The responding parties argue they have a common interest in responding to the IO and PA. Doc. 240, p. 31. While CDC and the PADs may share an interest in heading off a potential lawsuit by RWQCB, that alone is not enough to create a common interest exception with respect to communications between their respective consultants. In order for the common interest doctrine to apply, the parties must have had an agreement to keep their shared communications confidential. *In re Pacific Pictures Corp.*, 679 F.3d at 1129.

Here, the agreements the responding parties refer to as the basis for their claimed common interest are the CIA, which was entered into between the PADs, and the agreement between all the responding parties to maintain confidentiality in respect to the mediation sessions with Mr. Gallagher. The PADs entered into the CIA between themselves sometime in October and November, 2011, about three months after the PA and CA were entered into. Doc. No. 236-1, ¶ 38. CDC, however, was not a party to the CIA. Doc. No. 240, p. 33. The only information offered about the purported joint defense agreement between CDC and the PADs is in their brief, in which responding parties report CDC "agreed through the mediation process to maintain all of the work product and communication of the group in confidence." *Id.* The "mediation process" did not commence until early 2013. By that time, however, this litigation was nearly a year old.

By way of this lawsuit, CDC claims all the defendants, including the PADs, are "jointly and severally liable under CERCLA for general damages and all costs or expenses, including attorneys' fees, that it has incurred…." Doc. No. 68, p. 3. The filing of this action, in which CDC seeks recovery from each of the PADs, could not be more clear evidence that an adversarial relationship existed between them. While the common interest doctrine does not require a complete unity of interests among the participants, there is no legal precedent for it applying to communications between plaintiffs and select defendants in the same matter. The parties to a joint defense agreement need not have identical interests, however, they "do, at a minimum, need to be engaged in maintaining substantially the same cause on behalf of the same parties in the litigation." See *United States v. Gonzalez*, 669 F.3d 974, 980 (9th Cir. 2012). Here, however, the responding parties do "not have a true common goal, as it could not have been the [PADs'] goal to impose liability on [themselves]," which is CDC's objective in naming the PADs in this suit. *Bergonzi*, 216 F.R.D. at 497; see also, *In re Grand Jury Subpoena (Custodian of Records, Newparent, Inc.)*, 274 F.3d 563, 573 (1st Cir. 2001) (joint defense privilege "does not apply in subsequent litigation between the joint clients").

Thus, although CDC agreed to keep information confidential through the mediation process, that agreement which, as discussed supra, could be the basis for a more narrowly applied mediation privilege claim, did not create a common interest between CDC and the PADs, who at that time were already adversaries in this law suit. To the extent the common interest doctrine applies to any of the documents at issue, it would only apply to communications made between the PADs, so long as those communications were made after they entered into the CIA, were made in furtherance of their obligations under the IO and PA, and the privilege has not been waived, i.e., by disclosure to a individual or entity that is not a party to the CIA. Any communications between the PADs' counsel or consultants on the one hand, and CDC's counsel or consultants on the other, are not protected by the common interest doctrine, as a common interest did not exist between them. Likewise, any communications between the PADs that were shared with CDC are

also not protected by the common interest doctrine, as the disclosure of that information to CDC would have waived any work-product protection or attorney-client privilege for that information. See *Bergonzi*, 216 F.R.D. at 498. "Once a party had disclosed work product to one adversary, it waives work product protections as to all other adversaries."

### *The Parties Shall Meet and Confer Further & the Responding Parties shall Produce Amended Privilege Logs and Documents*

The parties' briefs also address a multitude of disputes regarding interrogatories and requests for admission propounded by Hollandia. The parties' arguments regarding the written discovery include many of the arguments raised in connection with the document requests, e.g., problematic construction of the discovery requests themselves, and objections based on mediation privilege, attorney-client privilege, and the work-product and common interest doctrines. Furthermore, as discussed above, counsel have not met their obligation to engage in a substantive meet and confer process. Based on the foregoing, the Court, therefore, orders counsel to immediately engage in substantive and thorough meet and confer discussions with an eye towards narrowing or eliminating all disputed discovery issues.

Additionally, any party withholding documents on the basis of a claimed protection or privilege must produce an amended privilege log that identifies the withheld documents in a manner such that Hollandia can reasonably identify and, if it deems necessary, challenge the withholding of the documents.[11] The privilege log need not include attorney client or work-product/common interest protected documents that were created after this litigation was initiated, and for which the protection was not waived by disclosure. Any documents claimed to be protected by another privilege or doctrine, such as the mediation

---

[11] The responding parties claim they should not be required to produce an itemized privilege log because such an undertaking would be unduly burdensome. See e.g. Doc. No. 243, p. 33. Although the Court is not persuaded by the responding parties' unsupported allegation regarding the amount of work involved in such an undertaking, it notes the number of documents that must be identified on the responding parties' respective privilege logs should be substantially less than previously contemplated by virtue of the guidance provided in this Order and the anticipated narrowing of the discovery demands.

privilege, shall be included on the log unless the communication was made post-litigation and is also subject to an un-waived attorney client privilege or work product/common interest claim.

Any party withholding documents on the basis the documents are privileged or otherwise protected from production, shall number each document in a way that would lend itself to later reasonable identification, prepare an index of documents (without disclosing the substance of the document), and set forth any objection related to production of any particular document. At a minimum, the index shall include the following information:

1.  Date of document

2.  Author

3.  Primary addressee (and the relationship of that person(s) to the client and/or author of the document)

4.  Secondary and all other addressee(s)/recipient(s) of the document (and the relationship of that person(s) to the client and/or author of the document)

5.  Type of document (e.g., internal memo, letter with enclosures, draft affidavit, etc.)

6.  Client (i.e., party asserting privilege)

7.  Attorneys

8.  Subject matter of document or privileged communication

9.  Purpose of document or privileged communication (i.e., legal claim for privilege. In the case of a mediation privilege claim, the specific mediation or communication with Mr. Gallagher for which the document or communication was made must be identified)

10. Whether the document or communication is withheld on the basis of work product, attorney client privilege, or some other asserted privilege

11. Identify each document by number or lettering system (e.g. Bates numbering)

12. Number of attachments and pages.

## CONCLUSION

Based on the foregoing, counsel shall immediately engage in substantive and thorough meet and confer discussions with an eye towards narrowing or eliminating all disputed discovery issues.  The responding parties must also produce any documents for which a privilege or protection was previously asserted but is not applicable by virtue of the Court's guidance, starting **January 25, 2019**.  Amended privilege logs shall be produced to Hollandia no later than **March 15, 2019**.  A telephonic status conference will be held on **February 8, 2019**, at **9:30 a.m**. before the undersigned.  Plaintiff's counsel shall initiate the conference call.

Dated:  January 11, 2019

Hon. Karen S. Crawford
United States Magistrate Judge

12CV0334-GPC(KSC)