1

2

3

4

5

6

7

8

9 UNITED STATES DISTRICT COURT

10 SOUTHERN DISTRICT OF CALIFORNIA

11

| | |
|---|---|
| CITIZENS DEVELOPMENT CORPORATION, INC., a California corporation,<br><br>        Plaintiff,<br><br>v.<br><br>COUNTY OF SAN DIEGO, a California municipal corporation, CITY OF SAN MARCOS, a California municipal corporation, CITY OF ESCONDIDO, a California municipal corporation, VALLECITOS WATER DISTRICT, a California municipal corporation, HOLLANDIA DAIRY, INC., a California corporation, and DOES 1 through 100, inclusive,<br><br>        Defendants.<br><br>AND RELATED COUNTER-ACTIONS AND CROSS-ACTIONS. | Case No.: 12CV00334 GPC-KSC<br><br>**ORDER GRANTING MOTION FOR GOOD FAITH SETTLEMENT DETERMINATION AND ESTABLISHMENT OF VALLECITOS LSM SETTLEMENT TRUST**<br><br>**[ECF No. 393.]** |

Before the Court is the Motion for Good Faith Settlement Determination ("Motion") filed by Plaintiff and Counter-Defendant Citizens Development Corporation, Inc. ("CDC") and Defendant, Counter-Claimant, and Cross-Claimant Vallecitos Water District ("Vallecitos"), as well as the Request for Judicial Notice filed by CDC and Vallecitos.  ECF Nos. 393, 393-3.  Defendant and Counter-Claimant County of San Diego ("County"), and Defendants, Counter-Claimants, and Cross-Claimants City of San Marcos ("San Marcos") and City of Escondido ("Escondido") have filed a response conditionally opposing the Motion.  ECF No. 400.

The Court finds this motion suitable for disposition without oral argument and VACATES the hearing on this matter originally set for February 19, 2021 pursuant to Civ. L.R. 7.1(d)(1). After considering the moving papers, declarations of counsel, the Settlement Agreement and Mutual Release ("Settlement Agreement") reached by CDC and Vallecitos, the opposition thereto and supporting declarations, and the record as a whole, the Court hereby finds that the Settlement Agreement was entered into in good faith and is fair, reasonable, and consistent with the intent of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9601, *et seq.* and California Code of Civil Procedure ("CCP") §§ 877 and 877.6.

## I. Background

This civil action arises out of the alleged contamination of the surface water and groundwater in and around Lake San Marcos ("the Lake") and San Marcos Creek ("Creek") located in San Marcos, California.  See Second Amended Complaint ("SAC") ¶¶ 1, 3, ECF No. 286.  On approximately September 20, 2011, the California Regional Water Quality Control Board, San Diego Region ("the RWQCB") issued an Investigative Order ("the IO") alleging that Plaintiff CDC had released pollutants into the Lake.  *See id.* ¶ 4.  In response, Plaintiff filed the present action against Defendants County, San Marcos, Escondido, Vallecitos, and Hollandia Dairy ("Hollandia"), alleging that each of them was responsible for the discharges that contaminated the Lake and its surrounding waters.  *See generally* Complaint, ECF No. 1; SAC ¶ 9.

## A. CDC's allegations

The CDC alleges that the Lake has been contaminated by discharges stemming from a wide variety of sources, including but not limited to, improper waste disposal, poor or unmanaged landscaping practices, sanitary sewer overflows, septic system failures, groundwater infiltration, the presence and operation of "the dam," and other "non-point source discharges" caused by storm events and dry weather conditions.  SAC ¶¶ 5–7.  These discharges, CDC alleges, were generated by the real property that is located upgradient of the Lake within the San Marcos Creek Watershed ("the Watershed"), which includes property owned or operated by Defendants.  *Id.* ¶¶ 8, 22–26. Vallecitos operates a sewer system that is partially within the Watershed.  ECF No. 393-8 ("Gumpel Decl.") ¶ 4.

Based on these and other allegations, the SAC asserts seven causes of action against Defendants.  They include: (1) private recovery under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"); (2) declaratory relief under federal law; (3) continuing nuisance; (4) continuing trespass; (5) equitable indemnity; (6) declaratory relief under California state law; and (7) injunctive relief under the Resource Conservation and Recovery Act ("RCRA").  *See id.*  The SAC's CERCLA theory of liability is predicated on the assertion that Defendants contaminated the Lake by releasing known "hazardous substances" into its watershed.  *Id.* ¶ 50.  CDC identifies those "hazardous substances," as "nitrogen, phosphorus, and nutrients found in fertilizers, pesticides and sewage."  *Id.* ¶ 43.

## B. Counterclaims by Vallecitos

Vallecitos filed counterclaims against CDC for its contamination of the Lake, asserting claims for: (1) response costs under CERCLA; (2) declaratory relief under CERCLA; (3) response costs under the California Hazardous Substance Account Act ("HSAA"), Health & Safety Code Section 25300, *et seq.*; (4) declaratory relief under HSAA; (5) state law contribution; (6) public nuisance; (7) negligence; (8) negligence per se; (9) equitable indemnity; and (10) unjust enrichment.  ECF No. 295.  County, San

12CV00334 GPC KSC

Marcos, and Escondido have not asserted crossclaims against Vallecitos.  ECF Nos. 292, 297, 298.

### C. Procedural History

This action was initially filed on February 8, 2012, approximately nine years ago.  ECF No. 1.  On January 8, 2014, the Court ordered a stay in the lawsuit to permit the parties to pursue mediation of their claims.  ECF No. 94.  By 2017, the mediation had not resulted in settlement, and the parties continued with discovery through September 2019, at which point Magistrate Judge Crawford stayed discovery pending settlement discussions.  *See* ECF No. 348.  By February 24, 2020, the parties had reached a settlement regarding claims by and against Hollandia, and the Magistrate Judge lifted the stay of discovery with respect to the remaining claims between CDC and the remaining Defendants.  ECF No. 362.

On May 5, 2020, the Court granted the Joint Motion for Good Faith Settlement Determination and Establishment of Hollandia LSM Settlement Trust, in which all Parties joined.  ECF No. 384.  As a result, Hollandia was to pay $1.5 million to the designated trust for the implementation of investigative and remedial actions, and all claims filed by and against Hollandia in this matter were dismissed with prejudice.  *Id.*; ECF No. 363-4 at 266–87.[1]  Claims against Hollandia for contribution or indemnity were also barred, except for claims expressly excluded in the settlement agreement.  ECF No. 384.

The remaining parties have proceeded with discovery.  Expert discovery has not yet closed due to extensions sought by the parties in light of the COVID-19 pandemic.  ECF No. 391.  In November 2020, CDC and Vallecitos (collectively "Movants") reached a settlement and filed this Motion for Good Faith Settlement Determination on December 14, 2020.  ECF No. 393.  All other remaining parties (County, San Marcos, and

---

[1] All citations to particular pages of electronically filed documents, including exhibits, refer to the page numbers provided by the CM/ECF system.

12CV00334 GPC KSC

Escondido, or collectively "Opposing Parties") jointly filed a conditional opposition, stating that they would oppose the Motion if the Court does not apply the "proportionate share" approach to account for this settlement in determining the scope of the Opposing Parties' potential liability.

## II.   Legal Standard

To approve of a consent decree under CERCLA, "a district court must conclude that the agreement is procedurally and substantively 'fair, reasonable, and consistent with CERCLA's objectives.'" *United States v. Coeur d'Alenes Co.*, 767 F.3d 873, 876 (9th Cir. 2014) (quoting *United States v. Montrose Chem. Corp. of Cal.*, 50 F.3d 741, 748 (9th Cir. 1995)).  Courts have applied the same standard to the review of settlement agreements. *See San Diego Unified Port Dist. v. Gen. Dynamics Corp.*, No. 07-CV-01955-BAS-WVG, 2017 WL 2655285, at *6 (S.D. Cal. June 20, 2017).

In approving a settlement between fewer than all of the parties in a multiparty litigation, a federal court may enter a bar order precluding subsequent claims for contribution and indemnity by non-settling parties. *See Heim v. Heim*, No. 5:10-CV-03816-EJD, 2014 WL 1340063, at *4 (N.D. Cal. Apr. 2, 2014).  "[C]ourts review settlements and generally enter contribution and indemnity bar orders in CERCLA cases if the settlement is fair, reasonable, and adequate." *Coppola v. Smith*, No. 1:11-CV-1257 AWI BAM, 2017 WL 4574091, at *2 (E.D. Cal. Oct. 13, 2017) (collecting cases); *AmeriPride Services Inc. v. Valley Indus.*, 2007 WL 1946635, at *2 (E.D. Cal. July 2, 2007), (citing *United States v. Western Processing Co., Inc.*, 756 F. Supp. 1424, 1432–33 (W.D. Wash. 1990)) ("Under federal law, particularly in CERCLA cases such as this, district courts have approved settlements and entered bar orders.").  Similarly, under California law, in a case with multiple tortfeasors a court must make a determination that any settlement was entered into in "good faith" before the other alleged joint tortfeasors will be barred from seeking contribution or indemnity from the settling party.  Cal. Code Civ. P. §§ 877, 877.6; *see also Mason & Dixon Intermodal, Inc. v. Lapmaster Int'l LLC*, 632 F.3d 1056, 1061 (9th Cir. 2011) (courts sitting in diversity apply Sections 877 and

877.6, as substantive California law, to good faith settlement determinations).

In determining whether a settlement was reached in good faith under Section 877 and 877.6, a court must consider the factors laid out in *Tech-Bilt, Inc. v. Woodward-Clyde & Assocs.*, 38 Cal. 3d 488 (1985), including: (1) "a rough approximation of the plaintiffs' total recovery and a settlor's proportionate liability"; (2) "the amount paid in settlement"; (3) "a recognition that a settlor should pay less in settlement than if found liable after a trial"; (4) "the allocation of settlement proceeds among plaintiffs"; (5) "the financial conditions and insurance policy limits of settling defendants"; and (6) evidence of "collusion, fraud, or tortious conduct aimed to injure the interests of nonsettling defendants." *Tech-Bilt*, 38 Cal. 3d at 499.  An opposing party must "demonstrate . . . that the settlement is so far 'out of the ballpark' in relation to these factors as to be inconsistent with the equitable objectives of the [joint tortfeasor] statute." *Id.* at 499–500. An evaluation of the factors is to be made based on the information available at the time of settlement.  *Id.* at 499. The court has discretion in determining whether a settlement is made in good faith.  *Id.* at 502.

Although courts have taken different approaches to determining whether the settlement of CERCLA claims is fair and reasonable, a number of courts in the Ninth Circuit have "borrowed" from California law the legal framework for determining whether a settlement has been entered into in good faith within the meaning of California Code of Civil Procedure Sections 877 and 877.6 and as explained in *Tech-Bilt*.  *See Heim*, 2014 WL 1340063, at *3; *Santa Clarita Valley Water Agency v. Whittaker Corp.*, No. 2:18-CV-06825-SB (RAOx), 2020 WL 8125638, at *2 (C.D. Cal. Nov. 16, 2020); *see also Lewis v. Russell*, No. 2:03-CV-02646 WBS AC, 2019 WL 5260731, at *3 (E.D. Cal. Oct. 17, 2019) ("The factors used to evaluate whether a CERCLA settlement is fair, reasonable, and adequate parallel those used to determine whether a settlement is in good faith under California law.").  Other courts have applied the *Tech-Bilt* factors in combination with settlement factors drawn from federal common law in cases involving both CERCLA and California state law claims.  *E.g.*, *San Diego Unified Port Dist.*, 2017

WL 2655285, at *6–10; *Cooper Drum Cooperating Parties Grp. v. Am. Polymers Corp.*, No. CV 19-03007-AB (FFMx), 2020 WL 2504331, at *5–8 (C.D. Cal. May 13, 2020).

"CERCLA specifies an approach for allocating liability to a nonsettling defendant . . . when the federal or state government has incurred recoverable response costs and enters into a settlement agreement," but it "does not specify how a settlement agreement between two private parties[2] affects the liability of nonsettling parties." *AmeriPride Servs. Inc. v. Texas E. Overseas Inc.*, 782 F.3d 474, 486 (9th Cir. 2015) (citing 42 U.S.C. § 9613(f)).  A district court therefore has discretion in choosing to follow the pro tanto approach, under which "the settlement does not discharge the nonsettling tortfeasors but reduces the injured party's claims against them by the dollar value of the settlement," or the proportionate share approach, under which "the settlement does not discharge the nonsettling tortfeasors but reduces the injured party's claims against them by the amount of the settling tortfeasor's proportionate share of the damages," depending on which would be the "most equitable method" in a given case. *Id.* at 483–84, 487–88 (citing Uniform Contribution Among Tortfeasors Act ("UCATA") § 4; Uniform Comparative Fault Act ("UCFA") § 6).  A court therefore may also consider these "competing methods of accounting for a settling party's share when determining the amount of a nonsettling defendant's liability" when determining whether a settlement is fair and reasonable under CERCLA.  *See Coppola*, 2017 WL 4574091 at *3 (quoting *AmeriPride*, 782 F.3d at 483).

## III.   Discussion

### A. Request for Judicial Notice and Objection to Evidence

Movants filed a request for judicial notice and an objection to the Expert Report of Robert Bell ("Bell Report") filed by the Opposing Parties.  ECF Nos. 393-3, 401-2.

\ \ \

---

[2] No party contends that any of the public entities in this case qualify as a "state government" for the purposes of CERCLA.

*i. Judicial notice*

Federal Rule of Evidence 201 provides that a court "may judicially notice a fact that is not subject to reasonable dispute," either because it is (1) "generally known within the trial court's territorial jurisdiction" or (2) "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). A court can therefore "take judicial notice of matters of public record," but "cannot take judicial notice of disputed facts contained in such public records." *Lee v. City of Los Angeles*, 250 F.3d 668, 689 (9th Cir. 2001); *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 999 (9th Cir. 2018). "Just because [a] document itself is susceptible to judicial notice does not mean that every assertion of fact within that document is judicially noticeable for its truth." *Khoja*, 399 F.3d at 999. A court therefore must identify what facts it is judicially noticing from a document. *Id.* Accordingly, the requesting party should accordingly identify what facts within the document it seeks to have judicially noticed. *See Capaci v. Sports Research Corp.*, 445 F. Supp. 3d 607, 617 (C.D. Cal. 2020) ("Because defendant does not identify which facts within the exhibits it asks the court to judicially notice nor does it explain why the court can judicially notice those facts, the court denies defendant's request for judicial notice."); *Riley v. Chopra*, No. CV 18-3371 FMO (SKx), 2020 WL 5217154, at *2 (C.D. Cal. June 19, 2020) (finding requesting party's arguments "unpersuasive" given party's failure to identify what facts were to be judicially noticed).

Movants seek judicial notice of fifteen documents. ECF No. 393-3. They include documents from the Court's docket (*id.* ¶¶ 1, 6, 7, 10, 13, 14); interrogatory responses (*id.* ¶ 11); the *Remedial Investigation/Feasibility Study Report Upper San Marcos Creek Watershed and Lake San Marcos* ("RI/FS") and related attachments (*id.* ¶¶ 2, 3, 9); RI/FS certifications by the remaining Parties (*id.* ¶ 4); the San Diego Regional Water Quality Control Board Approval of the RI/FS (*id.* ¶ 5); an order of the RWQCB (*id.* ¶ 8); and a report titled *Lake San Marcos, A Lake Management and Rehabilitative Investigation* prepared by Orville P. Ball and Associates ("Ball Report") (*id.* ¶ 12).

First, the Court notes that it has no need to judicially notice the existence of its own orders or the parties' filings in this case.  *See Tuan Nguyen v. Aurora Loan Servs., LLC*, No. SA-CV-11-1638-AG (ANx), 2011 WL 13234276, at *2 (C.D. Cal. Dec. 5, 2011) ("[T]he Court need not take judicial notice of filings on its own docket or orders it has previously issued"); *Nanavati v. Adecco*, 99 F. Supp. 3d 1072, 1075 (N.D. Cal. 2015) (declining to take judicial notice of complaint).  The Court accordingly DENIES AS MOOT Movants' request to take judicial notice of these filings.

As for Movants' request that the Court take judicial notice of the City of San Marcos's responses to Hollandia's interrogatories, they have not explained whether they seek judicial notice of the existence of these interrogatory responses or particular facts within the responses.  The content of the interrogatory responses are neither "generally known within the trial court's territorial jurisdiction" nor "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b); *see also Lil' Man In The Boat, Inc. v. City & Cty. of San Francisco*, No. 17-CV-00904-JST, 2019 WL 8263438, at *2 (N.D. Cal. Nov. 6, 2019) (quoting *Hawkins v. California*, No. 1:09-cv-01705-LJO-MS (PC), 2015 WL 2454275, at *2 (E.D. Cal. May 22, 2015)) ("Discovery documents are not generally appropriate candidates for judicial notice."); *Huntzinger v. Aqua Lung Am., Inc.*, No. 15-CV-1146-WQH-AGS, 2018 WL 325024, at *5 (S.D. Cal. Jan. 8, 2018) ("The Court declines to take judicial notice of any discovery responses in this litigation because they are not the proper subject of judicial notice.").

The Court also finds that the content of the RI/FS report and attachments, RI/FS certification letters, and the Ball Report are not proper subjects for judicial notice.  Movants have not explained how the information contained in the reports or attachments "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b).  The RI/FS report indicates that it was authored by a Daniel B. Stephens & Associates, Inc.  ECF No. 393-11.  Movants therefore have not established that the RI/FS, its attachments, or letters supporting the

RI/FS alternatives submitted by the parties are records of an administrative body, as they appear to suggest in their request for judicial notice. ECF No. 393-3 ¶¶ 2, 3, 4 9. In support of their request for judicial notice of the Ball Report, Movants cite cases for the proposition that the Court can take judicial notice of its own records and prior court proceedings. ECF No. 393-3 ¶ 12. The Ball Report is not a Court record.

However, the Court will take judicial notice of the San Diego Regional Water Quality Control Board Approval of the RI/FS, for the fact that the report was approved. "Judicial notice is appropriate for records and reports of administrative bodies." *United States v. 14.02 Acres of Land More or Less in Fresno Cty.*, 547 F.3d 943, 955 (9th Cir. 2008) (citation omitted); *see also Comm. to Protect our Agric. Water v. Occidental Oil & Gas Corp.*, 235 F. Supp. 3d 1132, 1153 (E.D. Cal. 2017) (taking judicial notice of state agency publications). The Court does not take judicial notice of the RWQCB order at this time because it is not necessary for the resolution of this motion.

However, just because the Court does not judicially notice of some documents does not mean it cannot consider them in its good faith settlement determination. To obtain a good faith settlement determination, the settling parties must present some basis for their claim that the settlement was entered into in good faith, *Brehm Communities v. Superior Court*, 88 Cal. App. 4th 730, 736 (2001), as modified (May 22, 2001)), which can be rebutted by evidence presented by the parties opposing settlement, *Tech-Bilt*, 38 Cal. 3d at 499–500 (citing Cal. Code Civ. P. § 877.6(d)) (noting that parties opposing settlement bear the ultimate burden of showing a lack of good faith). As County, San Marcos, and Escondido have not objected to the Court's consideration of the evidence, the Court finds that it is appropriate to consider the reports and other documents Movants provide in support of the Motion, although it will not take judicial notice of the facts within them except as noted above.

*ii. Evidentiary objection*

Movants contend that the Bell Report cannot be considered in determining whether this settlement was agreed to in good faith for two reasons. First, Movants argue that the

Bell Report is inadmissible and irrelevant because Mr. Bell's opinions were not available at the time of settlement.  Second, Movants argue that the Bell Report is inadmissible as expert opinion under *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993).

In *Tech-Bilt*, the court noted that "practical considerations obviously require that the evaluation be made on the basis of information available at the time of settlement." *Tech-Bilt*, 38 Cal. 3d at 499.  A court's task is to determine whether the settlement figure is "grossly disproportionate to what a reasonable person, *at the time of the settlement*, would estimate the settling defendant's liability to be." *Id.* (quoting *Torres v. Union Pacific R.R. Co.*, 157 Cal. App. 3d 499, 509 (1984)) (emphasis added); *cf. Cahill v. San Diego Gas & Elec. Co.*, 194 Cal. App. 4th 939, 968 (2011) (affirming good faith settlement determination made on the basis of information available at the time of settlement in April 2009, even though by January 2010, the time of the good faith settlement determination hearing, plaintiff had developed a new theory of causation that could have rendered settling defendants at greater risk of liability).  "What is brought out about the underlying liability picture during subsequent discovery or trial after that settlement is not relevant to the 'good faith' settlement issue because it could not have been a matter affecting the 'good faith' of the settlor at the time of the settlement." *Fisher v. Superior Court*, 103 Cal. App. 3d 434, 444 (1980).  At the same time, parties must have the ability to present evidence to oppose the settlement. *Tech-Bilt*, 38 Cal. 3d at 499.  Further, "the hallmark of evidence *available* at the time of settlement is not only what the settling parties actually contemplated or actually presented to the court in seeking a good faith determination; available evidence also encompasses what the parties should have known." *Singer Co. v. Superior Court*, 179 Cal. App. 3d 875, 896 (1986) (emphasis in original).  Thus, an expert declaration rebutting the evidence relied upon by the settling parties or interpreting evidence available at the time of settlement, even though drafted after the time of settlement, would likely be appropriately considered by the Court.  However, a declaration undertaking completely new and original analysis, supplying information that settling parties should not reasonably have known about at the

10

time of settlement, may not be appropriately considered "information available at the time of the settlement." *Tech-Bilt*, 38 Cal. 3d at 499.

The Bell Report—presented here as comprising both the initial expert report, dated December 18, 2020, and rebuttal report, dated January 27, 2021—had not been provided at the time the settlement was reached or the Motion was filed.  ECF No. 400-2 ("Bell Report").  The question, therefore, is whether the Bell Report merely offers a competing analysis of the information available at the time of settlement, or whether it should be considered new evidence that could not have been factored in to the determination of "what a reasonable person, at the time of the settlement, would [have] estimate[d] the settling defendant's liability to be." *Id.*  There is reason to conclude that some of the information in the Bell Report was not available at the time of the settlement.  In particular, Bell's opinion leading to his calculation that Vallecitos is responsible for 35% of the phosphorous contamination, is based on original analysis and modeling, which do not appear to be bases for the RI/FS or other prior investigations of contributions to the Site.  *See* Bell Report at 38–44.  However, other parts of the Bell Report cited by Opposing Parties, such as those that question the frequency of Vallecitos's inspection of its pipes or the location of its pipes with respect to the water table, appear to be based on information regarding Vallecitos's own practices and publicly available information from the RWQCB, which presumably were available to the parties at the time of settlement. *See id.* at 94.  Accordingly, whether the information in the Bell Report as a whole should be considered available at the time of the settlement is not clear.

Therefore, for the purposes of its analysis below, the Court presumes the admissibility of the Bell Report and considers it in conjunction with the other evidence provided.[3]

\ \ \

\ \ \

---

[3] Thus, the Court does not reach Movants' arguments under *Daubert*.

### B. Good Faith Settlement Determination Under *Tech-Bilt*

*i. Settlement terms*

Under the terms of the settlement, Vallecitos has agreed to pay $1 million towards remediation costs.  ECF No. 393-9 ("Settlement Agreement") at 4.  Additionally, Vallecitos has agreed to pay $83,035.88 towards additional investigative and regulatory oversight costs.  *Id.* at 3–4.  In exchange, the settlement agreement provides for dismissal with prejudice of claims by and against Vallecitos in this action, and is conditioned on the Court entering an order barring claims for contribution and indemnity relating to the Site.[4]  *Id.* at 6–7.  Movants do not contend that the settlement value should be considered greater than the amount allocated to remediation and investigative and oversight costs.

*ii. Approximation of potential recovery and proportionate liability and recognition that settling defendant should pay less than should it proceed to trial*

To meet the standard of "good faith," the amount of the settlement must be "within the reasonable range of the settling tortfeasor's proportional share of comparative liability for the plaintiff's injuries."  *Tech-Bilt*, 38 Cal. 3d at 499; *see also Torres v. Union Pac. R. Co.*, 157 Cal. App. 3d 499, 509 (1984) (holding that "a co-defendant's settlement price cannot be grossly disproportionate to his fair share of the damages").  The Court must therefore determine the approximate potential total recovery, and Vallecitos's approximate share of the potential liability.

#### 1.  Approximation of potential total recovery

In determining the total potential recovery for the purposes of evaluating a settlement under *Tech-Bilt*, the court makes a "rough approximation of what plaintiff would actually recover."  *West v. Superior Court*, 27 Cal. App. 4th 1625, 1636 (1994).  Plaintiff's claim for damages is not determinative.  *Id.*

Under CERCLA, "a private party may 'recover expenses associated with cleaning up contaminated sites.'"  *City of Colton v. Am. Promotional Events, Inc.-W.*, 614 F.3d

---

[4] In this order, the term "Site" has the same meaning as used in the Settlement Agreement.

998, 1002 (9th Cir. 2010) (quoting *United States v. Atl. Research Corp.*, 551 U.S. 128, 131 (2007)).  Movants contend that the approximate total remediation costs would amount to $12,424,217.85 in present-day dollars, based on the five preferred alternatives for the remediation of the Lake set forth in the RI/FS.  ECF No. 393-1 (citing RI/FS at 242).  Opposing Parties state that CDC's recovery claim totals at least $23,308,440.  ECF No. 400 at 13.  However, Opposing Parties do not indicate that they actually consider CDC likely to recover its entire claim for damages, and have not otherwise identified what they regard as CDC's approximate potential recovery.  Indeed, one of the reports filed by Opposing Parties estimates the response costs to be significantly lower than those proposed by CDC's expert and much closer to the RI/FS calculation of the costs for the preferred alternatives.  ECF No. 400-1 at 30.  For the purposes of this Motion, the Court therefore accepts the remediation costs figure provided by Movants based on the RI/FS as a "rough approximation of what plaintiff would actually recover"[5] for response costs.[6] *West*, 27 Cal. App. 4th at 1636.

### 2.  Vallecitos's estimated proportionate liability

The Court turns to each parties' contentions regarding Vallecitos's approximate proportionate liability.  Movants argue that the apportionment of liability between all parties would likely be determined based upon the "Gore Factors," and that consideration of those factors would militate in favor of the settlement because Vallecitos makes only

---

[5] Opposing parties do note in a footnote that the RWQCB has not yet considered what permanent remedy to approve, and thus that future cost of the remedy is not clear and "the CERCLA claim may not be ripe for adjudication."  ECF No. 400 at 5 n.1.  However, the Court's determination of whether a settlement was agreed upon in good faith rests on the facts available at the time of the settlement, and opposing parties do not approximate a different amount that CDC is likely to recover.

[6] Opposing Parties also include CDC's claims for lost business and lake expenses in their calculation of CDC's claimed damages, but do not explain to what extent these claimed damages should be considered in the "rough approximation of what [CDC] would actually recover."  Opposing Parties also reference CDC's RCRA claim.  However, several courts have found the RCRA does not provide a right to contribution, which would render Sections 877 and 877.6 inapplicable to the settlement of those claims.  *See, e.g.*, *Tyco Thermal Controls LLC v. Redwood Indus.*, No. C 06-07164 JF PVT, 2010 WL 3211926, at *12 (N.D. Cal. Aug. 12, 2010).

1    minor contribution to the Lake contamination and has maintained a high degree of care.

2    ECF No. 393-1 at 22–23.  Opposing Parties do not address what standard would apply to

3    determine each party's proportionate share of liability but argue that Vallecitos's

4    proportionate share of liability is much larger than Movants suggest, given the Bell

5    Report's opinion that 35 percent of the phosphorous[7] arriving at the lake came from

6    Vallecitos's sewer system.  ECF No. 400 at 16.

7         Under CERCLA, "the court may allocate response costs among liable parties using

8    such equitable factors as the court determines are appropriate."  42 U.S.C. § 9613(f)(1).

9    Some courts consider the Gore Factors, named after a proposed amendment to CERCLA

10   that was rejected by Congress.  *Boeing Co. v. Cascade Corp.*, 207 F.3d 1177, 1187 (9th

11   Cir. 2000).  "The Gore Factors are: '(1) the ability of the parties to demonstrate that their

12   contribution to a discharge, release or disposal of a hazardous waste can be distinguished;

13   (2) the amount of the hazardous waste involved; (3) the degree of toxicity of the

14   hazardous waste involved; (4) the degree of involvement by the parties in the generation,

15   transportation, treatment, storage, or disposal of the hazardous waste; (5) the degree of

16   care exercised by the parties with respect to the hazardous waste concerned, taking into

17   account the characteristics of such hazardous waste; and (6) the degree of cooperation by

18   the parties with Federal, State, or local officials to prevent any harm to the public health

19   or the environment.'"  *TDY Holdings, LLC v. United States*, 885 F.3d 1142, 1146 n.1 (9th

20   Cir. 2018) (quoting *Kerr-McGee Chem. Corp. v. Lefton Iron & Metal Co.*, 14 F.3d 321,

21   326 n.4 (7th Cir. 1994)).  However, district courts are not limited to consideration of

22   these factors and can allocate response costs using other equitable factors as they deem

23   appropriate.  *Boeing*, 207 F.3d at 1187.

24        Movants contend that all of the Gore Factors indicate Vallecitos would be

25   

26   ───────────────────

27   [7] Opposing Parties' response argues that Vallecitos is responsible for 35 percent of the loading within
     the Watershed. The Court notes that the Bell Report's findings discuss only Vallecitos's potential
     phosphorous contributions, whereas the RI/FS indicates that the Lake also has other contaminants in

28   need of remediation in addition to phosphorous.  RI/FS at 285–92.

equitably allocated only a small percentage of the costs.  ECF No. 393-1 at 22.
Specifically, they argue that, relevant to the second factor, the RI/FS concluded that
Vallecitos Sanitary Sewer Spills ("SSOs") contributed only minor amounts of nutrient to
the Creek and Lake compared to other Watershed contributors.  *Id.*  Movants also argue
that (1) the RI/FS found that groundwater was likely a minor source of nutrient
contribution to the Lake and (2) significant exfiltration of sewage from Vallecitos's pipes
into the groundwater is unlikely due to the high water table within two miles of the Lake,
suggesting that exfiltration from Vallecitos's pipes did not significantly contribute to the
nutrient load of the Lake.  *Id.* at 22–23.  Additionally, as to the third and fifth Gore
Factors, Movants contend that it is undisputed that Vallecitos is not responsible for urban
surface water runoff discharges into the Watershed and that Vallecitos has established a
high degree of care.  *Id.* at 23.  Movants argue that the $1 million settlement amount
constitutes about 8% of the total estimated cost to implement over 30 years the five
preferred remedial alternatives proposed in the RI/FS, which is "more than adequate"
considering Vallecitos's potential share of liability.  *Id.*

Opposing Parties do not contend that Vallecitos SSOs are responsible for
significant contamination to the Lake, but instead argue that exfiltration from Vallecitos's
pipes is a much greater source of nutrient contribution than represented by Movants.
Relying on the Bell Report, Opposing Parties argue that 914 kilograms per year or 35
percent of the phosphorous loading within the Watershed is attributable to Vallecitos's
leaky sewers.  ECF No. 400 at 7, 11.  Opposing Parties further state that evidence
undermines Movants' assertion that a hydrostatic barrier would prevent exfiltration from
most of Vallecitos's pipes.  *Id.* at 12.  Opposing Parties also contend that Vallecitos has
not taken a high degree of care in preventing these phosphorous contributions, as
evidenced by Vallecitos's ten-year inspection cycle.  *Id.*

The Court reiterates its concern that at least some of the findings of the Bell Report
constitute evidence that was not available in November 2020, when the settlement
between Movants was reached.  But even when taking the Bell Report into account, there

appears to be a legitimate dispute as to Vallecitos's contributions to the contamination of the Lake and Creek.  Based on the evidence presented by all parties, Vallecitos's level of contribution of phosphorous through exfiltration is still far from definitively established, as both sides' experts hotly contest the methodology relied upon by the opposite side's expert to calculate the likelihood of exfiltration from Vallecitos's pipes.  ECF No. 401-2 at 6–8; ECF No. 400 at 12.  Further, the RI/FS's conclusion that groundwater was likely not a significant contributor to the nutrient loading to the Lake, as well as the absence of any discussion of exfiltration from the RI/FS—the result of a multiyear undertaking engaged in by all parties that examined numerous potential sources of contamination to the Lake and Creek—reinforces the possibility that Vallecitos could ultimately be found to have contributed only a small proportion of the contamination.  *See* RI/FS at 232.  As *Tech-Bilt* suggested, the Court will not adopt an interpretation of "good faith" that "would tend to convert the pretrial settlement approval procedure into a full-scale mini-trial."  *Tech-Bilt*, 38 Cal. 3d at 499.  The Court therefore need not definitively determine which side's experts will carry the day, so long as evidence supports Movants' assertion that the settlement amount is within the range of Vallecitos's potential liability.

The Court therefore finds that based on the information available at the time of settlement, $1 million, or approximately 8% of the total approximate recovery, is "within the reasonable range of [Vallecitos's] proportional share of comparative liability for" remediation costs.  *Tech-Bilt*, 38 Cal. 3d at 499.  Even if the Court considers the Bell Report and determines that Vallecitos may ultimately be found responsible for a greater proportion of the discharge of phosphorous, the fact that the 8% figure is at the lower end of the range of possible recovery is not inconsistent with the *Tech-Bilt* factors.  *Tech-Bilt*, 38 Cal. 3d at 499 (courts determining good faith should recognize "that a settlor should pay less in settlement than he would if he were found liable after a trial"); *Abbott Ford, Inc. v. Superior Court*, 43 Cal. 3d 858, 874 (1987) ("[A] 'good faith' settlement does not call for perfect or even nearly perfect apportionment of liability.").

The Court therefore finds that Opposing Parties have not met their burden of

12CV00334 GPC KSC

showing that the approximately $1 million provided for in the settlement agreement would be "so far 'out of the ballpark'" of Vallecitos's potential share of liability that the settlement would be inequitable.  *Tech-Bilt*, 38 Cal. 3d at 499–500.

        *iii. Other* Tech-Bilt *factors*

        Opposing Parties do not argue that the other *Tech-Bilt* factors, such as the allocation of the settlement proceeds, the financial condition and insurance policy limits of Vallecitos, or the possibility of collusion, fraud, or tortious conduct weigh against a good faith settlement determination.  Additionally, upon independent review, the Court finds that Movants have demonstrated that these factors support a finding that the settlement was entered into in good faith.  There is no issue regarding allocation because the settlement is mainly to be allocated to remedial actions at the Site, while the remaining will be put towards investigative and regulatory oversight costs.  Vallecitos also states it is directly paying a significant portion of the settlement from pooled self-insurance funds due to coverage disputes, and that the settlement is fair considering the limited private insurance funds available.  ECF No. 393-1 at 24–25.  Lastly, the Court is satisfied that the settlement agreement is the result of arm's-length negotiations over the course of nearly a decade of litigation, and that there is no evidence that Movants engaged in any collusion, fraud, or other tortious conduct in coming to this agreement.

        Accordingly, the Court finds that upon review of the *Tech-Bilt* factors, the settlement agreement was arrived at in good faith.

## C. Determination of Whether Settlement is Fair, Reasonable, and Consistent with Purposes of CERCLA

        Courts have often approved of settlements and bar orders upon determination that "the proposed settlement is fair, reasonable, and consistent with the purposes that CERCLA is intended to serve," drawing from the standard courts apply in evaluating proposed consent decrees under CERCLA.  *Cooper Drum*, 2020 WL 2504331, at *4 (quoting *Rev 973, LLC v. Mouren-Laurens*, No. CV 98–10690 DSF (Ex), 2016 WL 9185139, at *1 (C.D. Cal. July 1, 2016)); *see also United States v. Montrose Chem. Corp.*

*of Cal.*, 50 F.3d 741, 746 (9th Cir. 1995); *Coppola*, 2017 WL 4574091, at *2.   Here, for the reasons set forth more fully above, the settlement is substantively and procedurally fair.  *See San Diego Unified Port Dist.*, 2017 WL 2655285, at *6–7 (citing *Arizona v. City of Tucson*, 761 F.3d 1005, 1012 (9th Cir. 2014)).  The settlement was arrived at after years of litigation and mediation, and sufficient formal discovery and independent investigation had occurred at the time of settlement to provide Movants with a basis from which they could approximate Vallecitos's proportionate share of liability.  *Cf. id.* ("[B]ecause all of the parties had ample opportunity to investigate the contamination and because they negotiated the settlement at arm's length, the Court concludes the settlement is procedurally fair.").  The settlement also minimizes prejudice to the non-settling parties because the amount to be paid by Vallecitos is within the range of its likely ultimate proportionate share of the fault for the Lake contaminants, based on the available evidence.  *See City of Tuscon*, 761 F.3d at 1012 ("[I]n order to approve a CERCLA consent decree, a district court must find that the agreement is "based upon, and roughly correlated with, some acceptable measure of comparative fault, apportioning liability among the settling parties according to rational (if necessarily imprecise) estimates of how much harm each [potentially responsible party] has done.").

Additionally, the settlement furthers the purposes of CERCLA.  "[O]ne of the core purposes of CERCLA is to foster settlement through its system of incentives and without unnecessarily further complicating already complicated litigation."  *Chubb Custom Ins. Co. v. Space Sys./Loral, Inc.*, 710 F.3d 946, 971 (9th Cir. 2013) (quoting *California Dep't of Toxic Substances Control v. City of Chico, Cal.*, 297 F. Supp. 2d 1227, 1235 (E.D. Cal. 2004)); *see also San Diego Unified Port Dist.*, 2017 WL 2655285, at *5 ("[O]ne of CERCLA's purposes is to encourage settlement through providing contribution protection—that is, preventing settling parties from being later sued for contribution by other joint tortfeasors.").  After approximately nine years of litigation, mediation, and settlement discussions, this purpose of CERCLA is certainly served by settlement at this stage of proceedings.  And as noted above, the $1 million Vallecitos has agreed to pay

18

towards remediation of the Lake and Creek approximates its proportionate share of liability and thus furthers the purpose of ensuring potentially responsible parties are allocated an equitable share of response costs.  *See* 42 U.S.C. § 9613(f).

The Court therefore finds that the settlement is fair, reasonable, and adequate, and is consistent with the purposes of CERCLA.

### D. Method of Accounting for Settlements

"[A] a district court has discretion under § 9613(f)(1) to determine the most equitable method of accounting for settlements between private parties in a contribution action." *AmeriPride*, 782 F.3d at 487.  Courts typically choose between the pro tanto approach and the proportionate share approach, "competing methods of accounting for a settling party's share when determining the amount of a nonsettling defendant's liability." *Id.* at 484.

Here, the terms of the settlement agreement do not provide for any particular method of accounting.  *See* ECF No. 393-9 at 7.  Movants also did not request that the Court apply the pro tanto approach in their moving papers. *See* ECF No. 393-1.  Instead, Movants raised the issue on reply, ECF No. 401, and Opposing Parties thus had no opportunity to respond.  Accordingly, because the Court "need not consider arguments raised for the first time in a reply brief," the Court will not consider whether the pro tanto approach must be followed here.  *See Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007).  However, Opposing Parties have also failed to adequately demonstrate that the proportionate share approach would be the most equitable method of accounting at this juncture.  As noted above, the Court finds the settlement is in good faith, fair, and reasonable because the agreement requires Vallecitos to pay an amount not incommensurate with its likely proportionate liability.  Thus, based on the information available at the time of the settlement, the Court finds that the settlement would not unfairly prejudice Opposing Parties regardless of what method of allocation applies.

Therefore, it is sufficient at this stage for the Court to find that settlement is not conditioned on the Court's adoption of any particular method of accounting.  The Court

thus does not reach the issue of what method of accounting would be the most equitable.

## IV.   Conclusion

The Court hereby **ORDERS** as follows:

1.   The Motion is GRANTED;

2.   The Settlement Agreement and Mutual Release ("Settlement Agreement") reached by the Parties with respect to Vallecitos Water District which is the subject of the Motion is in good faith, fair, reasonable, and consistent with the intent of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9601, *et seq.* and California Code of Civil Procedure ("CCP") §§ 877 and 877.6;

3.   Pursuant to the Settlement Agreement, CERCLA, and CCP § 877, *et seq.*, the Parties and their respective insurers and public agency liability pools are hereby discharged from all liability for claims for contribution or indemnity arising from any alleged past negligence, act, omission, or misconduct of Vallecitos Water District in connection with the Site and the subject matter of this litigation. This discharge of liability shall not apply to any claims by and between the Parties which were expressly excluded from the releases they granted to each other as set forth in section 4.B.(ii) of the Settlement Agreement.

4.   All claims, counterclaims and cross-claims asserted in the action by CDC and the Public Entities[8] against Vallecitos Water District, and all claims, counterclaims and cross-claims asserted in the action by Vallecitos Water District against CDC and the Public Entities, are hereby dismissed with prejudice, with the Parties each bearing their own attorneys' fees and costs.

5.   The Vallecitos LSM Settlement Trust shall be established as either a "Designated Settlement Fund" or a "Qualified Settlement Fund" pursuant to

---

[8] County, San Marcos, Escondido are hereinafter collectively referred to as the "Public Entities."

12CV00334 GPC KSC

Section 468B of the Internal Revenue Code, 26 U.S.C. § 468B, and the regulations promulgated pursuant thereto and codified at 26 C.F.R. § 1.468B, and in accordance with the terms and conditions of the Settlement Agreement.

**IT IS SO ORDERED.**

Dated:  February 11, 2021

Hon. Gonzalo P. Curiel
United States District Judge

21